## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

NOX MEDICAL EHF,

Plaintiff,

v.

Civil Action No. 15-709-RGA

NATUS NEUROLOGY INC.,

Defendant.

## MEMORANDUM OPINION

Bindu A. Palapura, Esq., POTTER, ANDERSON & CORROON, Wilmington, Delaware; Chad E. Nydegger, Esq. (argued), Brent P. Lorimer, Esq., WORKMAN NYDEGGER, Salt Lake City, Utah.

Attorneys for Plaintiff.

Arthur G. Connolly, III, Esq., CONNOLLY GALLAGHER LLP, Wilmington, Delaware; Thomas S. Reynolds, Esq. (argued), Jeremy Adelson, Esq. (argued), HANSEN REYNOLDS DICKINSON & CRUEGER LLC, Milwaukee, Wisconsin; Joseph J. Jacobi, Esq., HANSEN REYNOLDS DICKINSON & CRUEGER LLC, Chicago, Illinois.

Attorneys for Defendant.

February 3, 2018

ANDREWS, U.S. DISTRICT JUDGE:

Presently before the Court are Defendant's Motion for Summary Judgment of

Invalidity of the Asserted Claims of U.S. Patent 9,059,532 (D.I. 136) and related briefing

(D.I. 137, 157, 175), Plaintiff's Cross-Motion for Summary Judgment of No Invalidity

and for Additional Claim Construction (D.I. 156) and related briefing (D.I. 157, 175,

198), Defendant's Motion to Exclude Opinions of Nox Medical EHF's Retained Expert,

Alan T. Oslan, Pursuant to Federal Rule of Evidence 702 (D.I. 144) and related briefing

(D.I. 145, 179, 200), and Plaintiff's Motion to Exclude Certain Opinions and Testimony

of Dr. Justin Williams That the Claims of U.S. Patent No. 9,059,532 are Invalid (D.I.

154) and related briefing (D.I. 155, 177, 202). I held oral argument on January 9, 2018.

(D.I. 224).

For the reasons that follow, the Court will **DENY** Defendant's Motion for

Summary Judgment of Invalidity (D.I. 136); **DENY** in part and **GRANT** in part

Plaintiff's Cross-Motion for Summary Judgment of No Invalidity and for Additional

Claim Construction (D.I. 156); **DENY** Defendant's Motion to Exclude Opinions of Nox

Medical EHF's Retained Expert, Alan T. Oslan, Pursuant to Federal Rule of Evidence

702 (D.I. 144); and **DENY** in part and **GRANT** in part Plaintiff's Motion to Exclude

Certain Opinions and Testimony of Dr. Justin Williams That the Claims of U.S. Patent

No. 9,059,532 are Invalid (D.I. 154).

## I. BACKGROUND

Defendant has stipulated that certain of its products infringe claims 1, 4, 5, 6, 7, 8,

and 9 of U.S. Patent No. 9,059,532. (D.I. 72). Defendant contends that Claims 1, 6, 7,

and 9 are invalid as anticipated by the Nox RES Belt; claims 4, 5, and 8 are invalid as

2

obvious based on combinations including the Nox RES Belt; and claims 6 and 7 are

invalid under § 112(b) and (d). (D.I. 137 at 8-20).[1]

Claim 1 is an independent claim and reads as follows:

1. An electrode belt and a belt connector for electrically connecting a conductor of the electrode belt to a male portion of a snap connector electrode connected to a biometric device, the belt connector comprising:

> a molded plastic frame including a receiving hole having radial flexibility, the receiving hole being configured to function as a female snap button fastener for receiving and fastening the frame to a protrusion of the male portion of the snap connector electrode,

> a fastener configured to fasten the frame to a first end of said electrode belt, and

> an engaging member adjacent to said receiving hole, the engaging member engaging the conductor of the electrode belt by the conductor passing through the receiving hole while being wrapped around the engaging member, such that when the male portion of the snap connector electrode penetrates the receiving hole, the conductor is forced into physical contact with at least a lateral surface of the male portion of the snap connector electrode,

> wherein radial flexibility of said receiving hole is achieved by one or more slot[s] extending from said hole, and wherein said receiving hole and one or more slot[s] are formed by at least one elongated member having flexibility transverse to its longitudinal axis, thus imparting flexibility to the width of the hole.

Claims 4 through 9 depend from claim 1. Claim 4 depends from "[t]he electrode

belt and the belt connector of claim 1" and adds "wherein said belt connector comprises a

cover enclosing the frame, which cover either includes a hole overlapping the receiving

hole of the frame, or can be readily perforated by pressing the connector onto a male

fastener which fits the receiving hole of the frame." Claim 5 depends from "[t]he

---

[1] All asserted claims are challenged as obvious in a PTAB Trial initiated on March 23, 2017. IPR 2016-01822. The argument there does not rely upon the Nox RES Belt.

3

electrode belt and the belt connector of claim 4" and adds "wherein said cover is selected from the group consisting of a folded paper, plastic or fabric sticker, a plastic envelope and a textile envelope." Claim 6 depends from "[t]he electrode belt and the belt connector of claim 1" and adds "wherein said fastening means comprise a slot with a row of teeth, pins or hooks transverse to the belt direction, to engage a belt end." Claim 7 depends from "[t]he electrode belt and the belt connector of claim 1" and adds "wherein said fastening means comprise a ridge member of row of pins which lies transverse to the belt direction and to which a belt end can be fastened onto with heat melting or gluing." Claim 8 depends from "[t]he electrode belt and the belt connector of claim 1" and adds "wherein said belt connector comprises an adjustment slot with teeth, pin or hook members, through which slot a loop of desired length of said belt can be inserted, to adjust and fix the length of the belt." Claim 9 depends from "[t]he electrode belt and the belt connector of claim 1" and adds "wherein said belt is a flexible textile belt with an electrode wire interwoven in the belt or laminated between two layers of the belt." (D.I. 138-1, Exh. A).

## II.   LEGAL STANDARD

### A.   Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of proving the absence of a genuinely disputed material fact relative to the claims in question. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury

4

to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).

## B.    Claim Construction

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (internal quotation marks omitted). "'[T]here is no magic formula or catechism for conducting claim construction.' Instead, the court is free to attach the appropriate weight to appropriate sources 'in light of the statutes and policies that inform patent law.'" *SoftView LLC v. Apple Inc.*, 2013 WL 4758195, at *1 (D. Del. Sept. 4, 2013) (quoting *Phillips*, 415 F.3d at 1324) (alteration in original). When construing patent claims, a court considers the literal language of the claim, the patent specification, and the prosecution history. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977–80 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Of these sources, "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (internal quotation marks omitted).

"[T]he words of a claim are generally given their ordinary and customary meaning. . . . [Which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312–13 (citations and internal quotation marks

5

omitted). "[T]he ordinary meaning of a claim term is its meaning to [an] ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314.

When a court relies solely upon the intrinsic evidence—the patent claims, the specification, and the prosecution history—the court's construction is a determination of law. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015). The court may also make factual findings based upon consideration of extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317–19. Extrinsic evidence may assist the court in understanding the underlying technology, the meaning of terms to one skilled in the art, and how the invention works. *Id.* Extrinsic evidence, however, is less reliable and less useful in claim construction than the patent and its prosecution history. *Id.*

"A claim construction is persuasive, not because it follows a certain rule, but because it defines terms in the context of the whole patent." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows that "a claim interpretation that would exclude the inventor's device is rarely the correct interpretation." *Osram GMBH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007) (citation omitted).

6

## C.    Invalidity Under 35 U.S.C. § 102

"To show that a patent claim is invalid as anticipated, the accused infringer must show by clear and convincing evidence that a single prior art reference discloses each and every element of a claimed invention." *Silicon Graphics, Inc. v. ATI Tech., Inc.*, 607 F.3d 784, 796 (Fed. Cir. 2010). "[E]very element of the claimed invention [must be described], either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation." *Callaway Golf Co. v. Acushnet Co.*, 576 F.3d 1331, 1346 (Fed. Cir. 2009). As with infringement, the court construes the claims and compares them against the prior art. *See Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1332 (Fed. Cir. 2010). "While anticipation is a question of fact, it may be decided on summary judgment if the record reveals no genuine dispute of material fact." *Encyclopaedia Britannica, Inc. v. Alpine Elecs. of Am., Inc.*, 609 F.3d 1345, 1349 (Fed. Cir. 2010).

## D.    Invalidity Under 35 U.S.C. § 103

A patent claim is invalid as obvious under 35 U.S.C. § 103 "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. § 103; *see also KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406–07 (2007). "Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined." *KSR*, 550 U.S. at 406 (internal citation omitted).

7

A court is required to consider secondary considerations, or objective indicia of nonobviousness, before reaching an obviousness determination, as a "check against hindsight bias." *See In re Cyclobenzaprine Hydrochloride Extended–Release Capsule Patent Litig.*, 676 F.3d 1063, 1078–79 (Fed. Cir. 2012). "Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented." *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17–18 (1966). Where "the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent in light of these factors, summary judgment is appropriate." *KSR*, 550 U.S. at 427.

## E.    Invalidity Under 35 U.S.C. § 112(b)

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014).

## F.    *Daubert*

Federal Rule of Evidence 702 sets out the requirements for expert witness testimony and states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Third Circuit has explained:

8

Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit. Qualification refers to the requirement that the witness possess specialized expertise. We have interpreted this requirement liberally, holding that "a broad range of knowledge, skills, and training qualify an expert." Secondly, the testimony must be reliable; it "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his o[r] her belief. In sum, *Daubert* holds that an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity." Finally, Rule 702 requires that the expert testimony must fit the issues in the case. In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact. The Supreme Court explained in *Daubert* that "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."

By means of a so-called "*Daubert* hearing," the district court acts as a gatekeeper, preventing opinion testimony that does not meet the requirements of qualification, reliability and fit from reaching the jury. *See Daubert* ("Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a) [of the Federal Rules of Evidence] whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.").

*Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404-05 (3d Cir. 2003) (footnote and

internal citations omitted).[2]

## III.  DISCUSSION

### A.  Claim Construction

1.  "the receiving hole being configured to function as a female snap button fastener for receiving and fastening the frame to a protrusion of the male portion of the snap connector electrode"

    i.  *Plaintiff's proposed construction*:

---

[2] The Court of Appeals wrote under an earlier version of Rule 702, but the recent amendments to it were not intended to make any substantive change.

> Plain and ordinary meaning: The plastic defining the receiving hole must be able to receive and fasten to a protrusion of the male portion of the snap connector electrode for which the belt connector has been designed. (D.I. 157 at 18-24; D.I. 198 at 4-7). In doing so, the receiving hole must function like a "female snap button fastener." (D.I. 138-4 at ¶ 136).

  ii. *Defendant's proposed construction:*

> Plain and ordinary meaning: A roughly cylindrical space configured to or capable of functioning as a female snap button fastener. (D.I. 78 at 7 (Court defining "receiving hole"); D.I. 175 at 13).

  iii. *Court's construction:* The plastic defining the receiving hole must be able to receive and fasten to a protrusion of the male portion of the snap connector electrode for which the belt connector has been designed.

The parties submitted claim construction proposals on January 18, 2018. (D.I. 226).

Claim 1 of the '532 patent requires, among other things, a "receiving hole being configured to function as a female snap button fastener for receiving and fastening the frame to a protrusion of the male portion of the snap connector electrode."

This limitation of claim 1 does not require merely any "female snap button fastener." Rather, the plain language of claim 1 indicates that the "receiving hole" itself, as opposed to a wire spring loop or some other device, must be configured to function as a "female snap button fastener for receiving and fastening the frame to a protrusion of the male portion of the snap connector electrode." Furthermore, the claim requires that the "receiving hole" has "radial flexibility." Unless the plastic defining the "receiving hole" itself "receiv[es] and fasten[s] the frame to" the electrode, the "radial flexibility" limitation adds nothing to the claim. Accordingly, the plastic defining the receiving hole

10

must itself be able to receive and fasten to "a protrusion of the male portion of the snap connector electrode."

Claim 1 further requires that the receiving hole receives and fastens the frame specifically to the male snap electrode for which the belt connector has been designed. The claim requires that the "receiving hole" is "configured to function as a female snap button fastener for receiving and fastening the frame [of the belt connector] to a protrusion of *the* male portion of *the* snap connector electrode." (Emphasis added). This limitation therefore refers to the preamble, which covers, "An electrode belt and a belt connector for electrically connecting a conductor of the electrode belt to *a male portion of a snap connector electrode connected to a biometric device*." (Emphasis added). Therefore, the receiving hole must be capable of "receiving and fastening the frame" to that electrode, for which the belt connector has been designed.

In light of both requirements, I construe the term to require that "the plastic defining the receiving hole must be able to receive and fasten to a protrusion of the male portion of the snap connector electrode for which the belt connector has been designed."

2. "elongated member"

   i. *Plaintiff's proposed construction*:

      Plain and ordinary meaning: A distinct portion of the molded plastic frame that is longer than it is wide. (D.I. 157 at 28-30; D.I. 198 at 9-10).

   ii. *Defendant's proposed construction:*

      Plain and ordinary meaning: A structure that is longer than it is wide. (D.I. 175 at 14).

   iii. *Court's construction:* Structure that is longer than it is wide.

11

The parties agree that an "elongated member" is "longer than it is wide." (D.I. 226). They disagree as to whether it is "a distinct portion of the molded plastic frame."

Claim 1 specifies that an elongated member "ha[s] flexibility transverse to its longitudinal axis, thus imparting flexibility to the width of the hole." The specification further provides that this "flexibility" must be "sufficient" for the hole "to function as a female snap fastener." ('532 patent at 5:18-20).

The '532 patent's claim language and specification do not teach that an "elongated member" must be "distinct," nor do they give any indication as to how a "distinct" member might distinguished from a "non-distinct" member. Rather, the patent specification provides two embodiments of the invention, which include "elongated members" that Plaintiff argues are "distinct." (D.I. 138-1, Exh. A at 4-7; D.I. 157 at 28-30).

The Federal Circuit has "cautioned against reading limitations into a claim from the preferred embodiment described in the specification, even if it is the only embodiment described." *In re Am. Acad. of Sci. Tech Ctr.*, 367 F.3d 1359, 1369-70 (Fed. Cir. 2004). Here, any disclosure that an "elongated member" must be "distinct" appears in a preferred embodiment of the patent, as opposed to a teaching. Furthermore, even within those embodiments, there is no direct indication that the elongated members are "distinct," nor is there a workable definition of "distinct." Accordingly, Plaintiff's proposed "distinct" limitation cannot be read into claim 1 of the '532 patent.

I instead adopt the parties' agreed-upon requirement that an "elongated member" is a "structure that is longer than it is wide" as my construction.

3. "a conductor of the electrode belt"

12

i. *Plaintiff's proposed construction*:

> Plain and ordinary meaning: A wire that is at least partially located in the electrode belt, of which the belt connector is not a part. A wire that is located wholly outside of the electrode belt (e.g. located only in the belt connector) does not qualify. (D.I. 157 at 25-27; D.I. 198 at 7-9).

ii. *Defendant's proposed construction:*

> Plain and ordinary meaning: A conductor associated with, related to, belonging to, etc., the electrode belt, of which the connector is a part. (D.I. 175 at 42).

iii. *Court's construction ("electrode belt")*: The electrode belt and the belt connector are different parts of the claimed invention.

iv. *Court's construction ("a conductor of the electrode belt"):* A "conductor of the electrode belt" is a conductor that is at least partially located in the electrode belt.

The preamble of claim 1 of the '532 patent explains that the invention is, "An electrode belt and a belt connector for electrically connecting a conductor of the electrode belt to a male portion of a snap connector electrode connected to a biometric device." The claim then sets forth requirements for the "belt connector," namely, that the "engaging member engag[es] the conductor of the electrode belt by the conductor passing through the receiving hole while being wrapped around the engaging member, such that when the male portion of the snap connector electrode penetrates the receiving hole, the conductor is forced into physical contact with at least a lateral surface of the male portion of the snap connector electrode." ('532 patent, claim 1).

The parties' disagreement centers on whether the term "electrode belt" must encompass the "belt connector." (D.I. 175 at 42; D.I. 198 at 25-27).

The '532 patent claims refer to the "electrode belt" and "belt connector" as separate entities. Thus, Plaintiff argues, the "connector" is not part of the "electrode

13

belt." (D.I. 198 at 25-27). However, Defendant argues that the '532 patent at times uses the terms "belt" and "electrode belt" to refer to the entire assembly, including both the "belt connector" and belt material, and that Plaintiff's expert does the same. (D.I. 175 at 42).

By covering both an "electrode belt" and a "belt connector," the language of independent claim 1 and dependent claims 2-9 indicates that the "electrode belt" and "belt connector" are different parts of the claimed invention. ('532 patent, claims 1-9). Figures 2A, 2B, and 2C "illustrate a belt connector and connected belt," further indicating that the "electrode belt" and the "belt connector" are different entities. ('532 patent, Figs. 2A-2C, 2:9-10). I therefore construe "electrode belt" to clarify that the electrode belt and the belt connector are different parts of the claimed invention.

The parties' constructions indicate that they essentially agree that the "conductor of the electrode belt" must be at least partially located in the "electrode belt." Thus, I construe "conductor of the electrode belt" to be conductor that is at least partially located in the "electrode belt."

My construction does not necessarily exclude the possibility that a wire that is located wholly outside of the electrode belt, but is soldered to the wire that runs through the electrode belt, is part of the "conductor." That is a question for the jury.

**B.     Nox RES Belt**

Defendant argues that claim 1 of the '532 patent is anticipated by the Nox RES Belt. (D.I. 137 at 15). Claim 1 requires a "receiving hole being configured to function as a female snap button fastener for receiving and fastening the frame to a protrusion of the male portion of the snap connector electrode." I construed this limitation to require that

14

the "plastic defining the receiving hole must be able to receive and fasten to a protrusion of the male portion of the snap connector electrode for which the belt connector has been designed."

Plaintiff asserts that the Nox RES Belt does not embody the "receiving hole" requirement, as the plastic defining the receiving hole does not itself fasten to a protrusion of the male portion of the snap connector electrode for which the belt connector has been designed. Instead, Plaintiff argues, a wire spring loop performs the fastening, and absent its presence, "the female plastic connector simply falls off the male snap electrode when it is turned upside down; the female snap does not exert any retention force on the male snap," indicating that the hole itself does not perform any fastening function. (D.I. 157 at 18-25; D.I. 138-4 at ¶ 41).

As such, the Nox RES Belt does not contain a "receiving hole being configured to function as a female snap button fastener for receiving and fastening the frame to a protrusion of the male portion of the snap connector electrode." Thus, claim 1 is not anticipated by the Nox RES Belt. Dependent claims 6, 7, and 9 are also not anticipated by the Nox RES Belt, as the same "receiving hole" limitation underlies those claims. Accordingly, Defendant's Motion for Summary Judgment of Invalidity of the Asserted Claims of U.S. Patent No. 9,059,532 is denied as to anticipation by the Nox RES Belt, and Plaintiff's Cross-Motion for Summary Judgment of No Invalidity and for Additional Claim Construction is granted as to anticipation by the Nox RES Belt.[3]

---

[3] Although unnecessary to resolve this motion, I note that whether the prior art contains an "elongated member" is a question of fact for the jury.

15

Defendant proffers arguments that claims 4, 5, and 8 are invalid as obvious.

Those arguments involve additional references that disclose adjustments and covers, which, it is asserted, make the extra limitations of the dependent claims obvious. (D.I. 137 at 15-16, 19-20). The same "receiving hole" limitation underlies each combination proffered by Defendant. As a result, Defendant's Motion for Summary Judgment of Invalidity of the Asserted Claims of U.S. Patent No. 9,059,532 is denied as to whether claims 4 and 5 are rendered obvious by the Nox RES Belt and McIntire and whether claim 8 is rendered obvious by the Nox RES Belt and Abizaid or Orewiler.

## C. Indefiniteness

Defendant also argues that claims 6 and 7 are invalid as indefinite under 35 U.S.C. § 112(b) because the claims do not "particularly point[ ] out and distinctly claim[ ] the subject matter which the applicant regards as his invention." (D.I. 137 at 16-17). Claims 6 and 7 depend from claim 1, which refers to a "fastener." Claims 6 and 7 do not refer to a "fastener," but they do refer to "said fastening means." (D.I. 138-1, Exh. A). A person skilled in the art would recognize "said fastening means" as referring to the "fastener" of claim 1, and as such, would be informed "about the scope of the invention with reasonable certainty." *See Nautilus, Inc.*, 134 S. Ct. at 2124. First, the specification of the '532 patent teaches that the "fastening means" and corresponding structure fasten the connector to an end of a belt, just as claim 1 teaches that a "fastener" is configured to fasten the frame to an end of a belt. (D.I. 138-1 at 1:32-34, 3:40-46, 5:9-13). Likewise, the prosecution history shows that the "fastening means" in claim 1 was amended to a "fastener," but that the amendment was inadvertently not carried through to claims 6 and

16

7. (D.I. 160-1, Exh. 32). Accordingly, Defendant's Motion for Summary Judgment of Invalidity is denied as to the § 112(b) argument.[4]

## D. Hermannsson Reference

Plaintiff's Cross-Motion for Summary Judgment of No Invalidity and for Additional Claim Construction raises the issue of whether U.S. Patent No. 8,025,539 ("the Hermannsson reference") is prior art to the '532 patent for use in combination with other references.

Pre-AIA 35 U.S.C. § 103(c) dictates that "[s]ubject matter developed by another person, which qualifies as prior art under one or more subsections (e), (f), and (g) of section 102, shall not preclude patentability under [§ 103] where the subject matter and the claimed invention were, at the time the claimed invention was made, owned by the same person or subject to an obligation of assignment to the same person." 35 U.S.C. § 103(c)(1) (pre-AIA).

Plaintiff argues that the Hermannsson reference and the '532 patent were both subject to an obligation of assignment to Plaintiff at the "time the claimed invention was made" such that the Hermannsson reference cannot preclude patentability of the '532 patent under § 103. (D.I. 157 at 15-17). The "claimed invention" is the '532 patent, and

---

[4] Defendant's contention that Claims 6 and 7 are unpatentable under 35 U.S.C. § 112(d) fails. The case Defendant cites, *Pfizer, Inc. v. Ranbaxy Labs. Ltd.*, 457 F.3d 1284 (Fed. Cir. 2006), refers to a situation where claim 6 depended from claim 2, which in turn depended from claim 1. There, claim 6 referred to a limitation present only in claim 1, meaning that claim 6 and claim 2—from which claim 6 purported to depend—dealt with "non-overlapping subject matter" in violation of § 112(d)'s mandate that a dependent claim "incorporate by reference all the limitations of the claim to which it refers" and "then specify a further limitation of the subject matter." *Id.* at 1291. No such problem exists here; instead, Defendant seeks to use § 112(d)'s language to double down on its § 112(b) antecedent basis argument. Thus, Defendant's Motion for Summary Judgment of Invalidity is also denied as to the § 112(d) argument.

17

it "was made" between October 16, 2009 and November 27, 2009. (D.I. 159-1, Exh. 15 at 8). The parties do not dispute that the '532 patent and the Hermannsson reference were not "owned by the same person" "at the time the claimed invention was made."

Sveinbjörn Hoskuldsson, a co-inventor of the '532 patent, and Kormakur Hermannsson, the sole inventor of the Hermannsson reference and the other co-inventor of the '532 patent, did not have employment contracts requiring them to assign either invention to Plaintiff at "the time the claimed invention was made." Rather, their employment contracts were formed after "the time the claimed invention made" and were merely prospective. (D.I. 175 at 10; D.I. 157 at 16-17). Thus, those contracts did not create an obligation to assign either invention to Plaintiff at "the time the claimed invention was made." *See, e.g., Indus. Tech. Research Institute v. Pacific Biosciences of California, Inc.*, 640 Fed. App'x 871, 883 (Fed. Cir. 2016) (holding that evidence of later assignment or common ownership does not establish the necessary common ownership at the time of the invention).

Further, the inventors assigned Plaintiff their rights to the inventions after the "time the claimed invention was made": Mr. Hermannsson assigned his rights in the Hermannsson reference to Plaintiff on May 15, 2010, and he assigned his rights in the '532 patent to Plaintiff on March 12, 2013. (D.I. 157 at 5, 16; D.I. 159-1, Exh. 16 at ¶ 6; D.I. 159-1, Exh. 16 at ¶ 7). Mr. Hoskuldsson assigned his rights in the '532 patent to Plaintiff on January 12, 2016. (D.I. 159-1, Exh. 17 at ¶ 5). Just as the later employment contracts do not establish that common ownership or an obligation of assignment existed at the "time the claimed invention was made," these later assignments cannot establish a common ownership or obligation of assignment at that time.

18

The parties dispute whether Icelandic Law Act No. 72/2004 created an "obligation of assignment" to Plaintiff on behalf of the inventors under pre-AIA § 103(c) such that the Hermannsson reference does not qualify as prior art for purposes of an obviousness analysis.

The parties agree that Icelandic Law Act No. 72/2004 "requires an employee-inventor to present an invention to his employer for consideration, providing the employer with a right of first refusal to acquire rights in the invention." (D.I. 175 at 11; D.I. 198 at 2). They disagree only as to whether Plaintiff's statutory right of first refusal obliged Mr. Hermannsson and Mr. Hoskuldsson to assign their inventions to Plaintiff.

Defendant says that an employee's statutory duty to assign arises only after an employee presents the invention to the employer and after the employer advises the employee of its desire to acquire the right to the invention. (D.I. 175 at 11; D.I. 160-1, Ex. 27 at 2-3; Ex. J ¶ 10, at 3). Defendant says Plaintiff has identified no record evidence that the inventors presented the invention to Plaintiff or that Plaintiff advised them of its desire to acquire the rights. (D.I. 175 at 11).

Plaintiff responds that Defendant seeks to characterize what is actually an obligation of assignment as "an obligation to present the invention to the employer." (D.I. 198 at 2). But, Plaintiff says, the right of first refusal in the Icelandic statute dictates that "the employee *must* assign the invention if the employer demands it." (*Id.*). In that event, the employee has an "obligation" to assign, argues Plaintiff. Thus, Plaintiff characterizes the law as creating a "conditional obligation of assignment" triggered by the employer's demand. (D.I. 198 at 2-3). Plaintiff also cites the legislative history of § 103(c), which shows that the statute was meant to disqualify as prior art "background

19

scientific or technical information known within an organization but unknown to the public." (D.I. 198 at 3; Cong. Rec. H10527 (Oct. 1, 1984)).

Even if the right of first refusal created by the Icelandic statute is characteristically the same as an obligation of assignment, any obligation Mr. Hermannsson had to assign the Hermannsson reference to Plaintiff expired before "the time the claimed invention was made."

Article 4 of Icelandic Law Act No. 72/2004 provides that "[i]n case an employee has presented an invention being within the scope of his work an employer may require conveyance of the right covering the invention himself, provided that utilization thereof be within the employer's field of work."[5] (D.I. 160-1, Exh. 27). Articles 5 and 6 provide that the employee should "without undue delay give the employer notice in a verifiable manner of the invention," and upon that notice, "[i]n case an employer desire[s] to acquire the right to an invention in accordance with Art[icle] 4 he shall advise the employee accordingly within three months . . . ." (Id.).

Mr. Hermannsson, the co-founder, co-owner, Director of Supply Chain, and acting mechanical designer of Nox, filed a provisional patent application for the Hermannsson reference on May 15, 2009. (D.I. 157 at 4; D.I. 159-1, Exh. 16 at ¶ 3-6; D.I. 203-1, Exh. 70). Given Mr. Hermannsson's roles at Plaintiff, particularly being a co-owner, this application demonstrates Plaintiff received the requisite "verifiable" "notice" of the invention no later than May 15, 2009. The statute required Plaintiff to advise Mr. Hermannsson of its "desire to acquire the right to [the] invention . . . within three

_____

[5] Defendant provides a different translation of the statute, which leads to the same result. (D.I. 175-10, Exh. J).

20

months" of this date, but Mr. Hermannsson did not assign Plaintiff the Hermannsson reference during this statutory three month period.[6] Thus, any obligation of assignment held by Mr. Hermannsson had expired by the "time the ['532 patent] was made" five months later, between October 16 and November 27, 2009. (D.I. 159-1, Exh. 15).

Accordingly, the Hermannsson reference is prior art for § 103 purposes. I will deny that portion of Plaintiff's Cross-Motion for Summary Judgment of No Invalidity and for Additional Claim Construction. (D.I. 156).

## E.    Plaintiff's Cross-Motion for Summary Judgment of No Invalidity

Plaintiff asserts that Defendant has asserted that the only independent claim of the patent is "anticipated by three references and would have been rendered obvious by twenty-three different combinations of references involving seven different primary references and five secondary references." (D.I. 157 at 2 (citing D.I. 138-3, the 197-page Dr. Williams report)). Based on the headings in Dr. Williams' report, he says Claim 1 is anticipated by Hermannsson, the 2009 CareFusion Catalog, and the Nox RES Belt, and that it is made obvious by the combinations of (1) the Nox PRIP (Metal Snap) Belt and the Nox RES Belt, (2) McIntire and Hermannsson, (3) McIntire and the Nox RES Belt, (4) McIntire and the Nox PRIP (Metal Snap) Belt, (5) Harhen and Hermannsson, (6 – 11) (McIntire or Harhen) and (Kristbjarnarson or Linville or Uehara), (12 – 13) Hermannsson and (Lawrence or Sommer), (14 – 15) the 2009 CareFusion Catalog and (Lawrence or Sommer), (16-21) Gobron and (Lawrence or Sommer)

---

[6] Hermannsson assigned the reference to Plaintiff on May 15, 2010. (D.I. 159-1, Exh. 16 at ¶ 6).

and (Kristbjarnarson, Linville, or Uehara).[7] The arguments about claim 1 are the first third of the expert report; the other two-thirds deals with the asserted dependent claims.

I am going to deny Plaintiff's Cross-Motion for Summary Judgment of No Invalidity, with the exception of anticipation by the Nox RES Belt, as explained above. I do so because Plaintiff raises so many issues that most of them are at best cursorily briefed. Plaintiff may have some valid arguments buried amongst its many conclusorily-supported arguments, but they are sufficiently well-hidden that I do not see them. If history is any guide, Defendant will drop most of its invalidity arguments, and Plaintiff will drop most of its no invalidity counter-arguments. There are only so many arguments that a party can make in the time allotted, and most trial lawyers know that juries react to a plethora of arguments about the same way that judges do, that is, the party making the arguments is grasping at straws. When the parties do not recognize this, upon application the Court will usually limit the number of asserted claims or the number of asserted prior art references or the number of asserted obvious combinations, the last of which seems to be the issue in this case.

## F. *Daubert* Motions

Defendant seeks to preclude Plaintiff's expert Mr. Alan T. Oslan from testifying about secondary considerations of non-obviousness given that his report comprises "cherry picked" facts and data provided to him by Nox, rather than any actual expert opinion; providing opinions about obviousness of the asserted claims given his improper methodology; and providing opinions about insertion and extraction forces for the prior art Nox RES Belt given that the opinions are unreliable and irrelevant. (D.I. 145).

---

[7] I think Plaintiff gets to twenty-three obvious combinations by counting the Gobron combinations differently than I would.

22

Plaintiff seeks to preclude Defendant's expert Dr. Justin T. Williams from testifying that a general market demand for a "low cost, mass-producible electrode belt" would have motivated a person of ordinary skill in the art to combine elements from the prior art into the claimed combinations; testifying about combining features of the McIntire reference, given that he has no valid motivation to combine those features; and providing anticipation and obviousness theories that are based upon incorrect claim constructions. (D.I. 154).

I am going to deny both motions. Neither motion makes a serious case to exclude expert testimony on the basis of "qualification, reliability, and fit." *See Schneider ex rel. Estate of Schneider*, 320 F.3d at 404-05.

As to Defendant's arguments, Defendant can object at trial to any improper factual testimony by Mr. Oslan, and Defendant can cross-examine Mr. Oslan about any insufficient documentation of his testing of insertion and extraction forces. Separately, Mr. Oslan's opinions about obviousness of the asserted claims use proper methodology. Because Defendant does not argue that an element of the claims of the '532 patent is an obvious modification of a claim in the prior art, to render a claim invalid as obvious requires showing that the argued prior art combination teaches every element of the challenged claim. *Par Pharm. Inc. v. Twi Pharms., Inc.*, 773 F.3d 1186, 1194 (Fed. Cir. 2014) ("We first must determine whether [the accused infringer] carried its burden to prove that all claimed limitations are disclosed in the prior art") (citing *Medichem. S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1164 (Fed. Cir. 2006)). Thus, Plaintiff's expert can defeat combinations by showing missing elements. (D.I. 179 at 12-14).

23

Plaintiff's arguments about Dr. Williams' testimony about general market demand and combining features of the McIntire reference amount to failure of proof arguments, rather than *Daubert* arguments. Plaintiff can address them in cross-examination at trial.

However, Dr. Williams' opinion that the Nox RES Belt contains the "receiving hole" limitation does not require the "receiving hole" to "fasten" to the male snap electrode for which the belt connector has been designed. (D.I. 155 at 14; D.I. 138-3, Exh. C at 12-14). My claim construction for the "receiving hole" limitation requires the plastic defining the receiving hole to itself fasten to a protrusion of the male portion of the snap connector electrode for which the belt connector has been designed. As a result, I am finding no genuine dispute of material fact that the Nox RES Belt does not contain the "receiving hole" limitation, and granting Plaintiff's Cross-Motion for Summary Judgment of No Invalidity and for Additional Claim Construction as to anticipation by the Nox RES Belt. Thus, Dr. Williams cannot testify that the Nox RES Belt embodies the "receiving hole" limitation.

## IV. CONCLUSION

A separate order will be entered.