08:54:42

1                          - VOLUME 5 -

2               IN THE UNITED STATES DISTRICT COURT

3               IN AND FOR THE DISTRICT OF DELAWARE

4                            - - -

5

    NOX MEDICAL EHF,                :    CIVIL ACTION
6                                    :
                    Plaintiff,       :
7                                    :
          vs.                        :
8                                    :
    NATUS NEUROLOGY, INC.,           :
9                                    :
                    Defendant.  :    NO. 15-709 (RGA)
10

11                            - - -

12                           Wilmington, Delaware
                             Monday, May 7, 2018
13                           9:30 o'clock, a.m.

14                            - - -

15  BEFORE:   HONORABLE RICHARD G. ANDREWS, U.S.D.C.J., and a
    jury
16
                              - - -
17
    APPEARANCES:
18

19          POTTER, ANDERSON & CORROON LLP
            BY:  BINDU A. PALAPURA, ESQ.
20

21                    -and-

22

23
                              Valerie J. Gunning
24                            Official Court Reporters

25

1    APPEARANCES (Continued):

2

3                    WORKMAN NYDEGGER
                     BY:   CHAD E. NYDEGGER, ESQ. and
                           BRENT P. LORIMER, ESQ.
4                          (Salt Lake City, utah)

5
                           Counsel for Plaintiff
6

7

8                    CONNOLLY GALLAGHER LLP
                     BY:   ARTHUR G. CONNOLLY, III, ESQ. and
                           MARY AKHIMIEN, ESQ.
9

10                          -and-

11

12                   HANSEN REYNOLDS L.L.C.
                     BY:   THOMAS S. REYNOLDS II, ESQ.,
                           ALAN W. NICGORSKI, ESQ.,
13                         JOSEPH J. JACOBI, ESQ. and
                           JEREMY ADELSON, ESQ.
14                         (Milwaukee, Wisconsin)

15
                           Counsel for Defendant
16

17                          -   -   -

18

19

20

21

22

23

24

25

1                    **P R O C E E D I N G S**

2

09:56:32    3              (Proceedings commenced in the courtroom,

09:56:38    4      beginning at 9:30 a.m.)

09:30:48    5

09:30:48    6              THE COURT:  All right.  Good morning, everyone.

09:31:32    7              I assume based on everything that we're --

09:31:35    8      please be seated -- we're ready to go.  Right?

09:31:38    9              MR. NYDEGGER:  Yes, your Honor.

09:31:39   10              THE COURT:  All right.  And we actually have in

09:31:42   11      hand the jury instructions and the verdict form.  Right?

09:31:44   12      All right.

09:31:45   13              Can I get a copy of the jury instructions and

09:31:48   14      the verdict form?

09:31:56   15              And, Ms. Palapura, did you personally check to

09:32:00   16      make sure that it was all good?

09:32:01   17              MS. PALAPURA:  I did not, your Honor.

09:32:02   18              THE COURT:  Okay.

09:32:04   19              MS. PALAPURA:  I left it in good hands.

09:32:06   20              THE COURT:  Okay.  You have somebody you rely

09:32:08   21      upon who checked it?

09:32:09   22              MS. PALAPURA:  Yes your Honor.

09:32:09   23              THE COURT:  Okay.  Good enough.  Thank you.

09:32:11   24              All right.  Let's get the jury.

09:32:39   25              (The jury entered the courtroom.)

09:33:43   1          THE COURT:  All right.  Good morning, members of

09:33:45   2   the jury.  Everyone, you may be seated.

09:33:46   3          So as I said, I'm going to give you what's

09:33:52   4   called the jury charge now, and the first thing we're going

09:33:56   5   to do is hand you out copies of the jury instructions and

09:33:59   6   the verdict form.

09:34:31   7          All right.  So, members of the jury, so I'm

09:34:48   8   going to read you the jury instructions, so you have a copy.

09:34:53   9   You can either read as I go along or you can listen, and

09:34:57   10   you'll have the written copy to look back at when you are in

09:35:00   11   the jury room.  Whatever works best for you trying to absorb

09:35:05   12   what I'm about to cover.  All right?

09:35:07   13          So now it is time for me to instruct you about

09:35:11   14   the law that you must follow in deciding this case.

09:35:13   15          I will start by explaining your duties and the

09:35:15   16   general rules that apply in every civil case.

09:35:17   17          Then I will explain some rules that you must use

09:35:19   18   in evaluating particular testimony and evidence.

09:35:22   19          Then I will explain the positions of the parties

09:35:26   20   and the law you will apply in this case.

09:35:28   21          And last, and I will do this after the closing

09:35:35   22   arguments, I will explain the rules that you must follow

09:35:38   23   during your deliberation in the jury room, and the possible

09:35:40   24   verdicts that you may return.

09:35:42   25          Please listen very carefully to everything I

say.  In following my instructions, you must follow all of them and not single out some and ignore others.  They are all important.

You will have your written copy of these instructions with you in the jury room for your reference during your deliberations.  You will also have a verdict form, which will list the questions that you must answer to decide this case.

You have two main duties as jurors.  The first one is to decide what the facts are from the evidence that you saw and heard here in court.  Deciding what the facts are is your job, not mine, and nothing that I have said or done during this trial was meant to influence your decision about the facts in any way.

Your second duty is to take the law that I give you, apply it to the facts, and decide the issues presented to you on the verdict form by applying the appropriate burden of proof.  It is my job to instruct you about the law, and you are bound by the oath that you took at the beginning of the trial to follow the instructions that I give you, even if you personally disagree with them.  This includes the instructions that I gave you before and during the trial, and these instructions.  All the instructions are important, and you should consider them together as a whole.

| | | |
|---|---|---|
| 09:36:44 | 1 | Perform these duties fairly.  Do not let |
| 09:36:47 | 2 | any bias, sympathy or prejudice that you may feel |
| 09:36:50 | 3 | toward    one side or the other influence your decision |
| 09:36:53 | 4 | in any way. |
| 09:36:56 | 5 | In any legal action, facts must be proven by a |
| 09:37:05 | 6 | required standard of evidence, known as the burden of proof. |
| 09:37:08 | 7 | In this case, there are two different burdens of proof.  The |
| 09:37:10 | 8 | first is called preponderance of the evidence.  The second |
| 09:37:12 | 9 | is called clear and convincing evidence. |
| 09:37:14 | 10 | As I told you before and as you know, this is a |
| 09:37:15 | 11 | civil case in which Nox Medical is accusing Natus of patent |
| 09:37:18 | 12 | infringement.  Natus and Nox have stipulated that the Natus |
| 09:37:38 | 13 | Pre-Sized Single Use RIP belt infringes claims 1, 5 and 9 of |
| 09:37:39 | 14 | the '532 patent. |
| 09:37:41 | 15 | Nox Medical asserts that Natus' infringement of |
| 09:37:44 | 16 | those claims is willful.  However, Natus contends that it is |
| 09:37:47 | 17 | not liable for infringement because the '532 patent is |
| 09:37:49 | 18 | invalid and denies that it willfully infringed the '532 |
| 09:37:53 | 19 | patent. |
| 09:37:53 | 20 | Natus has the burden of proving that each of |
| 09:37:56 | 21 | claims 1, 5 and 9 of the '532 patent is invalid by clear and |
| 09:38:00 | 22 | convincing evidence.  Clear and convincing evidence is |
| 09:38:03 | 23 | evidence that produces an abiding conviction that the truth |
| 09:38:05 | 24 | of a factual contention is highly probable.  Proof by clear |
| 09:38:08 | 25 | and convincing evidence is a higher burden than proof by a |

preponderance of the evidence.

Nox Medical must prove its contention that Natus willfully infringed the '532 patent by a preponderance of the evidence.  That means Nox Medical has to produce evidence which, when considered in light of all of the facts, leads you to believe that what Nox Medical claims is more likely true than not.

To put it differently, if you were to place Nox Medical's and Natus' evidence on the opposite sides of a scale, the evidence supporting Nox Medical's claims would have to make the scales tip somewhat to Nox Medical's side.

If you find that Natus has not met its burden to prove that all of the asserted claims of the '532 patent are invalid, then you will proceed to consider damages. Nox Medical must also prove its entitlement to damages and the amount of such damages by a preponderance of the evidence.

You must make your decision based only on the evidence that you saw and heard here in court.  Do not let rumors, suspicions, or anything else that you may have seen or heard outside of court influence your decision in any way.

The evidence in this case includes only what the witnesses said while they were testifying under oath, the exhibits that I allowed into evidence, and the stipulations

09:39:27  1   that the lawyers agreed to.

09:39:29  2          Nothing else is evidence.  The lawyers'

09:39:31  3   statements and arguments are not evidence.  Their questions

09:39:35  4   and objections are not evidence.  My legal rulings are not

09:39:37  5   evidence.  My comments and questions are not evidence.

09:39:40  6          During the trial I may have not let you hear the

09:39:43  7   answers to some of the questions that the lawyers asked.  I

09:39:45  8   also may have ruled that you could not see some of the

09:39:47  9   exhibits that the lawyers wanted you to see.  And sometimes

09:39:49  10  I may have ordered you to disregard things that you saw or

09:39:52  11  heard, or I struck things from the record.  You must

09:39:55  12  completely ignore all of these things.  Do not even think

09:39:59  13  about them.  Do not speculate about what a witness might

09:40:01  14  have said or what an exhibit might have shown.

09:40:04  15          These things are not evidence, and you are bound

09:40:06  16  by your oath not to let them influence your decision in any

09:40:09  17  way.  Sometimes testimony and exhibits are received only for

09:40:11  18  a limited purpose.  When I give an instruction regarding

09:40:13  19  that limited purpose, you must follow it.

09:40:14  20          Make your decision based only on the evidence,

09:40:16  21  as I have defined it here, and nothing else.

09:40:23  22          You should use your common sense in weighing the

09:40:27  23  evidence.  Consider it light of your everyday experience

09:40:31  24  with people and events, and give it whatever weight you

09:40:44  25  believe it deserves.

| | |
|---|---|
| 09:40:44 | 1 |

If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion.

There are two kinds of evidence, direct and circumstantial evidence.

Direct evidence is direct proof of a fact, such as the testimony of an eyewitness.  For example, if a witness testified that she saw it raining outside, and you believed her, that would be direct evidence that it was raining.

Circumstantial evidence is indirect proof of a fact, that is, proof of facts from which you may infer or conclude that other facts exist.  For example, if someone walked into the courtroom wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be circumstantial evidence from which you could conclude that it was raining.

The law makes no distinction between the weight that you should give to either direct or circumstantial evidence, nor does it say that one type of evidence is any better evidence than the other.  You should consider all the evidence, both direct and circumstantial, and give it whatever weight you believe it deserves.

You are the sole judges of each witness' credibility, or believability, and of the weight each

witness' testimony deserves.  You should consider each witness' means of knowledge, strength of memory, opportunity to observe, how reasonable or unreasonable the testimony is, whether it is consistent or inconsistent, whether it has been contradicted, the witness' biases, prejudices, or interests, including the witness' relation to either party in the case and whether and how the witness might be affected by the verdict, the witness' manner or demeanor on the witness stand, and all circumstances that, according to the evidence, could affect the credibility of the testimony.

If you find the testimony to be contradictory, you must try to reconcile it, if reasonably possible, so as to make one harmonious story of it all.  But if you cannot do this, then it is your duty and privilege to believe the portions of testimony that, in your judgment, are most believable and disregard any testimony that, in your judgment, is not believable.

In determining the weight to give to the testimony of a witness, you should ask yourself whether there was evidence tending to prove that the witness testified falsely about some important fact, or, whether there was evidence that at some other time the witness said or did something, or failed to say or do something that was different from the testimony he gave at the trial.  You have

the right to distrust each witness' testimony in other particulars and you may reject all or some of the testimony of that witness or give it such credibility as you may think it deserves.

You should remember that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth.  People may tend to forget some things or remember other things inaccurately.

If a witness has made a misstatement, you must consider whether it was simply an innocent lapse of memory or an intentional falsehood, and that may depend upon whether it concerns an important fact or an unimportant detail.

This instruction applies to all witnesses, including expert witnesses and witnesses that provided testimony by deposition.

When knowledge of technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field -- called an expert witness -- is permitted to state his or her opinion on those technical matters.  However, you are not required to accept that opinion.  As with any other witness, it is up to you to decide whether to rely upon it.

In weighing expert testimony, you must consider the expert's qualifications, the reasons for the expert's

opinions, and the reliability of the information supporting

the expert's opinions, as well as the factors I have

previously mentioned for weighing testimony of any other

witness.   Expert testimony should receive whatever weight

and credit you think appropriate, given all the other

evidence in the case.   You are free to accept or reject the

testimony of experts, just as with any other witness.

During the course of the trial, you have seen

many exhibits.   Many of these exhibits were admitted as

evidence.   You will have these admitted exhibits in the jury

room for your deliberations.   The other exhibits (including

charts and animations presented by attorneys and witnesses)

were offered to help illustrate the testimony of the various

witnesses.   These illustrations, called demonstrative

exhibits, have not been admitted as evidence, are not

evidence, and should not be considered as evidence.   Rather,

it is the underlying testimony of the witness that you heard

when you saw the demonstrative exhibits that is the evidence

in this case.

Before you can decide the issues in this case,

you will have to understand the patent claims.   The patent

claims are the numbered paragraphs at the end of the patent.

The patent claims involved here are claims 1, 5 and 9 of the

'532 patent.

The claims are intended to define, in words,

09:45:58  1    the boundaries of the invention described and illustrated

09:46:01  2    in the patent.  In patent law, the requirements of a claim

09:46:04  3    are often referred to as claim elements or claim

09:46:07  4    limitations.

09:46:07  5            In this case, the parties have stipulated that

09:46:09  6    the Natus pre-sized single use RIP belt infringes claims 1,

09:46:13  7    5 and 9 of the '532 patent.  This means that each claim

09:46:17  8    element or claim limitation of those claims is found in the

09:46:19  9    Natus belt.

09:46:20  10           However, Natus contends that it is not liable

09:46:23  11   for infringement because claims 1, 5 and 9 of the '532

09:46:26  12   patent are invalid because they would have been obvious to

09:46:30  13   one skilled in the art of that patent, also referred to as a

09:46:33  14   person of ordinary skill in the art at the time of the

09:46:35  15   invention.

09:46:35  16           As I will instruct you later, one of the things

09:46:38  17   you must do in determining whether the asserted claims would

09:46:41  18   have been obvious to a person having ordinary skill in the

09:46:43  19   art is to compare the patent claims to the prior art.  In

09:46:46  20   making this comparison, it is important to remember that the

09:46:48  21   relevant comparison is between the language of the claims

09:46:51  22   and the prior art.

09:46:51  23           There are two different types of claims in a

09:47:05  24   patent.  The first type is called an independent claim.  An

09:47:08  25   independent claim does not refer to any other claim of the

09:47:11  1    patent.   An independent claim is read alone to determine its

09:47:14  2    scope.

09:47:15  3            In this case, claim 1 of the '532 patent is an

09:47:18  4    independent claim.   You know this because it mentions no

09:47:21  5    other claim.   Accordingly, the words of claim 1 are read by

09:47:24  6    themselves in order to determine what that claim covers.   An

09:47:27  7    independent claim sets forth all of the requirements that

09:47:30  8    must be met in order for an accused system or method to be

09:47:33  9    covered by that claim.

09:47:34  10           The second way a claim can be stated is in the

09:47:37  11   form of a dependent claim.   A dependent claim does not

09:47:40  12   itself recite all of the requirements of the claim but

09:47:43  13   refers to another claim or claims for some of its

09:47:45  14   requirements.

09:47:46  15           In this way, the claim depends from another

09:47:48  16   claim or claims.   A dependent claim incorporates all of the

09:47:50  17   requirements of the claims to which it refers.   The

09:47:53  18   dependent claim then adds its own additional requirements.

09:47:58  19   To determine what a dependent claim covers, it is necessary

09:48:01  20   to look at both the dependent claim and any other claims to

09:48:04  21   which it refers.

09:48:05  22           Claim 9 of the '532 patent is a dependent claim

09:48:10  23   that depends from claim 1.   Accordingly, the words of claim

09:48:13  24   1 must be read together with the words of claim 9 in order

09:48:15  25   to determine what claim 9 covers.   Claim 5 depends from

claim 4, which depends from claim 1.  Accordingly, the words of claims 1 and 4 must be read together with the words of claim 5 in order to determine what claim 5 covers.

Before you decide whether claims 1, 5 and 9 of the '532 patent are invalid, you will have to understand the patent claims.  It is my job as judge to provide to you the meaning of any claim language that must be interpreted.  In this case, I have interpreted the following terms from claim 1 of the '532 patent.

Flexibility.

The receiving hole being configured to function as a female snap button fastener for receiving the fastening the frame to a protrusion of the male portion of the snap connector electrode.

Electrode belt and the belt connector.

A conductor of the electrode belt.

Elongated member.

The conductor passing through the receiving hole.

These definitions are set forth in JTX-1.  You must accept the meaning I give you in JTX-1 and use them when you decide whether any claim is invalid.  For terms that I have not defined, you should give them their ordinary meaning.

I will now summarize the issues that you must

decide and provide instructions to guide your deliberations. You must decide the following main issues.

One, whether Natus has proven by clear and convincing evidence that claims 1, 5 and 9 of the '532 patent are invalid.

If you find that all of the asserted claims of the '532 patent are invalid, then your deliberations are complete.  However, if you find that any asserted claim is not invalid, then you will proceed to decide the following issues.

Two, whether Nox Medical has proven by a preponderance of the evidence the amount of damages adequate to compensate it for the infringement, which in no event is less than a reasonable royalty.

Three, whether Nox Medical has proven by a preponderance of the evidence that Natus' infringement was willful.

Natus contends that the asserted claims are invalid.  Natus contends that the asserted claims would have been obvious to one of ordinary skill in the art of the '532 patent at the time of the alleged invention.  I will now instruct you on the rules you must follow in deciding whether or not Natus has proven invalidity.

To prove that any claim of the '532 patent is invalid, Natus must persuade you by clear and convincing

evidence, i.e., you must be left with an abiding conviction that the claim is invalid.

When a party challenging the validity of a patent relies on prior art that was considered by the Examiner, the PTO, during the prosecution of the application which resulted in the issued patent, that party's ability to satisfy its evidentiary burden may be more difficult.

When a party challenging the validity of a patent presents evidence that was not considered by the PTO Examiner during the prosecution of the application which resulted in the issued patent, such new evidence may be given more weight than evidence considered by the Examiner and may make it easier to satisfy the parties' evidentiary burden.

A claimed invention is invalid as obvious if it would have been obvious to a person of ordinary skill in the art of the claimed invention at the time the invention was made.  Obviousness may be shown by considering one or more -- I'm sorry, one or more than one item of prior art.

In this case, Natus contends that claims 1, 5 and 9 of the '532 patent would have been obvious at the time of the invention, based on one or more of the combinations, as I will describe in a couple pages.  The date of the invention was June 2010.

The following factors must be evaluated in

determining whether Natus has established that the claimed inventions would have been obvious to one of ordinary skill in the art at the time of the invention.

One, the level of ordinary skill in the art at the time the invention of the '532 patent was made.

Two, the scope and content of the prior art relied upon by Natus.

Three, the difference or differences, if any, between claims 1, 5 and 9 of the '532 patent and the prior art.

And, four, additional considerations, if any, that indicate that the invention was obvious or not obvious.

Each of these factors must be evaluated, although they may be analyzed in any order, and must perform a separate analysis for each of the claims.

I will now explain each of the four factors in more detail.

The determination of whether a claimed invention would have been obvious is based on the perspective of a person of ordinary skill in the art to which the '532 patent pertains.

The person of ordinary skill is presumed to be aware of all of the relevant art in the field to which the '532 patent pertains.  The person of ordinary skill is also a person of ordinary skill creativity that can use common

09:54:39  1    sense to solve problems.

09:54:39  2            Natus and Nox Medical have stipulated that the

09:54:44  3    field of the art of the '532 patent is medical devices and

09:54:49  4    that a person having ordinary skill in the art of the '532

09:54:52  5    patent would include:

09:54:53  6            An individual with at least a Master's degree in

09:54:57  7    mechanical engineering, biomedical engineering, electrical

09:55:00  8    engineering, or an equivalent field, or an individual with a

09:55:06  9    bachelor's degree in mechanical engineering, biomedical

09:55:09 10    engineering, electrical engineering, or an equivalent field,

09:55:13 11    and with approximately one year of relevant experience in

09:55:15 12    industry or academia.

09:55:17 13            For the purposes of deciding obviousness, the

09:55:25 14    parties have stipulated and agreed that the relevant prior

09:55:27 15    art includes the following items received into evidence.

09:55:29 16            The Nox Abdomen and Thorax Respiratory Effort

09:55:34 17    Belt, which has been referred to by the attorneys and the

09:55:37 18    witnesses as the Semi-Disposable RES Belt, The

09:55:40 19    Semi-Disposable Belt, or the RES Belt.

09:55:43 20            And U.S. Patent No. 8,251,736, issued to

09:55:53 21    McIntire and other inventors which I will refer to as

09:55:58 22    McIntire.

09:55:59 23            These references were not considered by the

09:56:02 24    Examiner for purposes of determining patentability of the

09:56:04 25    claimed invention.

09:56:06   1        You should analyze whether there are any

09:56:12   2   relevant differences between the prior art and the claimed

09:56:14   3   invention from the view of a person of ordinary skill in the

09:56:16   4   art at the time of the invention.

09:56:18   5        Your analysis must determine the impact, if any,

09:56:20   6   of such differences on the obviousness of the invention as a

09:56:23   7   whole, and not merely some portion of it.  In making this

09:56:27   8   comparison, it is the asserted claims of the '532 patent,

09:56:30   9   not the commercial embodiment of the '532 patent, that you

09:56:33  10   must compare to the prior art.

09:56:34  11        In analyzing the relevance of the differences

09:56:38  12   between the claimed invention and the prior art, you do not

09:56:40  13   need to look for precise teaching in the prior art directed

09:56:43  14   to the subject matter of the claimed invention.

09:56:45  15        You may take into account the inferences and

09:56:48  16   creative steps that a person of ordinary skill in the art

09:56:51  17   would have employed in reviewing the prior art at the time

09:56:54  18   of the invention.  However, to find that a combination of

09:56:56  19   prior art rendered the invention obvious, you must find that

09:57:03  20   combination provided a reasonable expectation of success.

09:57:06  21   For example, if the claimed invention combined elements

09:57:09  22   known in the prior art and the combination yielded results

09:57:12  23   that were predictable to a person of ordinary skill in

09:57:15  24   the art at the time of the invention, then this evidence

09:57:17  25   would make it more likely that the claim would have been

obvious.

If, on the other hand, the combination of known elements yielded unexpected or unpredictable results, or if the prior art teaches away from combining the known elements, then this evidence would make it more likely that the claim that successfully combined those elements was not obvious.

Importantly, a claim is not proved obvious merely by demonstrating that each of the elements was independently known in the prior art.  Most, if not all, inventions rely on building blocks long since uncovered, and claimed discoveries almost of necessity will likely be combinations of what is already known.  Therefore, you should consider whether a reason existed at the time of the invention that would have prompted a person of ordinary skill in the art in the relevant field to combine the known elements in the way the claimed invention does.

The reason could come from the prior art, the background knowledge of one of ordinary skill in the art, the nature of any problem or need to be addressed, market demand, or common sense.  You may also consider whether the problem or need was known, the possible approaches to solving the problem or addressing the need were known and finite, and the solution was predictable through use of a known option.

If you find that a reason existed at the time of the invention to combine the elements of the prior art to arrive at the claimed invention, and there would have been a reasonable expectation of success for doing so, this evidence would make it more likely that the claimed invention was obvious.

You must undertake this analysis separately for each claim that Natus contends would have been obvious to a person of ordinary skill in the art at the time of the invention.

Before deciding the issue of obviousness for each claimed invention, you must also consider certain factors, which may help to determine whether or not the invention would have been obvious.  No factor alone is dispositive, and you must consider the obviousness or nonobviousness of the invention as a whole.  These factors include:

One, were products covered by the claim commercially successful due to the merits of the claimed invention rather than due to advertising, promotion, salesmanship, or features of the product other than those found in the claim?

Two, was there long-felt need for a solution to the problems facing the inventors, which was satisfied by the claimed invention?

10:00:03    1         Three, did others try, but fail, to solve the

10:00:07    2    problem solved by the claimed invention?

10:00:09    3         Four, did others copy the claimed invention?

10:00:23    4         Five, did the claimed invention achieve

10:00:26    5    unexpectedly superior results over the closest prior art?

10:00:29    6         Answering any, or all, of these questions yes

10:00:33    7    may suggest that the claim was not obvious.  These factors

10:00:35    8    are relevant only if there is a connection, or nexus,

10:00:39    9    between the factor and the invention covered by the patent

10:00:42   10    claims.  If you find there is such a connection, or nexus,

10:00:45   11    then, unless Natus shows that the claimed invention is not a

10:00:48   12    reason for the existence of a factor, that factor should be

10:00:52   13    considered along with all the other evidence in the case in

10:00:54   14    determining whether Natus has proven that the claimed

10:00:58   15    invention would have been obvious.

10:01:07   16         The question of nonobviousness is simple to ask,

10:01:11   17    but difficult to answer.  A person of ordinary skill in the

10:01:13   18    art is presumed to have knowledge of the relevant prior art

10:01:16   19    at the time of the invention of the '532 patent.  If you

10:01:19   20    find the available prior art shows each of the elements of

10:01:21   21    the claims in suit, you must determine whether it would have

10:01:24   22    then been obvious to a person of ordinary skill in the art

10:01:26   23    to combine or coordinate these elements in the same manner

10:01:29   24    as the claims.  The difficulty that attaches to all honest

10:01:33   25    attempts to answer this question can be attributed to the

strong temptation to rely on hindsight while undertaking this evaluation.  You must not use hindsight or the '532 patent as a guide through the prior art references, combining the right references in the right way so as to achieve the result of the claims of the '532 patent.

If, after considering all of the evidence and the law as I stated it, you are convinced that all of the asserted claims of the '532 patent are invalid, your verdict should be for Natus and you needing no further in your deliberations.  On the other hand, if you find that any asserted claim of the '532 patent is valid, you must then consider what amount of damages to award to Nox Medical for the infringement.

I will now instruct you about the measure of damages.  By instructing you on damages, I am not suggesting which party should win this case, on any issue.

The damages you award must be adequate to compensate Nox Medical for the infringement.  They are not meant to punish an infringer.  Your damages award, if you reach this issue, should put Nox Medical in approximately the same financial position that it would have been in had the infringement not occurred.

Nox Medical has the burden to establish the amount of its damages by a preponderance of the evidence.

Nox Medical is entitled to all damages that can

10:03:11  1   be proven with reasonable certainty.  On one hand,

10:03:14  2   reasonable certainty does not require proof of damages with

10:03:16  3   mathematical precision.  Mere difficulty in ascertaining

10:03:20  4   damages is not fatal to Nox Medical.  On the other hand,

10:03:22  5   Nox Medical is not entitled to speculative damages, that is,

10:03:25  6   you should not award any amount for loss, which, although

10:03:29  7   possible, is wholly remote or left to conjecture and/or

10:03:33  8   guess.  You may base your evaluation of reasonable certainty

10:03:38  9   on opinion evidence.  I will give more detailed instructions

10:03:42  10  regarding a reasonable royalty shortly.

10:03:43  11       The patent laws provide that the amount of

10:03:54  12  damages that Natus must may Nox Medical for infringing the

10:03:58  13  '532 patent must be enough to compensate for the

10:04:00  14  infringement, but may not be less than a reasonable royalty

10:04:03  15  for the use of Nox Medical's invention.

10:04:05  16       A royalty is a payment made to a patentholder in

10:04:08  17  exchange for the right to make, use, or sell the claimed

10:04:12  18  invention.  A reasonable royalty is the amount of royalty

10:04:24  19  payment that a patentholder and the infringer would have

10:04:27  20  agreed to in a hypothetical negotiation taking place at a

10:04:31  21  time just prior to when the infringement first began.  In

10:04:34  22  considering this hypothetical negotiation, you should focus

10:04:37  23  on what the expectations of the patentholder and the

10:04:40  24  infringer would have been had they acted reasonably in their

10:04:44  25  negotiations and entered into an agreement at that time.  In

determining this, you must assume that both parties believed the patent was valid and infringed and the patentholder and infringer were willing to enter into an agreement.  The reasonable royalty you determine must be a royalty that would have resulted from the hypothetical negotiation, and not simply a royalty either party would have preferred.

I will provide you shortly with a list of factors that you may consider when determining what royalty would have resulted from a hypothetical negotiation. Evidence of events after infringement first began can be considered in evaluating the reasonable royalty, but only to the extent that the evidence of such later events aids in assessing what royalty would have resulted from a hypothetical negotiation just before the time of infringement.

In determining the reasonable royalty, you should consider all the facts known and available to the parties at the time the infringement began.  Some of the kinds of factors that you may consider in making your determination are:

One, the nature and scope of the license, as exclusive or nonexclusive; or as restricted or none restricted in terms of territory or with respect to whom the manufactured product may be sold.

Two, the licensor's established policy and

1    marketing program to maintain his patent exclusivity by not

2    licensing others to use the invention or by granting

3    licenses under special conditions designed to preserve that

4    exclusivity.

5            Three, the commercial relationship between the

6    licensor and licensee, such as, whether they are competitors

7    in the same territory in the same line of business, or

8    whether they are inventors or promoters.

9            Four, the effect of selling the patented product

10   in promoting sales of other products of the license, the

11   existing value of the invention to the licensor as a

12   generator of sales of his non-patented items, and the extent

13   of such derivative sales.

14           Five, the duration of the patent and the term of

15   the license.

16           Six, the established profitability of the

17   product made under the patent, its commercial success, and

18   its current popularity.

19           Seven, the utility and advantages of the

20   patented product over the old modes or devices, if any, that

21   had been used for working out similar results.

22           Eight, the nature of the patented inventions,

23   the character of the commercial embodiment of it as owned

24   and produced by the licensor, and the benefit to those who

25   have used the invention.

10:07:31   1          Nine, the extent to which the infringer has made

10:07:37   2    use of the invention, and any evidence probative of the

10:07:41   3    value of that use.

10:07:42   4          Ten, the portion of the profit that should be

10:07:45   5    credited to the invention as distinguished from non-patented

10:07:47   6    elements, the manufacturing process, business risks, or

10:07:50   7    significant features or improvements aided by the infringer.

10:07:53   8          Eleven, the opinion testimony of qualified

10:07:56   9    experts.

10:07:56   10         Twelve, evidence concerning the availability and

10:08:02   11   cost of acceptable, non-infringing alternatives to the

10:08:09   12   patented product.  An acceptable, noninfringing alternative

10:08:12   13   must have been an acceptable substitute for the claimed

10:08:14   14   invention that did not infringe the patent, and was

10:08:18   15   available as of the date the '532 patent issued, on June 16,

10:08:23   16   2015.

10:08:24   17         And, 13, the amount that a licensor such as Nox

10:08:28   18   Medical and a licensee such as Natus would have agreed upon

10:08:33   19   at the time the infringement began if both had been

10:08:36   20   reasonably and voluntarily trying to reach an agreement.

10:08:40   21   That, is the amount which a prudent licensee -- who desired,

10:08:43   22   as a business proposition, to obtain a license to

10:08:45   23   manufacture and sell a particular article embodying the

10:08:49   24   patented invention -- would have been willing to pay as a

10:08:52   25   royalty and yet be able to make a reasonable profit and

10:08:54  1   which amount would have been acceptable by a prudent

10:08:57  2   patentee who was willing to grant a license.  To determine

10:09:01  3   this amount, you should consider any other economic factor

10:09:04  4   that a normally prudent businessperson would, under similar

10:09:06  5   circumstances, take into consideration in negotiating the

10:09:09  6   hypothetical license.

10:09:10  7           That is, you should take into account any other

10:09:13  8   factors that, in your mind, would have increased or

10:09:15  9   decreased the amount of a reasonable royalty that Natus

10:09:17  10  would have been willing to pay and Nox Medical would have

10:09:23  11  been willing to accept, acting as normally prudent

10:09:26  12  businesspeople.

10:09:26  13          No one factor is dispositive and you can and

10:09:30  14  should consider the evidence that has been presented to you

10:09:33  15  in this case on each of the factors to determine a

10:09:35  16  reasonable royalty, that is, the payment that would have

10:09:38  17  resulted from a negotiation between the patentholder and the

10:09:40  18  infringer taking place at a time just before the date when

10:09:44  19  the infringement began on June 16, 2015.

10:09:46  20          If you find that any asserted claim of the

10:09:53  21  '532 patent has not been proven invalid, then you must

10:09:58  22  also determine whether or not Natus' infringement was

10:10:00  23  willful.

10:10:04  24          To show that Natus' infringement was willful,

10:10:20  25  Nox Medical must prove by a preponderance of the evidence

that Natus knew of the '532 patent and intentionally infringed it.

For example, you may consider whether Natus' behavior was malicious, wanton, deliberate, consciously wrongful, or in bad faith.  However, you may not find that Natus' infringement was willful merely because it knew about the patent, without more.  Furthermore, the fact that Natus stipulated to infringement of the asserted claims of the '532 patent is not the same as an admission that it willfully infringed.  It is simply an agreement that Natus' product did infringe the '532 patent.  In determining whether Nox Medical has proven that Natus' infringement was willful, you must consider all of the circumstances and assess Natus' knowledge at the time the challenged conduct occurred.

Knowledge of the asserted patent is a prerequisite to willfulness.  Willfulness is assessed at the time of the challenged conduct, and defenses to liability about which an infringer was not aware of until later are irrelevant when assessing willfulness.

Nox Medical has put on evidence from which you could conclude Natus copied Nox's patented product before the '532 patent issued, and then, when it learned of the patent, continued to make and sell its product.  It is perfectly lawful to copy unpatented products, and before the

10:11:37  1   date of issuance of the '532 patent, the Nox disposable belt

10:11:42  2   was not patented.  Deliberate copying of the commercial

10:11:45  3   product of the patent owner before issuance of the patent,

10:11:47  4   however, can be evidence of willfulness to the extent it

10:11:50  5   demonstrates Natus' state of mind after the '532 patent

10:11:54  6   issued and after Natus became aware of it.

10:11:57  7         If you determine that any infringement was

10:12:06  8   willful, you may not allow that decision to affect the

10:12:09  9   amount of any damages award you gave for infringement.

10:12:12  10         All right.  So, members of the jury, that's the

10:12:28  11  great bulk of the jury instructions.  We're going to take a

10:12:33  12  five-minute break so you have a chance to refresh yourself

10:12:38  13  before we go into closing arguments.

10:12:41  14         I believe, because I've set time limits, that

10:12:46  15  plaintiff's closing argument will be less than 45 minutes.

10:12:49  16  We'll take a 15-minute break after that.

10:12:52  17         Defendant's closing argument will be less than

10:12:56  18  45 minutes also.  And whatever time plaintiff didn't use,

10:13:00  19  they have a very brief opportunity to rebut.  Then I will

10:13:07  20  give the last five pages of the jury instructions and then

10:13:10  21  you'll retire to deliberate.

10:13:11  22         All right?  So right now, take a short break to

10:13:16  23  wake yourselves up.

10:13:17  24         (The jury was excused for a short recess.)

10:13:34  25         THE COURT:  All right.  So are there any

| | | |
|---|---|---|
| 10:13:36 | 1 | exceptions to the jury instruction as read so far as opposed |
| 10:13:42 | 2 | to the substantive objections that you were making on |
| 10:13:45 | 3 | Friday? |
| 10:13:48 | 4 | MR. NYDEGGER:  No, your Honor. |
| 10:13:48 | 5 | MR. REYNOLDS:  None, your Honor. |
| 10:13:49 | 6 | THE COURT:  Okay.  All right.  We'll take a |
| 10:13:50 | 7 | five-minute break. |
| 10:13:51 | 8 | (Short recess taken.) |
| 10:16:40 | 9 | -  -  - |
| 10:16:40 | 10 | (Proceedings resumed after the short recess.) |
| 10:23:17 | 11 | THE COURT:  All right.  We are ready to go here? |
| 10:23:19 | 12 | MR. NYDEGGER:  Yes. |
| 10:23:22 | 13 | THE COURT:  All right.  Let's get the jury. |
| 10:23:25 | 14 | Par. |
| 10:23:27 | 15 | MR. NYDEGGER:  Your Honor, I do plan to reserve |
| 10:23:29 | 16 | about five minutes for rebuttal. |
| 10:23:31 | 17 | THE COURT:  Okay. |
| 10:23:50 | 18 | MR. NYDEGGER:  And I could have really used the |
| 10:23:51 | 19 | extra ten minutes. |
| 10:23:53 | 20 | THE COURT:  I think the jury will thank you. |
| 10:23:59 | 21 | MR. NYDEGGER:  That's probably true as well. |
| 10:24:01 | 22 | (The jury entered the courtroom.) |
| 10:24:03 | 23 | THE COURT:  All right, members of the jury. |
| 10:24:24 | 24 | Welcome back.  Everyone, you may be seated. |
| 10:24:26 | 25 | Mr. Nydegger? |

MR. NYDEGGER:   Thank you, Your Honor.   May it please the Court.

Well, we appreciate your time and attention throughout this trial, and now today the case will be submitted to you to make a decision.   And you may be asking yourself, well, what do I have to decide?   What you have to decide is on the jury verdict form, which you'll see up on the screen now.

The first question that you have to decide is the validity of the claims of the '532 patent, claims 1, 5 and 9.   And for each claim, Natus made two arguments for invalidity.   The first is that the claim is invalid in view of the Nox RES belt or RES belt.

The second is that each claim is invalid in view of the Nox RES belt with supplemented by McIntire.   So for each claim, you have to decide whether either of those arguments renders the claim invalid.

Now, if you find any claim to be valid, then you move to the next portion of the verdict form, which I will show you now.   That's Question No. 2.

Question No. 2 is:   What amount of damages should be awarded to Nox Medical to compensate it for Natus' infringement?

And then No. 3, you need to decide whether Natus' infringement was willful.

So you may be asking yourself, well, how do I do this?  How do I make these decisions?  It's not as hard or as daunting as it might seen.

As the Court instructed, use your common sense. It's your job to go through the evidence and decide what is the evidence, what facts do the evidence support, and use that to make a determination and throw out everything else. Throw out what's fiction, what's not true.  Throw out outlandish theories that just fly in the face and mock common sense.  If you do that, then the facts and the evidence will take you to the right decision.

So let's talk about validity first, because that's where you'll be starting.

To find a claim invalid, Natus must have presented evidence, clear and convincing evidence, that produces an abiding conviction that the claim is invalid. To do that, it has to show that each and every claim is taught by the prior art and that also there was a reason to combine those elements the way that the claim does.  You heard that in the jury instructions that Judge Andrews has read this morning.  Well, I've made a claim chart to sort of help you organize and go through this.

Now, when you perform this exercise in your deliberations, you'll have to go through each element of each claim.

| | |
|---|---|
| 10:27:08 | 1 |
| 10:27:11 | 2 |
| 10:27:14 | 3 |
| 10:27:16 | 4 |
| 10:27:19 | 5 |
| 10:27:20 | 6 |
| 10:27:22 | 7 |
| 10:27:28 | 8 |
| 10:27:33 | 9 |
| 10:27:35 | 10 |
| 10:27:36 | 11 |
| 10:27:39 | 12 |
| 10:27:43 | 13 |
| 10:27:47 | 14 |
| 10:27:52 | 15 |
| 10:27:55 | 16 |
| 10:27:57 | 17 |
| 10:28:00 | 18 |
| 10:28:01 | 19 |
| 10:28:04 | 20 |
| 10:28:08 | 21 |
| 10:28:12 | 22 |
| 10:28:16 | 23 |
| 10:28:20 | 24 |
| 10:28:23 | 25 |

Here, I've put up a few elements, I've summarized a few elements of claim 1 on the board for you, because these are the elements that are most glaringly absent in the prior art, and I just don't have time to go through all of them.

Now, you'll see that the middle row in this chart is a row that says RES plus PHOSITA.  This is that first combination, whether the RES belt viewed in light of the knowledge of a person of skill in the art teaches these claim elements.

The second or the second or last column there, RES plus McIntire, that's the combination of the RES belt plus teachings of McIntire, because there are some absences in McIntire, there are some absences in the RES belt that Natus tries to fill in with McIntire.  And so we'll go through them and we'll talk about each of these, and the evidence will show you that each of these claim elements are missing.

And, by the way, in order to find a claim invalid, there must be "yesses" all the way down one of those columns.  If there is a single "no" in either of those columns, then the claim is valid.  And if claim 1 is valid, claims 5 and 9 are also valid, because claims 5 and 9 each depend from claim 1, as Judge Andrews explained just a moment ago in the instructions.

10:28:25  1          So I'd like to start with the element that's the

10:28:28  2   third down, the conductor of the electrode.  The conductor

10:28:33  3   of the electrode belt enters, passes through, and exits the

10:28:36  4   hole.  Okay.  So let's talk about that.

10:28:39  5          Now, this is an example of the patented belt,

10:28:45  6   and you can see that that conductor of the electrode, it

10:28:48  7   enters the hole, exits the hole, thereby passing through.

10:28:52  8   Okay.  That meets the claim language.

10:28:55  9          All right.  Well, let's go and look at some

10:28:57  10  testimony from Dr. Williams now about the prior art.

10:29:00  11          I asked Dr. Williams, what does the word hole

10:29:04  12  mean?  And he says, you just give it your plain and ordinary

10:29:08  13  meaning.  I'm not an engineer.  Most of you aren't

10:29:11  14  engineers, but we can all understand this because it's just

10:29:13  15  a plain and ordinary meaning.  And he said that the meaning

10:29:15  16  he used was an absence of material that is required to

10:29:18  17  receive the male snap.

10:29:20  18          Well, I thought that was a little curious,

10:29:23  19  required to receive the male snap.  And so if you will

10:29:25  20  remember, I started to question Dr. Williams about what that

10:29:27  21  really meant.  And I took this exhibit, this is PDX 42, and

10:29:34  22  I took this, and I said, Dr. Williams, if I put my hand like

10:29:37  23  this through the hole, does my hand exit the hole?  And he

10:29:42  24  said, yeah, it does.  I said, oh, I'm thinking, okay, that

10:29:45  25  makes sense.

10:29:46   1          What if I close my hand and this now represents

10:29:48   2   a male snap?  Does my hand exit the hole now?  He said, no,

10:29:53   3   it doesn't.

10:29:54   4          What?  Ladies and gentlemen, that flies in the

10:29:58   5   face of common sense.  How does my hand exit the hole

10:30:02   6   here, but it's a male snap and it doesn't exit the hole

10:30:05   7   here?

10:30:06   8          See, Dr. Williams is using some contrived,

10:30:10   9   contorted meaning of hole to try and make it fit the claim

10:30:16  10   language.  That is not the plain and ordinary meaning.

10:30:18  11          And so I pursued this further with Dr. Williams.

10:30:21  12   Remember, I gave him this example.  This is a representation

10:30:24  13   of the snap blown up so that we can see.

10:30:26  14          And I said, Dr. Williams, if I put this male

10:30:31  15   snap, this skinny male snap in the connector, does that

10:30:34  16   red wire pass through the hole?  He said, no, it doesn't.

10:30:39  17   Okay.  Well, what if I put my hand in there?  He looked at

10:30:44  18   it and he said, yes.  Now that wire passes through the hole.

10:30:48  19   It exits the hole.

10:30:50  20          It hasn't changed one bit.  How does the hole

10:30:54  21   change sizes depending on the snap put inside?  It doesn't.

10:30:58  22   It flies in the face of common sense.  It's just not

10:31:02  23   credible.  Either it passes through the hole based on the

10:31:05  24   structure of the hole itself, or it does not, and it does

10:31:10  25   not.

| 10:31:10 | 1 | If we go and look at the RES belt, which is up |
| 10:31:16 | 2 | on the screen, you see that the spring wire, it lies behind |
| 10:31:20 | 3 | the hole in the front phase.  It doesn't pass through that |
| 10:31:23 | 4 | at all. |
| 10:31:25 | 5 | Well, I also asked -- I also asked Mr. Oslan |
| 10:31:28 | 6 | about that.  And you remember, Mr. Oslan, he made an example |
| 10:31:32 | 7 | where this represents the opening in the front face, that |
| 10:31:37 | 8 | hole, and these are the wires.  And I asked Mr. Oslan, does |
| 10:31:41 | 9 | that pass through the hole, Mr. Oslan?  And he said, no, it |
| 10:31:44 | 10 | doesn't.  I think we would all agree. |
| 10:31:46 | 11 | Well, what happens if I put the dimple that's |
| 10:31:50 | 12 | located on the back of the conductor?  If you put that |
| 10:31:52 | 13 | conductor up again, please, you see that there's a dimple on |
| 10:31:58 | 14 | the back side?  So when you close it, this is what you get. |
| 10:32:00 | 15 | You have the opening and you have the dimple. |
| 10:32:03 | 16 | Well, do the wires pass through that now?  No, |
| 10:32:07 | 17 | they don't.  Why?  Because the hole is defined by the |
| 10:32:10 | 18 | plastic.  The wires pass through a space between the dimple |
| 10:32:14 | 19 | and the opening.  Why is that space there?  That space is |
| 10:32:18 | 20 | critical.  As you heard Mr. Hoskuldsson testify, that space |
| 10:32:21 | 21 | is critical so that the wires can move back and forth when |
| 10:32:25 | 22 | the male snap goes through.  So the wire does not pass |
| 10:32:30 | 23 | through the receiving hole. |
| 10:32:31 | 24 | So if we go back to our claim chart, we put a |
| 10:32:37 | 25 | big no, that that element is not found in the RES belt. |

10:32:41  1    That right there is enough to show that the RES belt and

10:32:46  2    the PHOSITA do not invalidate claim 1.  But wait, there's

10:32:51  3    more.  Let's start at the column and work our ways down from

10:32:54  4    the top.

10:32:55  5            The plastic receiving hole must fasten to the

10:32:58  6    male electrode.  Now, Dr. Williams conceded that the RES

10:33:02  7    belt doesn't do that.  So what did he argue?  He, in fact --

10:33:07  8    this is Mr. Reynolds asking him.  He said, it's abundantly

10:33:12  9    clear that that hole doesn't fasten to the male snap?  He

10:33:15  10   said, that's correct, it's abundantly clear.

10:33:17  11           So what did he argue?  He said, well, a person

10:33:19  12   of skill in the art would take that hole and he would shrink

10:33:23  13   it down and make it smaller so that it did fasten to the

10:33:26  14   male snap.

10:33:27  15           Well, remember what the Judge told you about

10:33:31  16   making modifications or combinations.  This is in your jury

10:33:36  17   instruction 4.5.  Most, if not all inventions, rely on

10:33:40  18   building blocks that have been uncovered before.  And so the

10:33:43  19   claims, most claim discoveries are new combinations of old

10:33:46  20   things.  And then this last sentence.  Therefore, you should

10:33:50  21   consider whether a reason existed at the time of the

10:33:53  22   invention to combine those teachings.

10:33:58  23           And so I asked Dr. Williams that very question.

10:34:01  24   Dr. Williams, what is the reason that would have motivated

10:34:05  25   a person of skill in the art to make that hole smaller?

10:34:08   1   And you remember this.  Well, wait.  Before we get there,

10:34:13   2   why do we need that reason?  Let's go to the next jury

10:34:16   3   instruction.

10:34:17   4            Hindsight, obviousness.  The reason that that

10:34:22   5   instruction, that you can't just put things together at

10:34:24   6   random, you have to have some reason for doing it, is to

10:34:26   7   avoid hindsight, because we've all seen an invention, and

10:34:30   8   after we've seen it, we've thought, I could have come up

10:34:32   9   with that.  I could have been a millionaire.  Well, yeah.

10:34:36  10   The answer to the problem is easy to see once you've seen

10:34:41  11   it, but that's using hindsight, and that's improper under

10:34:44  12   the law.

10:34:45  13            The person of skill in the art didn't have the

10:34:47  14   '532 patent to guide him or her, and so the reason that

10:34:51  15   there has to be some motivation or reason to combine the

10:34:54  16   elements is to guard against using hindsight, which is

10:34:58  17   improper.

10:34:59  18            So let's move on.  We then have my question to

10:35:03  19   Dr. Williams.  I said, Dr. Williams, what is the motivation,

10:35:06  20   what is the reason that would cause them to shrink that

10:35:08  21   hole?  And he gave me two things.  He said, you could make

10:35:11  22   it easier to manufacture and you could make it cheaper.

10:35:15  23   What?

10:35:16  24            So I asked him, because that didn't make sense

10:35:18  25   to me.  I said, would making the hole smaller make it easier

10:35:22  1    to manufacture?  At that point he caved and he said no.  It

10:35:28  2    just flies in the face of common sense.

10:35:30  3           Would it make it less expensive to manufacture

10:35:32  4    by making that hole smaller?  No, it wouldn't.  He had to

10:35:36  5    concede, no, it wouldn't.  He had no reason to do that.

10:35:40  6    There was no reason for a person of skill in the art to

10:35:43  7    make the hole smaller.  There was no reason to combine.

10:35:46  8    And so consequently, we go back to the claim chart, and

10:35:50  9    we put a no there, because there was no reason to do what

10:35:53  10   Dr. Williams said should be done.

10:35:56  11          Let's go to the next one.  The conductor at

10:35:59  12   least partially located in the electrode belt.  This is

10:36:03  13   JTX-1, the Court's claim construction where he interpreted

10:36:06  14   certain phase phrases, and the Court has said that the

10:36:10  15   electrode belt and the belt connector, which are plastic

10:36:13  16   parts, they are different parts.

10:36:15  17          And he said, the conductor of the electrode belt

10:36:17  18   is a conductor that is at least partially located in the

10:36:20  19   belt.  Well, that makes sense.  It's a conductor of the

10:36:23  20   belt, so it's partly in the belt.

10:36:24  21          Well, let's go and look at the analysis now.

10:36:29  22          Dr. Williams, he testified that the spring,

10:36:34  23   that's this part here, that the spring, curvy part, was

10:36:38  24   the conductor of the electrode belt that passes through

10:36:41  25   the hole and wraps around and does all the things it's

10:36:44  1   supposed to do.  But I asked him, is any portion of the

10:36:46  2   spring in the belt?  No, it's not.  There's no portion of

10:36:51  3   the spring in that belt material part.  And he had to agree

10:36:55  4   with that.

10:36:56  5           And so I continued and I said, well, now, the

10:36:59  6   spring wire, the spring wire is stiff, made of stiff metal,

10:37:03  7   because it has to perform the fastening function?  He said,

10:37:05  8   that's right, it is.

10:37:08  9           And I said, the spring and the wire that

10:37:10  10  actually comes out of the belt, the conductor of the belt,

10:37:13  11  they're different parts with different material properties,

10:37:16  12  and they're just connected together.  They are soldered

10:37:19  13  together?  And he had to agree with that as well.

10:37:21  14          The spring is not the conductor of the electrode

10:37:23  15  belt.  It's attached to the conductor of the electrode belt.

10:37:27  16  It's a different connector that is attached to it.

10:37:30  17          And so we go back to our claim chart and, once

10:37:33  18  again, we have another no.  The conductor of the electrode

10:37:37  19  belt is not what passes through and wraps around as required

10:37:40  20  by the claims.

10:37:41  21          Next we have the conductor of the electrode belt

10:37:45  22  is wrapped around an engaging member so that the engaging

10:37:48  23  member forces it into the sides of the snap.

10:37:52  24          Well, what do we have on that front?  When

10:37:56  25  explaining this, Dr. Williams, he had this picture up, and

10:38:00  1   he was explaining to Mr. Reynolds what that claim limitation

10:38:03  2   means.  And he said, this is talking about when the male

10:38:07  3   snap is in the hole.  You can see it right there.  It's in

10:38:09  4   the hole.  And the conductor is forced into physical contact

10:38:13  5   with that narrow net part of the snap.  And he said, it

10:38:18  6   maintains that connection, so it doesn't just wobble away.

10:38:22  7   And that's what that claim limitation is talking about.

10:38:25  8        Well, then when he does his analysis, he does a

10:38:29  9   little sleight of hand and switches on us.  If we look at

10:38:31  10  his testimony about the analysis, he says, well, to make

10:38:35  11  this make sense, the engaging member is contacting the wire

10:38:39  12  to keep it from just bending out and not coming back.  Wait.

10:38:44  13  Bending out and not coming back?  That's what springs do.

10:38:48  14  That's why it's a spring.  It springs back after it is bent

10:38:52  15  out.

10:38:53  16       The engaging member doesn't force it back.

10:38:57  17  Further, and more importantly, remember, he said that the

10:39:00  18  claim limitation requires it to maintain the contact after

10:39:03  19  it's in the hole.

10:39:06  20       Well, you'll remember I did this demonstration

10:39:08  21  with Dr. Williams.  I took the plastic engaging members

10:39:14  22  completely off and I took this spring and I snapped it on

10:39:18  23  the snap like so and I held that.  And I said, Dr. Williams,

10:39:22  24  would you agree with me now it's the force of the spring

10:39:25  25  that maintains that contact?  And he had to agree that it

10:39:30   1   does.

10:39:31   2          How could he not?  There is no plastic on that.

10:39:34   3   It's not the plastic engaging member that forces the spring

10:39:38   4   into contact with the side of the electrode.  It's the force

10:39:42   5   within the spring itself.  That is why they use a spring.

10:39:46   6          And so we go back to our claim chart and, once

10:39:48   7   again, we add another no.  We've got four of them now.

10:39:52   8          And last, we have the elongated member that

10:39:55   9   imparts flexibility to the hole.  Well, Dr. Williams didn't

10:39:59  10   talk about this with the RES at all.  He didn't talk, he

10:40:03  11   didn't show you elongated members on the RES.  He didn't

10:40:05  12   show you any longitudinal axis or any of that that's

10:40:08  13   required by the claim language.  He didn't talk about it at

10:40:10  14   all.  So that's a definite no.  So we have no's all the way

10:40:15  15   down the first column.

10:40:17  16          Well, remember, Dr. Williams then, he tried to

10:40:20  17   fill in some of those holes, saying that McIntire teaches

10:40:23  18   them.  Well, let's look at that.

10:40:26  19          So we'll start at the top again.  And before we

10:40:30  20   get there, go ahead.  Go to that next slide.

10:40:33  21          So I asked him if there was anything that would

10:40:38  22   cause a person of skill in the art to combine features for

10:40:42  23   McIntire with other things?  And remember he read some

10:40:45  24   portions of McIntire, and you're going to I think see those

10:40:48  25   again when Mr. Reynolds gets up.

10:40:50    1        And McIntire says, well, you could combine the

10:40:53    2   different features and components of McIntire in lots of

10:40:55    3   different ways, and you would do it to make it easier, to

10:40:59    4   manufacture and cheaper, and it said you could combine them

10:41:03    5   in different ways to do these things.

10:41:05    6        Well, remember, Mr., or Dr. Williams said that

10:41:09    7   McIntire teaches a semi-infinite number of combinations.

10:41:14    8   How many is semi-infinite?  A million, ten million?  I don't

10:41:18    9   know.  A lot.

10:41:19   10        So a semi-indefinite number of combinations.

10:41:24   11   But remember, the law says there must be a reason to combine

10:41:26   12   them in the way the claim does.

10:41:29   13        And so I asked Dr. Williams that question:

10:41:32   14        Dr. Williams, what would cause a person of skill

10:41:35   15   in the art to combine it the way the claim does?  Is it

10:41:40   16   because, is there anything in McIntire that says it would be

10:41:43   17   cheaper to combine these elements like the claim?

10:41:46   18        He said, No, McIntire doesn't give us any

10:41:50   19   direction there.

10:41:50   20        I said, is there anything in McIntire that says

10:41:53   21   that one special combination of the claim would be easier to

10:41:56   22   manufacture than all these semi-infinite number of

10:41:59   23   combinations?

10:42:00   24        Again, he didn't -- he said no.

10:42:04   25        I said, there's nothing that would suggest that?

10:42:06    1           And he said, you're right, there's not.

10:42:08    2           So there's, once again, no motivation, there's

10:42:12    3   no motivation to come to that one special combination of

10:42:15    4   claim 1.

10:42:16    5           And so if we go back to the chart in the top,

10:42:20    6   does McIntire teach a plastic hole that will fasten to the

10:42:24    7   snap?  Yes, it does.  We don't dispute that.  It's taught.

10:42:28    8   But there's no reason to combine that with the RES belt.

10:42:32    9   And so, once again, that ends up being a no in that square.

10:42:36   10   It's present, but there's no reason to put it together with

10:42:40   11   the RES belt.

10:42:41   12           Well, the conductor at least partially located

10:42:44   13   in the electrode belt.  Was there any reason -- sorry,

10:42:48   14   not a reason, but Dr. Williams, he testified that McIntire

10:42:53   15   doesn't teach that.  He didn't say that McIntire fills that

10:42:57   16   hole at all.  So that's not an RES belt and it's not in

10:43:00   17   McIntire.

10:43:01   18           And the same is for the next one down, the

10:43:04   19   conductor of the electrode belt passing through the hole.

10:43:07   20   He never told you that any conductor of any electrode belt

10:43:10   21   passed through any hole in McIntire.  He concedes that it

10:43:13   22   does not.  So that's a no.

10:43:14   23           The next one, the conductor wire wrapped around

10:43:17   24   the engaging member so that it's forced into the side.  Does

10:43:20   25   McIntire teach that?  You didn't hear one word from Dr.

10:43:25  1  Williams that said McIntire taught that.  It's just not

10:43:27  2  there, and so that is a no.

10:43:29  3  And then, last, we have elongated member that

10:43:32  4  imparts flexibility.  Well, these are located in the

10:43:36  5  McIntire, this is taught by the McIntire.  It's taught in

10:43:39  6  Figure 12, and I think you'll see that a little later today

10:43:43  7  as well.

10:43:43  8  The question then becomes:  Was there a reason

10:43:46  9  to combine that feature with the RES belt?  And the answer

10:43:50  10  is no.  Just like it was no for the plastic receiving hole,

10:43:54  11  he uses the same motivations and the same analysis that

10:43:57  12  applies for the elongated members.  There's no reason to

10:44:01  13  combine them.  He couldn't give one.

10:44:03  14  And so we have no's all the way down the first

10:44:05  15  claim and all the way down the second claim.

10:44:07  16  Remember, if there's even one in each column,

10:44:10  17  one no in each column, the claim is valid.  And we've got at

10:44:14  18  least five.  So the claim is invalid, but let's just assume

10:44:20  19  hypothetically that you found that each of the elements are

10:44:24  20  present, so you have yesses all the way down one or both of

10:44:27  21  these claims.  What then?

10:44:29  22  Well, we go to jury instruction 4.6.  These are

10:44:35  23  other considerations that you must consider before

10:44:39  24  determining whether the claim was obvious.  These other

10:44:43  25  considerations, that's what happened in the real world.

| | |
|---|---|
| 10:44:45 | 1 |
| 10:44:48 | 2 |
| 10:44:51 | 3 |
| 10:44:54 | 4 |
| 10:44:58 | 5 |
| 10:45:01 | 6 |
| 10:45:04 | 7 |
| 10:45:06 | 8 |
| 10:45:12 | 9 |
| 10:45:14 | 10 |
| 10:45:18 | 11 |
| 10:45:21 | 12 |
| 10:45:23 | 13 |
| 10:45:27 | 14 |
| 10:45:31 | 15 |
| 10:45:35 | 16 |
| 10:45:38 | 17 |
| 10:45:41 | 18 |
| 10:45:44 | 19 |
| 10:45:47 | 20 |
| 10:45:47 | 21 |
| 10:45:50 | 22 |
| 10:45:53 | 23 |
| 10:45:53 | 24 |
| 10:45:56 | 25 |

This is no longer out there in make believe land or
hypothetical person of skill in the art.  This is what
really happened.  And as you see on the bottom, answering
any or all of these questions "yes" may suggest the claim
was not obvious.  Well, let's go through them quickly.

Were the products covered by the claim
commercially successful due to the merits of the claimed
invention?  Well, that is a "yes" answer.  Mr. Hoskuldsson
explained.  He went through claim 1 and he said, here is the
feature of claim one.  Here it is in the Nox disposable
belt.  And this is why it's commercially successful.
Because it wraps -- because that conductor wire from the
belt wraps around the hole, that gives us a great signal.
We have good signal stability.  We have good signal quality.
Because we used that one plastic frame with the receiving
hole, it's easy to use.  That makes it saleable.  That makes
it commercially successful.  It was so commercially
successful that Natus started copying and selling it as well
and all of that success was due to the claimed features, so
that's a yes.

Was there a long-felt need for a solution to the
problem facing the inventors, which was satisfied by the
claimed invention?

Well, you remember Nox Medical.  They set out to
solve the problems of the cut-to-fit belts.  Did they do

10:45:59   1   that?  Yes, they did.   They solved the ease of use problems.

10:46:03   2   They've solved the signal stability and quality problems.

10:46:06   3   And they did it by incorporating the claimed features into

10:46:10   4   the Nox disposable belt.  So, yes.

10:46:13   5           How long had those problems been felt?  Well,

10:46:15   6   remember, the cut-to-fit belts had been used since 2001.

10:46:19   7   We're now in 2009.  At the time of the invention, almost a

10:46:23   8   decade, those problems had been felt and unsolved.  The

10:46:28   9   answer to number two is yes.

10:46:29   10          Number three.  Did others try to solve the

10:46:32   11  problem the claimed invention solved?  Well, I can think of

10:46:36   12  four attempts and failures.

10:46:37   13          The first, interestingly enough, is Nox Medical.

10:46:40   14  Nox Medical, when they first started their company, they

10:46:43   15  tried to solve the problem of the cut-to-fit belt.  Their

10:46:48   16  first product was the disposable belt, but that didn't solve

10:46:51   17  the problems.  The problems were still there for signal

10:46:54   18  stability.  They solved the ease-of-use problems but not the

10:46:56   19  others.

10:46:56   20          Well, that's one.  So who else?  Well, Natus.

10:47:00   21  They had every motivation to solve these problems.  They

10:47:03   22  were getting complaints all over the place about their

10:47:06   23  cut-to-fit belts.  They went to SASN.  They couldn't do it.

10:47:13   24  Elas, they couldn't do it.  All of them tried and failed.

10:47:16   25  So the answer to question number three is yes.

| | |
|---|---|
| 10:47:18 | 1 |
| 10:47:20 | 2 |
| 10:47:24 | 3 |
| 10:47:25 | 4 |
| 10:47:29 | 5 |
| 10:47:33 | 6 |
| 10:47:35 | 7 |
| 10:47:39 | 8 |
| 10:47:42 | 9 |
| 10:47:46 | 10 |
| 10:47:49 | 11 |
| 10:47:52 | 12 |
| 10:47:55 | 13 |
| 10:47:58 | 14 |
| 10:48:01 | 15 |
| 10:48:05 | 16 |
| 10:48:09 | 17 |
| 10:48:13 | 18 |
| 10:48:13 | 19 |
| 10:48:15 | 20 |
| 10:48:17 | 21 |
| 10:48:21 | 22 |
| 10:48:23 | 23 |
| 10:48:26 | 24 |
| 10:48:30 | 25 |

Number four, did others copy the claimed invention?  Well, we'll talk about that later, but absolutely.

Mr. Murphy said, it's the Sinbon is the knockoff, is the Nox knockoff.  That's a copy, folks.  The answer to question number four is yes.

And, lastly, did the invention have unexpected results?  Well, you remember Mr. Hoskuldsson talked about this as well.  He testified that the signal quality that they got out of this disposable belt was phenomenal, exceeded everything they expected.  In fact, the signal quality is so good, that they are now collaborating with universities like Harvard, because there's new information that they couldn't get from the old belts, and they're now researching that information so they can better diagnose sleep disorders, better treat people, and help them have a happier, healthier life.  The answer to question number five is yes.

So even they get yesses down both of those columns, after considering all of these other considerations, is it clear and convincing, you have an abiding conviction that the claim was obvious?

Well, if that wasn't enough, what was the last question I asked Dr. Williams?  Remember, he said that this technology is old as the hills.  It has been around for

10:48:34  1    40 years or more.  The invention is so easy, a sophomore in

10:48:39  2    college could do it.

10:48:40  3             I said, if this had been around so long and it

10:48:42  4    was so easy, has anybody done it?  The answer was no.  There

10:48:48  5    are only two people who have done it -- Nox Medical, who

10:48:51  6    invented it, and Natus, who copied.  No one else.  That is

10:48:57  7    the antithesis of obviousness.

10:49:00  8             So we've established now that the claims are

10:49:03  9    valid.  Once we've done that, we go to the next phase, which

10:49:08  10   is damages.

10:49:09  11            And in damages, both parties presented an expert

10:49:13  12   witness and they both talked about a reasonable royalty.

10:49:15  13   And in doing that, they went through the 15 Georgia-Pacific

10:49:19  14   factors saying, this one has an up arrow, this one has a

10:49:24  15   down arrow, this one increased it, decreased it.  At the end

10:49:27  16   of the day, they each came up with a royalty rate.  $1 for

10:49:31  17   Mr. Bero, $2 for Mr. Cragun.

10:49:33  18            There were two significant differences between

10:49:36  19   they're analysis.  Let's talk about the first one.

10:49:38  20            The first one has to do with a starting royalty

10:49:41  21   rate used by Mr. Bero.  Mr. Bero used a starting royalty

10:49:45  22   rate of 65 cents.  Okay?  And he said that that is the

10:49:48  23   foundation of his analysis.  And he said that it's the

10:49:52  24   starting royalty rate because that's where you start from,

10:49:57  25   and you build from that for the rest of the analysis.  He

10:50:00    1    went through the factors.

10:50:01    2         He said, this factor is a positive so that makes

10:50:03    3    it go up and this one is a positive, too.  He's going

10:50:07    4    through all the 15 factors.  He says, this one, that's a

10:50:10    5    negative, so that would decrease it, and that's another

10:50:13    6    negative.  And he went through one by 1 through 15 factors,

10:50:18    7    okay, stacking them up, showing his analysis.  You get the

10:50:22    8    picture.  At the end, where did he end up?  He ends up at

10:50:27    9    the end of the day with a royalty rate of $1.

10:50:34    10         So we have all the pluses and minuses all the

10:50:37    11    way up through all the Georgia-Pacific factors, and that's

10:50:40    12    what we get.

10:50:41    13         Well, let's go back to that starting rate,

10:50:44    14    because he said that it's important, it's important that you

10:50:47    15    get that starting number right, because if you don't get

10:50:49    16    that starting number right, that's the foundation, and that

10:50:52    17    affects the whole rest of the analysis.

10:50:54    18         Well, let's look at that starting rate for a

10:50:57    19    minute.  How did we find 65 cents?  He said, Natus has

10:51:01    20    stolen the belt sales from two of Nox Medical's customers,

10:51:05    21    and those belt sales to those two customers represent

10:51:09    22    15 percent of Natus' sales, so I take 15 percent, I times

10:51:13    23    that by Natus' gross profit, and I get 65 cents, and that's

10:51:17    24    what I've done.

10:51:18    25         But there's a problem there.  Natus didn't sell,

10:51:21   1   or Nox Medical didn't just say to two customers in the U.S.

10:51:25   2   They sell to 650 customers in the U.S.  And did Mr. Bero,

10:51:32   3   did he consider all of those 650 customers?  We asked him:

10:51:36   4   How many of those 650 did Natus sell belts to taking sales

10:51:41   5   away from Nox Medical?  He said, I can't tell you.  I don't

10:51:43   6   know.  Well, he had all of the customers of Nox Medical.

10:51:47   7            Did you ask Natus for their customer list so you

10:51:49   8   could do a cross-comparison and find out?  He said, no, I

10:51:54   9   didn't do that.  I expected Nox Medical to do that.

10:51:56  10            This is your theory, Doctor, or Mr. Bero.  Why

10:52:01  11   would Nox Medical do your work?  That doesn't make sense at

10:52:04  12   all.

10:52:04  13            So at the end of the day, Mr. Bero considered

10:52:07  14   two out of 650 customers, that missing 99 percent of Nox

10:52:14  15   Medical's customers.  So he has no idea if this is right or

10:52:17  16   wrong.  And what happened?  You pull the foundation out, the

10:52:23  17   whole analysis comes crashing down.  It can't stand because

10:52:26  18   the 65 cents is clearly wrong.  He didn't even look at

10:52:31  19   99 percent of the customers out there to see if Natus had

10:52:34  20   stolen sales from Nox Medical.  It just doesn't even pass

10:52:39  21   the straight face test. That's only one problem.

10:52:43  22            The second problem is that Mr. Bero, he said

10:52:46  23   that this is an open kimono negotiation.  All the cards are

10:52:50  24   on the table, everything is face up.  The parties know

10:52:52  25   everything and consider everything.  Well, he said that, but

10:52:56  1   then he didn't do that in his analysis.  He ignored all

10:52:59  2   sorts of evidence because it was bad for Natus.  Let's look

10:53:02  3   at some of that evidence.

10:53:04  4           This is an e-mail where Ms. Quinlivan is

10:53:08  5   reporting that they're expecting a 4.4 million drop in their

10:53:12  6   XactTrace line in 2014.  Their sales are dropping

10:53:18  7   4.4 million.  He said this is due mostly because we lost

10:53:21  8   sales to Europe, to Nox, and because we have problems with

10:53:24  9   the reusable belts, but at the end there, the single, the

10:53:28  10  new single use belts, that's the knockoff, should help us

10:53:30  11  recover in the marketplace.  Mr. Bero ignored that.

10:53:35  12          Let's go to the next one.  Mr. Murphy, the

10:53:38  13  director of marketing.  He is e-mailing his people.  We know

10:53:42  14  the impact that these cut-to-fit belts are having on your

10:53:45  15  sales in general.  It's not disputed.

10:53:47  16          Now, this is not just cut-to-fit -- it's not

10:53:50  17  just affecting their belt sales.  It's affecting their

10:53:53  18  sales in general.  This problem is contaminating other

10:53:57  19  products.

10:53:58  20          Let's go to the next one.  Mr. Bero ignored

10:54:00  21  that.

10:54:00  22          Edmund Kotzur.  He said Vivosol management is

10:54:08  23  one step away from terminating its relationship with Natus

10:54:10  24  and Embla.  He said, it's so bad, we have to give away FOC

10:54:14  25  locks free of charge.  We are giving locks away.  The

1   cut-to-fit belt, we're giving it away free to keep people

2   from going to Nox.

3         Well, even then, not all customers will accept

4   that response.  Some of them are still leaving, and he said

5   Vivosol expects action from Natus.  Mr. Bero ignored that.

6         Let's go to the next one.  This is Mr. Davies.

7   Mr. Davies.  He said, well, I fear that if we don't replace

8   the previous lock design, that's the cut-to-fit design, our

9   customers will not switch back to Embla.  They refer to use

10  the Nox belts they know to be reliable.  Mr. Bero ignored

11  that all over the place.

12        Well, Mr. Bero, he said, I can ignore all of

13  that because that's all in Europe.  This is a U.S. patent.

14  Remember, he talked about it.  He said, this is a U.S.

15  patent.  That's one of the three critical facts he focused

16  on.  U.S. patent, U.S. sales.

17        Well, does that stand up to the evidence and the

18  facts?  Let's look.

19        Next exhibit.  This is an e-mail from Claude

20  Buckles.  Who is he?  The director of key accounts and

21  distribution in North America.  We are no longer in Europe.

22  We're talking about North America here in the United States.

23  He says, I just had a frustrated key account.  They have

24  more belts that are faulty.  They're broken.  They are not

25  working.  It has gotten so bad, they have to track the

10:55:43  1    faults by putting tape on them to keep track of them.  He

10:55:45  2    said the customer has told us, they will give us one last

10:55:48  3    try to rectify this issue.  This is it.  That's all they

10:55:52  4    will stand for.  No more belts or supplies of any sort if

10:55:57  5    this fix doesn't work.

10:55:59  6              Once again, not just limited to Europe, not just

10:56:04  7    limited to belt sales.  This was a big problem all over the

10:56:07  8    world.  It was affecting all of their different products.

10:56:11  9    Mr. Bero, he ignored it.  That is not open kimono

10:56:15  10   negotiation.

10:56:16  11             Why are all of these facts -- in fact, it's

10:56:18  12   interesting.  Mr. Bero, he did not show you a single exhibit

10:56:23  13   in his whole presentation, not one.  I don't know if you

10:56:26  14   noticed that or not.  There wasn't a single citation to the

10:56:29  15   evidence.

10:56:30  16             The reason this is important is because these

10:56:34  17   are the facts that would drive a licensing negotiation.

10:56:37  18   Natus, they needed that product.  They were giving their

10:56:39  19   belts away for free.  And Mr. Bero, he says, well, Mr.

10:56:43  20   Cragun, he said, I considered all of this, and $3 is what

10:56:47  21   Natus would have been willing to pay.  That still left them

10:56:54  22   30 percent of their margin.  It fixed all the problems.  It

10:56:57  23   solved all their problems so it wouldn't contaminate the

10:56:59  24   other product lines where they have even higher margins,

10:57:02  25   and that's what Nox Medical would have accepted.  That's

10:57:04  1    the profit they make selling Nox Medical.  That's the profit

10:57:08  2    Nox Medical makes selling to CareFusion, its U.S.

10:57:10  3    distributor.

10:57:11  4            Well, what's wrong with having Natus pay the

10:57:14  5    same profit to Nox Medical that CareFusion pays?  There's

10:57:19  6    nothing wrong with that.  Natus can go out and make a

10:57:23  7    reasonable profit the same as CareFusion if they are paying

10:57:27  8    the same amount of its profit to Nox Medical.  It just puts

10:57:30  9    CareFusion and Natus on an equal playing field.  There's

10:57:33  10   nothing wrong or unreasonable about that.

10:57:35  11           So at the end of the day, the damages amount

10:57:38  12   that you should apply is $3 per belt.  You times that by the

10:57:43  13   number of belts and you come up with $890,250.  The number

10:57:50  14   of belts is not in dispute.  It's just a matter of

10:57:52  15   multiplication.  $890,250.  That is the reasonable royalty

10:57:57  16   rate.

10:58:01  17           Let's go to willfulness.  That is the last issue

10:58:03  18   that you have to decide.

10:58:05  19           So back in 2012, Natus was hurting.  We just

10:58:15  20   looked at the evidence.  The facts are, Natus' belts were

10:58:19  21   causing it all kinds of grief.  That problem had spilled

10:58:22  22   over into different products contaminating the reputation

10:58:25  23   of Natus.  It was giving them heartburn like you can't

10:58:28  24   believe.

10:58:28  25           Well, in his opening statement, Mr. Reynolds --

| | |
|---|---|
| 10:58:34 | 1 |
| 10:58:39 | 2 |
| 10:58:42 | 3 |
| 10:58:45 | 4 |
| 10:58:48 | 5 |
| 10:58:52 | 6 |
| 10:58:56 | 7 |
| 10:59:01 | 8 |
| 10:59:01 | 9 |
| 10:59:05 | 10 |
| 10:59:10 | 11 |
| 10:59:13 | 12 |
| 10:59:17 | 13 |
| 10:59:19 | 14 |
| 10:59:25 | 15 |
| 10:59:28 | 16 |
| 10:59:31 | 17 |
| 10:59:36 | 18 |
| 10:59:40 | 19 |
| 10:59:45 | 20 |
| 10:59:48 | 21 |
| 10:59:53 | 22 |
| 11:00:03 | 23 |
| 11:00:04 | 24 |
| 11:00:08 | 25 |

1   I told you that Natus copied the product.  Mr. Reynolds,

2   this is what he told you.  He said, Natus didn't really

3   copy.  He said, they asked a bunch of suppliers for a design

4   proposal.  And Mr. Reynolds told you that the evidence would

5   show that they got a design proposal back from a Chinese

6   manufacturer that Natus later found out it was the same

7   because they happened to be the same manufacturer as Nox

8   Medical.

9           Well, let's look at the evidence.  This is an

10  e-mail from Tom Duffy, the product manager of Natus' belts,

11  September 5th, 2012.  A sample of the Nox design has been

12  shipped to Sinbon today.  Once they receive it, they can

13  give us a better estimate on a schedule.

14          So who is telling the full story?  What did they

15  get back?  Well, let's look and see.  On the left, you have

16  the Nox Medical belt that was shipped to Sinbon.  On the

17  right, you have the product that comes back.  The product is

18  called, unsurprisingly, the Nox knockoff.  Natus absolutely

19  copied the product.  Can there be any denial of that?  Not a

20  credible one.

21          Well, let's go to some jury instructions.  The

22  instructions in -- let's move on.  Oh, well, okay.  We'll

23  talk about this first.

24          So Mr. Murphy said, Natus said, we're not

25  willful because we did a patent search.  We did a patent

11:00:11    1    search and we found there were no problems.

11:00:12    2          Mr. Murphy, he testified that this idea of

11:00:15    3    looking at a patent and doing a patent search was important,

11:00:17    4    and it was even heightened in this situation where the

11:00:20    5    products are so similar.  And he said, I would want to know

11:00:23    6    about patent applications as well as patents.  Right?

11:00:26    7    That's what he testified.

11:00:27    8          So let's move on.  Next, he says, well -- we

11:00:38    9    said, well, okay.  A few questions though.  Where is the

11:00:42   10    search?  Has Natus ever produced a search?  They have not.

11:00:48   11    Not one document showing somebody has said, I did a search.

11:00:52   12    We're okay.  I did a search.  This is what I found.  I did a

11:00:54   13    search.  This is what I did not find.  Not a shred of

11:00:59   14    evidence about the actual search, nothing.

11:01:02   15          Well, we tried to find out who did the search.

11:01:06   16    We asked Mr. Murphy.  Mr. Murphy, did you perform this

11:01:10   17    search?  He said, no, I did not.  Well, did you talk to who

11:01:13   18    performed the search?  He said, no, I did not.

11:01:17   19          Let's go back a slide.  This is Mr. Duffy, the

11:01:19   20    product manager.  We also asked him, Mr. Duffy, did you

11:01:23   21    perform the search?  He said, I did not personally look into

11:01:26   22    that.  It was someone else's responsibility.

11:01:30   23          Well, we have an e-mail from Mr. Nitin Shali.

11:01:35   24    He said, leave the patent stuff up to me.  I will take care

11:01:38   25    of it.

| | |
|---|---|
| 11:01:39 | 1 |
| 11:01:43 | 2 |
| 11:01:46 | 3 |
| 11:01:50 | 4 |
| 11:01:55 | 5 |
| 11:01:59 | 6 |
| 11:02:03 | 7 |
| 11:02:08 | 8 |
| 11:02:11 | 9 |
| 11:02:14 | 10 |
| 11:02:14 | 11 |
| 11:02:17 | 12 |
| 11:02:21 | 13 |
| 11:02:24 | 14 |
| 11:02:30 | 15 |
| 11:02:32 | 16 |
| 11:02:38 | 17 |
| 11:02:41 | 18 |
| 11:02:47 | 19 |
| 11:02:47 | 20 |
| 11:02:52 | 21 |
| 11:02:55 | 22 |
| 11:02:58 | 23 |
| 11:03:02 | 24 |
| 11:03:05 | 25 |

We asked Mr. Duffy that question.  Did Mr. Shali, did he do the search?  Mr. Murphy said, I don't know who did it either.  Who did the search?  Natus has never told us who did the search, what they found, what came back or evidence.  That evidence leads to one or two conclusions.  One, they never did the search, or, two, if they did the search, they ignored it.  That's it.

I mean, we know.  We look at the face of the patent, we know that there was information out there to find.

Now, Natus has argued, and Mr. Reynolds in his opening said, Nox Medical hid the patent.  They hid the applications.  This was published in 2011.  That is the PCT.  You cannot hide a published application.  It's published by the Government entity that the application was filed with.  It's impossible to hide.  And 2011, that was before Natus even started its project.  This was long before the 2012 September e-mail from Mr. Shali.  It was not hidden.

Further, in October of 2014, Nox Medical sent them the U.S. published application.  This was before they launched in the U.S.  And they said, look, we have a published application.  And this is in October of 2014.  Nox Medical didn't hide the applications.  They couldn't.  In fact, it sent them to Natus, telling them, be warned.

| | |
|---|---|
| 11:03:08 | 1 |
| 11:03:12 | 2 |
| 11:03:19 | 3 |
| 11:03:23 | 4 |
| 11:03:25 | 5 |
| 11:03:29 | 6 |
| 11:03:33 | 7 |
| 11:03:37 | 8 |
| 11:03:41 | 9 |
| 11:03:48 | 10 |
| 11:03:51 | 11 |
| 11:03:55 | 12 |
| 11:03:57 | 13 |
| 11:04:00 | 14 |
| 11:04:04 | 15 |
| 11:04:07 | 16 |
| 11:04:09 | 17 |
| 11:04:13 | 18 |
| 11:04:16 | 19 |
| 11:04:22 | 20 |
| 11:04:25 | 21 |
| 11:04:27 | 22 |
| 11:04:31 | 23 |
| 11:04:36 | 24 |
| 11:04:39 | 25 |

Well, then we get to June 2015.  The patent
issues.  Here, we have a letter, the day the patent issues,
June 16th, 2015, telling Natus, our patent has issued.  Your
products infringe.  We demand you stop.

Now, Mr. Reynolds, he's going to say, all that
copying beforehand doesn't matter, but let's go to your jury
instructions, because your jury instructions tell you it
does.  The willfulness is assessed at the time of the
alleged conduct, June 16th, 2015, and defenses to liability
that come up later are irrelevant.  So the defenses that
Natus has put in this case, they are irrelevant to
willfulness, because they came up later.

Well, your instruction also tells you that
deliberate copying of the commercial product before issuance
can tell you about the state of mind of Natus after the
patent issued.

So let's talk about that.  Natus knew it had
copied the product.  What does that mean?  When it got
that letter on June 15th, or June 16th, it knew it
infringed.  It had copied the product.  How could it believe
otherwise?

So that copying before tells you that after the
patent issued, they knew they infringed.  What did they do?
They didn't have any idea, they didn't have any belief it
was invalid.  They knew they infringed.  They kept going on

| | |
|---|---|
| 11:04:43 | 1 |
| 11:04:47 | 2 |
| 11:04:50 | 3 |
| 11:04:52 | 4 |
| 11:04:57 | 5 |
| 11:04:59 | 6 |
| 11:05:02 | 7 |
| 11:05:06 | 8 |
| 11:05:09 | 9 |
| 11:05:13 | 10 |
| 11:05:15 | 11 |
| 11:05:17 | 12 |
| 11:05:21 | 13 |
| 11:05:24 | 14 |
| 11:05:34 | 15 |
| 11:05:42 | 16 |
| 11:05:47 | 17 |
| 11:05:51 | 18 |
| 11:05:54 | 19 |
| 11:05:56 | 20 |
| 11:06:21 | 21 |
| 11:06:23 | 22 |
| 11:06:24 | 23 |
| 11:06:26 | 24 |
| 11:06:29 | 25 |

with business as usual.  They kept selling it.  They kept

taking customers and sales away from Nox Medical.

You remember Mr. Bero, he said that they could

have easily avoided infringement for all of its

rest-of-world sales.  They could have done it simply, is the

word he used, by just rerouting the shipping to their

warehouse in Ireland.  After they got that letter, they

didn't even do that.  They didn't respond to the letter.

They didn't reroute their shipping.  That is willful

infringement.

They said, we're the multinational corporation

here.  We're the big dog.  We're going to crush Nox Medical.

We're not even going to respond.  We dare them to come and

sue us.  That is the message that they were projecting.

That is willfulness.  It's bad faith.  It's malicious.

You get to now decide this case.  Thank you.

THE COURT:  All right.  So, members of the jury,

as I said, we'll take our morning break for 15 minutes.  All

right?  Then we'll come back and finish up here.

(The jury was excused for a short recess.)

THE COURT:  All right.  So we'll take our

morning break.

Mr. Nydegger, the clock says you have

three-and-a-half minutes of rebuttal.  Okay?

MR. NYDEGGER:  Three-and-a-half?

| | | |
|---|---|---|
| 11:06:33 | 1 | MR. LORIMER:  Yes. |
| 11:06:34 | 2 | THE COURT:  See you again in 15 minutes. |
| 11:06:36 | 3 | MR. NYDEGGER:  Thank you, your Honor. |
| 11:06:43 | 4 | (Short recess taken.) |
| 11:15:03 | 5 | -  -  - |
| 11:15:03 | 6 | (Proceedings resumed after the short recess.) |
| 11:23:29 | 7 | THE COURT:  All right.  Are you ready to go? |
| 11:23:32 | 8 | MR. REYNOLDS:  Yes. |
| 11:23:32 | 9 | THE COURT:  All right.  Let's get the jury. |
| 11:23:56 | 10 | (The jury entered the courtroom.) |
| 11:24:40 | 11 | THE COURT:  All right.  Members of the jury, |
| 11:24:41 | 12 | welcome back. |
| 11:24:41 | 13 | Everyone, you may be seated. |
| 11:24:42 | 14 | Mr. Reynolds? |
| 11:24:44 | 15 | MR. REYNOLDS:  Thank you, your Honor. |
| 11:24:45 | 16 | Ladies and gentlemen, thank you for your service |
| 11:24:48 | 17 | here over this past week.  Natus greatly appreciates the |
| 11:24:53 | 18 | time and attention you clearly have shown to the evidence |
| 11:24:56 | 19 | that has been presented to you. |
| 11:24:58 | 20 | We at Natus have done everything in our power to |
| 11:25:01 | 21 | try to give you as direct and straightforward a presentation |
| 11:25:04 | 22 | of the evidence as we could so that you would have the tools |
| 11:25:09 | 23 | when you go back into the jury room to answer the questions |
| 11:25:11 | 24 | your being asked in this case. |
| 11:25:12 | 25 | As the video in the beginning of this case |

| | |
|---|---|
| 11:25:18 | 1 |
| 11:25:21 | 2 |
| 11:25:24 | 3 |
| 11:25:27 | 4 |
| 11:25:30 | 5 |
| 11:25:32 | 6 |
| 11:25:35 | 7 |
| 11:25:37 | 8 |
| 11:25:40 | 9 |
| 11:25:43 | 10 |
| 11:25:47 | 11 |
| 11:25:49 | 12 |
| 11:25:53 | 13 |
| 11:25:57 | 14 |
| 11:26:00 | 15 |
| 11:26:02 | 16 |
| 11:26:05 | 17 |
| 11:26:06 | 18 |
| 11:26:15 | 19 |
| 11:26:17 | 20 |
| 11:26:20 | 21 |
| 11:26:23 | 22 |
| 11:26:25 | 23 |
| 11:26:29 | 24 |
| 11:26:31 | 25 |

said -- let me take a step back.  Natus has always believed that this patent, the '532 patent on a plastic snap connector for an electrode belt should not, could not have been granted.  We believe that it shouldn't have.  But the video in the beginning of this case said that it is you, the jury, and only you who makes the decision about the validity of the '532 patent.

Now, Nox, on the other hand, has done everything during this trial to avoid the question of invalidity.  Mr. Nydegger in his closing talked about invalidity more than their expert talked about invalidity during the trial, during any of the witnesses that Nox presented testified about the invalidity of a patent.  That is because this whole case for them has been a sideshow, a bag of tricks, to try to distract you from the simple, straightforward analysis that you are going to be asked to do when you enter the jury room.

You cannot let that distract yourself from the job your going to be doing here.  As I told you at the beginning of the week, a week ago, at the end of this case, your going to be given a jury verdict form, a verdict form.  So we're at the end of the case -- and here it is.  That's the verdict form.  Mr. Nydegger has also already shown you it.  It's up on the whiteboard.

There are three questions your going to be asked

11:26:33     1    to answer.

11:26:34     2              First, as we have stated, we believe the '532

11:26:38     3    patent is invalid, and I will get more into that in a

11:26:41     4    second.  That's question one.

11:26:43     5              If you find the patent to be invalid, your job

11:26:45     6    is over.  You don't get to questions 2 and 3 at all.  If,

11:26:49     7    however, it's your decision and your decision alone, jury,

11:26:51     8    to decide whether the '532 patent is invalid, if you find it

11:26:54     9    valid, then and only then do you reach these questions 2 and

11:26:57    10    3 about damages and willfulness.

11:26:59    11              So, first, the invalidity of the '532 patent,

11:27:03    12    what this case has been all about.

11:27:04    13              Specifically, your being asked to decide whether

11:27:08    14    claims 1, 5 and 9 would have been obvious to a PHOSITA, a

11:27:13    15    person having ordinary skill in the art.  Now, that is

11:27:15    16    agreed to be an engineer who has got some experience in the

11:27:19    17    medical device arena.  Your being asked to decide whether

11:27:24    18    the '532 patent and claims 1, 5 and 9 would have been

11:27:27    19    obvious to such a person in light of the prior art, in light

11:27:30    20    of the RES belt alone, with their knowledge that they have

11:27:34    21    in their head as a person having ordinary skill in the art,

11:27:36    22    an engineer with some work experience, and then, secondly,

11:27:40    23    in combination with, or and the McIntire reference.

11:27:43    24              Dr. Williams in his testimony walked you through

11:27:46    25    every limitation of the claim chart.  That's what we have in

11:27:50   1   front of you and I'm going to get to that in a second.

11:27:52   2          Mr. Nydegger even this morning -- what

11:27:55   3   Mr. Nydegger did, and you can look at the jury instructions

11:27:57   4   that the Court provided you, jury instruction 1.4 talks

11:28:00   5   about evidence.  It says that evidence in this case includes

11:28:04   6   only what the witnesses said while they were testifying

11:28:07   7   under oath.  That's what Dr. Williams did.  The exhibits

11:28:10   8   that I allow into evidence and the stipulations that the

11:28:12   9   lawyers agree to.  Nothing else is evidence.  And this is

11:28:16   10  very important.  The lawyers' statements and arguments are

11:28:18   11  not evidence.

11:28:19   12          Finally in this case, Mr. Nydegger tried to talk

11:28:22   13  about some claim language because Nox avoided that during

11:28:25   14  the entire case, but even then he actually didn't put up

11:28:27   15  exact wording from the claim.  This is the claim.

11:28:30   16          So Dr. Williams told you that every word in

11:28:37   17  claim 1 is literally found in the prior art RES belt except

11:28:41   18  for the concept of the receiving hole flexibly being the

11:28:46   19  snap connector that attaches to the male electrode.  If you

11:28:49   20  remember the RES belt -- and if we can put up PDX-18.  Can

11:28:56   21  we blow that up at all?

11:28:58   22          This is the inside of the RES belt.  By the way,

11:29:03   23  this is a Nox photograph.  They took a high res photograph,

11:29:10   24  so to really point these features out, I wanted to use their

11:29:14   25  photograph.

11:29:14  1        Dr. Williams walked you through and said every

11:29:16  2   single element of this claim is found in the Nox RES belt

11:29:19  3   literally except for that the RES belt uses a spring clip to

11:29:23  4   attach to the male electrode, and the claimed invention, as

11:29:28  5   I will show you in a second, and we already talked with Dr.

11:29:31  6   Williams, it is the flexibility of the receiving hole that

11:29:33  7   does that job.

11:29:33  8        So let's go through what Dr. Williams said.

11:29:36  9        First of all, he said that the preamble is

11:29:40  10  pretty much just something to set the stage for what we are

11:29:43  11  talking about.  We're not talking about cars or chemicals

11:29:45  12  here.  We're talking about electrode belts and a belt

11:29:47  13  connector.  We're clearly in the right field here, and

11:29:49  14  that's not a limitation, but just again sort of sets the

11:29:53  15  stage.  It's called the preamble.  But let's go to the claim

11:29:56  16  language.

11:29:56  17       First, it requires a molded plastic frame.  Dr.

11:30:02  18  Williams testified.  Again, evidence, testimony, not some

11:30:05  19  argument by a lawyer at the end of the case that that is a

11:30:08  20  molded plastic frame.  There's indicia of molding by the

11:30:11  21  marks and so forth.  There can be no dispute that's a molded

11:30:15  22  plastic frame.

11:30:16  23       Then he said, that molded plastic frame includes

11:30:20  24  a receiving hole, the receiving hole being configured to

11:30:27  25  function as a female snap button fastener.  Okay.

| | |
|---|---|
| 11:30:30 | 1 |

The RES belt includes a receiving hole.  If you will go to Williams number 3, that photograph.

If you remember this picture that Dr. Williams talked about, the hole that receives the male electrode is the receiving hole.  All this magic with putting your hand through a hole and just the opening of it, Dr. Williams said it's because I can't tell, you know, that's not a real world example.

Where the receiving hole is, it isn't defined. It is absolutely clearly defined in the prior RES belt. It's that hole that receives the mail electrode snap.  The receiving hole being configured to function as a female snap button fastener.  There's no question that the RES belt functions as a female snap button fastener.  It attaches to the male electrode.  That's what it does.

Then it says, for receiving.  Again, there can be no question that that receives the male snap, and fastening.  We're going to leave that to the side for a second because that's the difference in claim 1.  The radial flexibility of doing the fastening that is different from what is in the RES belt.  But it says, for receiving and fastening the frame to a protrusion of the male portion of the snap connector electrode.

Ladies and gentlemen, that simply is a female snap button fastener, but has language, and I'm going to

11:31:52   1   even circle it to be sure we're giving you this as straight

11:31:55   2   as we can.  Radial flexibility does the fastening.  I will

11:31:59   3   get to that in a second.  All of those other words are

11:32:01   4   clearly found in the prior art RES belt.

11:32:03   5        Then Dr. Williams went to the next limitation.

11:32:05   6   A fastener configured to fasten the frame to a first end of

11:32:09   7   the electrode belt.  If we can go back to the PDX-18.

11:32:14   8        If you remember, we talked about these little

11:32:20   9   teeth that are very hard to see in this picture, but there's

11:32:23   10  no dispute about this.  Those little teeth on the bottom,

11:32:27   11  when you sandwich the RES belt connector to the belt, they

11:32:31   12  fasten the belt to the buckle.  No are question about this

11:32:35   13  element.  It is found in the prior art RES belt.

11:32:37   14        Next is this engaging member.  Now, this is very

11:32:40   15  telling because, again, this is Nox's photograph.  If we can

11:32:45   16  blow that up.

11:32:48   17        There is no question that these engaging members

11:32:54   18  that are on the sides of the hole or adjacent to the

11:32:57   19  receiving hole, it says, it gives you structure about those

11:33:02   20  engaging members, and then it has a such that language,

11:33:05   21  which is a clause that I will read, that tells you the

11:33:07   22  function that that structure has to perform.

11:33:10   23        So, first of all, it flat-out says, an engaging

11:33:13   24  member adjacent to said receiving hole.  There are these

11:33:16   25  two engaging members adjacent to the receiving hole.  The

| | |
|---|---|
| 11:33:17 | 1 |
| 11:33:21 | 2 |
| 11:33:21 | 3 |
| 11:33:25 | 4 |
| 11:33:28 | 5 |
| 11:33:31 | 6 |
| 11:33:35 | 7 |
| 11:33:39 | 8 |
| 11:33:39 | 9 |
| 11:33:44 | 10 |
| 11:33:50 | 11 |
| 11:33:54 | 12 |
| 11:33:57 | 13 |
| 11:34:01 | 14 |
| 11:34:04 | 15 |
| 11:34:07 | 16 |
| 11:34:09 | 17 |
| 11:34:10 | 18 |
| 11:34:19 | 19 |
| 11:34:22 | 20 |
| 11:34:28 | 21 |
| 11:34:30 | 22 |
| 11:34:33 | 23 |
| 11:34:36 | 24 |
| 11:34:39 | 25 |

1   engaging member engaging the conductor of the electrode

2   belt.  Okay.

3         Now, this is Nox's photograph, and the reason I

4   find it so telling is you can see with the snap in, those

5   engaging members are pushing on the spring to keep it in

6   place, keep it aligned.  This magic show of showing things

7   in thin air is irrelevant.  This is the way it actually

8   works.

9         Now, in addition to that, if we can go to

10   Williams No. 4.  To remove any doubt about this, the

11   conductor is of the belt.  When you remove the belt from the

12   buckle, the conductor is right there.  I mean, yes, it's

13   soldered to the part of the conductor that is in the,

14   woven into the belt material, but that's all the

15   conductor -- there's no question that that is a conductor of

16   the belt, and that's what this language says, conductor of

17   the belt.

18         As we said, the engaging member is adjacent to

19   the receiving hole, the engaging member engaging the

20   conductor of the electrode belt.  Now back to Williams 3.

21         By the way, you may have remembered, too, that

22   that is our photograph, but Mr. Nydegger, when he approached

23   Dr. Williams on the stand, he brought -- he took the belt

24   out of the buckle, and when he brought the belt up there, it

25   had the conductor with it.  He was trying to deal with

| | |
|---|---|
| 11:34:42 | 1 |
| 11:34:44 | 2 |
| 11:34:47 | 3 |
| 11:34:51 | 4 |
| 11:34:53 | 5 |
| 11:34:56 | 6 |
| 11:35:00 | 7 |
| 11:35:02 | 8 |
| 11:35:03 | 9 |
| 11:35:06 | 10 |
| 11:35:08 | 11 |
| 11:35:12 | 12 |
| 11:35:13 | 13 |
| 11:35:19 | 14 |
| 11:35:23 | 15 |
| 11:35:31 | 16 |
| 11:35:34 | 17 |
| 11:35:37 | 18 |
| 11:35:40 | 19 |
| 11:35:43 | 20 |
| 11:35:45 | 21 |
| 11:35:47 | 22 |
| 11:35:51 | 23 |
| 11:35:55 | 24 |
| 11:35:59 | 25 |

another issue at the time, but the conductor is of the belt.

The next language, it says, by the conductor passing through the receiving hole.  Okay.

Ladies and gentlemen, if you look at the male electrode in the receiving hole, and then on the left we have it removed so you can see cut away, you can see that whole hole, there is no question that the conductor passes through the receiving hole.

Look, how could it not?  The thing wouldn't function if the conductor didn't pass through the receiving hole.  It has to make electrical contact with the male electrode.

The conductor passes through the receiving hole while being wrapped around the engaging member, and that -- back to Williams, I'm sorry, PDX-18.

PDX-18 shows you that they wrap them around those engaging members so that they can engage and push the spring clip, the conductor into contact with the male electrode.  So the such that language says, we've got the structure in the prior art RES belt.

Now let's just talk about what that structure is supposed to do.  The claim tells us, it specifically says, such that when the male portion of the snap connector penetrates the receiving hole, which is shown down here, the conductor is forced into physical contact with at least a

11:36:02   1   lateral surface of the male portion of the snap connector

11:36:05   2   electrode.  There's no magic here, ladies and gentlemen.

11:36:08   3   That simply is what has to happen.

11:36:09   4        So if we can go back to Williams number three.

11:36:16   5   When you put the male electrode in, it has to contact that

11:36:20   6   electrode.  That electrode is held in place by the engaging

11:36:24   7   members that hold it in place, position it so that it stays

11:36:27   8   in contact with the male electrode.  That's what Dr.

11:36:32   9   Williams said this language means and that's what Dr.

11:36:34   10  Williams says this language covers.

11:36:36   11       So what we're left with is, Dr. Williams said,

11:36:40   12  all of this language in claim 1 that I've crossed out is

11:36:43   13  literally found in the prior art RES belt.  That's evidence.

11:36:47   14  That's Dr. Williams saying that.

11:36:50   15       He said, however, though, it doesn't

11:36:52   16  specifically, it doesn't literally show radial flexibility

11:36:56   17  of the hole.  He did say that you may have heard him say the

11:37:01   18  hole of the RES belt is radially flexible because it's made

11:37:04   19  out of plastic, and plastic inherently has some radial

11:37:09   20  flexibility.  But it is not the radial flexibility in the

11:37:12   21  RES belt that does the fastening.  It's that spring clip.

11:37:13   22       So he says radial flexibility doing the

11:37:14   23  fastening by the specific structure, and I'm going to

11:37:17   24  get to that in a second.  He said, it's not literally shown

11:37:20   25  in the RES belt, but one of ordinary skill in the art, an

| | |
|---|---|
| 11:37:23 | 1 |
| 11:37:28 | 2 |
| 11:37:31 | 3 |
| 11:37:36 | 4 |
| 11:37:39 | 5 |
| 11:37:42 | 6 |
| 11:37:45 | 7 |
| 11:37:45 | 8 |
| 11:37:49 | 9 |
| 11:37:51 | 10 |
| 11:37:54 | 11 |
| 11:37:56 | 12 |
| 11:37:59 | 13 |
| 11:38:01 | 14 |
| 11:38:04 | 15 |
| 11:38:06 | 16 |
| 11:38:15 | 17 |
| 11:38:19 | 18 |
| 11:38:22 | 19 |
| 11:38:25 | 20 |
| 11:38:28 | 21 |
| 11:38:31 | 22 |
| 11:38:34 | 23 |
| 11:38:38 | 24 |
| 11:38:43 | 25 |

engineer with some experience in the medical device industry would readily know that you could substitute, you could replace a metal spring clip fastener for a flexible plastic snap fastener.  That's what engineers do, ladies and gentlemen.  They look at things that are in the prior art. They design.  They take cost out of things.  They jigger things around.

This idea of infinite possibilities that Mr. Nydegger keeping talking about, that's because, yes, you could slightly change the whole size.  You could change the color.  You could slightly choose a different material and suddenly you have a lot of different possibilities for doing this, but at the end of the day, you are not going to end up with a Ferrari.  Your still talking about an electrode connector.  That's what this is.

Now, as I said, Dr. Williams specifically said that one of ordinary skill in the art looking at the RES belt alone would say, okay.  The RES belt basically discloses everything of claim 1.  And what's missing, this idea of using the flexibility to just do the snapping function instead of a spring clip, Dr. Williams said, I think that that would be readily known to one of ordinary skill in the art.  However, to remove any doubt about it, we have McIntire.  So let's throw up the McIntire patent, page 12 and 13.

| | |
|---|---|
| 11:38:44 | 1 |
| 11:38:50 | 2 |
| 11:38:55 | 3 |
| 11:38:58 | 4 |
| 11:39:03 | 5 |
| 11:39:05 | 6 |
| 11:39:07 | 7 |
| 11:39:11 | 8 |
| 11:39:13 | 9 |
| 11:39:16 | 10 |
| 11:39:19 | 11 |
| 11:39:22 | 12 |
| 11:39:25 | 13 |
| 11:39:29 | 14 |
| 11:39:29 | 15 |
| 11:39:32 | 16 |
| 11:39:35 | 17 |
| 11:39:38 | 18 |
| 11:39:42 | 19 |
| 11:39:46 | 20 |
| 11:39:49 | 21 |
| 11:39:51 | 22 |
| 11:39:55 | 23 |
| 11:39:57 | 24 |
| 11:40:00 | 25 |

Figs 12 and 13 clearly say that prior art prior to this invention of claim 1, that it was well-known that you had flexible plastic spring clips.  Now, Dr. Williams said that flexible plastic spring clips would be well-known to one of ordinary skill in the art, an engineer with experience.  He said that would even be something, especially when you are looking at McIntire, that one of his software design students would find obvious.

I would hazard a guess that if any of you on the jury is even reasonably mechanically or electrically inclined, that you would look at McIntire and say, you know, that's obvious that I could use the teachings of it and come up with a plastic snap connector version of what claim 1 says.

So let's talk about that.  Radial flexibility doing the fastening.  There is no question, and Dr. Williams testified, that that is what is shown here.  Two different versions of it.  And in Figure 12, it happens to be that it shows the exact structure that is in the wherein clause. You have to have radial flexibility to do the fastening according to the literal language of the claim, but then the wherein clause tells you, I'm going to specifically narrow down this to say it has to be this structure.

And let's read what it says and what Dr. Williams said it says.  Wherein radial flexibility of the

```
11:40:02    1    receiving hole is achieved by one or more slots, and if you

11:40:06    2    look here, we've got these two slots extending from the

11:40:15    3    hole.  That's what the beginning of the claim says, and,

11:40:18    4    frankly, as Dr. Williams said, that would be readily

11:40:20    5    understood by one of ordinary skill in the art even without

11:40:22    6    McIntire, because you know you can put little slots on a

11:40:25    7    hole to impart radial flexibility.

11:40:28    8           If you've ever had a jacket with a snap or a

11:40:30    9    Western shirt or something like that, they often have two

11:40:32   10    little spring clips in there, or there is another

11:40:36   11    alternative where even with a metal snap, they just rely on

11:40:40   12    the radial flexibility by cutting little slots in the

11:40:42   13    perimeter.  So where radial flexibility of said receiving

11:40:45   14    hole is achieved by one or more slots extending from said

11:40:48   15    hole.  Clearly shown in Figure 12 as I just pointed out.

11:40:54   16           And wherein the receiving hole and one or more

11:40:57   17    slots are formed by at least one elongated member having

11:41:01   18    flexibility transverse to the longitudinal axis.  These

11:41:06   19    elongated members on the side of the hole form the hole and

11:41:10   20    they act like a diving board, I think is what Dr. Williams

11:41:13   21    said was his example of why a long thin member always has

11:41:17   22    some transverse flexibility.

11:41:19   23           Again, McIntire specifically said exactly what

11:41:23   24    this claims.  Now, you may also remember that Mr.

11:41:29   25    Hoskuldsson, when he testified in this case, said, I don't
```

| | |
|---|---|
| 11:41:31 | 1 |
| 11:41:34 | 2 |
| 11:41:39 | 3 |
| 11:41:41 | 4 |
| 11:41:42 | 5 |
| 11:41:45 | 6 |
| 11:41:49 | 7 |
| 11:41:56 | 8 |
| 11:42:03 | 9 |
| 11:42:17 | 10 |
| 11:42:20 | 11 |
| 11:42:21 | 12 |
| 11:42:22 | 13 |
| 11:42:25 | 14 |
| 11:42:27 | 15 |
| 11:42:31 | 16 |
| 11:42:33 | 17 |
| 11:42:36 | 18 |
| 11:42:40 | 19 |
| 11:42:40 | 20 |
| 11:42:43 | 21 |
| 11:42:46 | 22 |
| 11:42:49 | 23 |
| 11:42:51 | 24 |
| 11:42:54 | 25 |

1  think that anything in the prior art ever showed transverse

2  flexibility.  He was saying that that idea of just springing

3  out and back was not something he knew to be in the prior

4  art.

5           There it is.  If you force a male snap into that

6  hole, your going to get these two beams, these two elongated

7  members to Flex, you know, lateral or radial to the hole,

8  transverse outward from the hole.

9           Now, I would like to put up some language from

10  McIntire.  Before I do that, let's just stay where we are

11  for a second.

12           Dr. Williams basically said that all of the

13  words of claim 1 are found in the RES belt except that one

14  function we just talked about.  He said that would be

15  obvious to one of ordinary skill in the art.  So he said

16  that claim 1 in his opinion would be obvious even without

17  the McIntire reference, but to remove any doubt, we look at

18  McIntire and it has even the exact details of some of this

19  other language.

20           And you'll see in the jury instructions, you

21  don't have to have a slavish adherence to this language.  It

22  has to be generally found in the prior art.  And, and then I

23  will go into McIntire, the language.

24           Mr. Nydegger complained that there was nowhere

25  that anybody in the world would ever look to say, I know I

11:42:57   1    can combine the teachings of McIntire with the RES belt.

11:42:59   2    Well, here it is in black and white.   The whole yellow

11:43:02   3    highlighted area was what Dr. Williams talked about.   It

11:43:05   4    talks about all sorts of things that engineers do.   That

11:43:08   5    they try to take cost out of things, they try to make them

11:43:11   6    easier to use, they look at the prior art.   They try to

11:43:14   7    figure out, you know, what would be another variation.

11:43:16   8    Again, they are not remaking the product.   They are not

11:43:18   9    remaking it all of a sudden, the next thing you know, you

11:43:21   10   have an EEG machine.

11:43:23   11           They are talking about, can you make minor

11:43:25   12   design variations?   That is what engineers do.   The

11:43:27   13   embodiments thus described in McIntire provide an electrical

11:43:31   14   lead that may be less costly and/or more easily

11:43:34   15   manufactured, assembled, and/or connected to an electrode

11:43:37   16   than at least some known electrical leads.

11:43:39   17           They're even telling you in McIntire that these

11:43:41   18   kinds of things that Mr. Nydegger was harping on about

11:43:44   19   easier to manufacture, assemble, connected to other kinds of

11:43:49   20   electrical leads, McIntire says, use the patent.   Use this

11:43:52   21   female flexible snap connector in exactly the way we're

11:43:56   22   doing here with the RES belt.

11:43:58   23           Secondly, it says, rather, the embodiments

11:44:00   24   described and illustrated herein may be used with any system

11:44:04   25   for measuring any physiologic information.

| | |
|---|---|
| 11:44:06 | 1 |
| 11:44:10 | 2 |
| 11:44:14 | 3 |
| 11:44:17 | 4 |
| 11:44:19 | 5 |
| 11:44:23 | 6 |
| 11:44:27 | 7 |
| 11:44:33 | 8 |
| 11:44:38 | 9 |
| 11:44:39 | 10 |
| 11:44:41 | 11 |
| 11:44:50 | 12 |
| 11:44:56 | 13 |
| 11:44:59 | 14 |
| 11:45:03 | 15 |
| 11:45:06 | 16 |
| 11:45:10 | 17 |
| 11:45:13 | 18 |
| 11:45:16 | 19 |
| 11:45:20 | 20 |
| 11:45:23 | 21 |
| 11:45:26 | 22 |
| 11:45:30 | 23 |
| 11:45:32 | 24 |
| 11:45:36 | 25 |

Again, Mr. Nydegger harped on this limitless number of possibilities.  Sure, you can change minor little things like the type of material or the size of the hole minorly and you'll get a lot of different possibilities, but this is specifically saying here, ladies and gentlemen, that within the medical device arena, within the physiological device kind of a space, which is exactly what we're talking about with the RES belt, you would use McIntire, it would teach an engineer that you can use the teachings to modify, modify the RES belt.

Now, it is worth noting here or re-noting actually that Nox spent so much time on the sideshow, that they paid almost zero attention to this claim language. Their expert, Mr. Oslan, was thrown up there at the end for 12 minutes and taken down.  He didn't do any specific analysis of the claim.  It was -- they relied almost entirely on Mr. Nydegger basically arguing his point in closing.

And that's partly because Mr. Oslan, who is not here today, but Mr. Oslan admitted that he really does not have any experience in the design of electrode belts.  So I think they put him up there, had him answer a few questions, and then got him down within 12 minutes.

And it should be noted that Mr. Herrmansson, he is sort of the, where is Mr. Herrmansson character in this

| | |
|---|---|
| 11:45:39 | 1 |
| 11:45:43 | 2 |
| 11:45:47 | 3 |
| 11:45:50 | 4 |
| 11:45:51 | 5 |
| 11:45:55 | 6 |
| 11:45:56 | 7 |
| 11:45:59 | 8 |
| 11:46:03 | 9 |
| 11:46:05 | 10 |
| 11:46:06 | 11 |
| 11:46:09 | 12 |
| 11:46:12 | 13 |
| 11:46:16 | 14 |
| 11:46:20 | 15 |
| 11:46:22 | 16 |
| 11:46:25 | 17 |
| 11:46:28 | 18 |
| 11:46:33 | 19 |
| 11:46:40 | 20 |
| 11:46:45 | 21 |
| 11:46:47 | 22 |
| 11:46:51 | 23 |
| 11:46:56 | 24 |
| 11:46:58 | 25 |

case?  Mr. Herrmansson is the inventor of the '532 patent.
They told you that he still does consulting work for Nox and
he didn't even show up at trial.  He's the inventor of this
thing.

          MR. NYDEGGER:  Objection, your Honor.  He's
pointing to an empty chair.

          THE COURT:  All right.  Overruled.

          MR. REYNOLDS:  Now --

          THE COURT:  And actually, let me just think
about that.

          So, members of the jury, one thing you have to
understand is, I do give the parties, you may not believe
this, but I actually give them time limits as to how long
they have to present their case.  That's the reason why on
Monday morning last week I was able to tell you we'll be
finished the evidence by the end of Wednesday, because I
basically told them that's how long you can have.

          So when you talk about witnesses who are here or
not here, you have to judge in light of the facts that there
is a limited amount of time, and so one of the instructions
that I sometimes give, but I didn't give because I didn't
think it was necessary here, was that it's not the number of
witnesses you call, who calls more witnesses or less.
That's not what is important.  What is important is what the
witnesses who are here, what they say.

| | |
|---|---|
| 11:47:00 | 1 |
| 11:47:02 | 2 |
| 11:47:03 | 3 |
| 11:47:05 | 4 |
| 11:47:08 | 5 |
| 11:47:12 | 6 |
| 11:47:15 | 7 |
| 11:47:20 | 8 |
| 11:47:22 | 9 |
| 11:47:25 | 10 |
| 11:47:28 | 11 |
| 11:47:31 | 12 |
| 11:47:32 | 13 |
| 11:47:38 | 14 |
| 11:47:49 | 15 |
| 11:47:54 | 16 |
| 11:47:56 | 17 |
| 11:47:59 | 18 |
| 11:48:04 | 19 |
| 11:48:08 | 20 |
| 11:48:12 | 21 |
| 11:48:16 | 22 |
| 11:48:19 | 23 |
| 11:48:22 | 24 |
| 11:48:25 | 25 |

All right.  Go ahead, Mr. Reynolds.

MR. REYNOLDS:  Thank you, your Honor.

Yes.  My point, jury, is, ladies and gentlemen
of the jury, is, simply that Mr. Oslan was up there for
12 minutes.  Mr. Herrmansson didn't rise to the level of
importance to be at the trial.  And neither one of them was
mentioned a single time -- I'm sorry.  Mr. Oslan was
mentioned once by Mr. Nydegger in his closing.  One time
they mentioned their expert, who has been working with them
for almost three years now analyzing these claims.  One time
in the closing was Mr. Oslan mentioned, and never was
Mr. Herrmansson mentioned.

So Natus asks that you find claim 1 would have
been obvious in light of the RES belt alone and in light of
the semi-disposable RES belt and McIntire together.  That's
what we believe the testimony shows.  We believe the
testimony of Dr. Williams is largely unrefuted.

Now, if you find claim 1 invalid, you must find
claims 5 and 9 invalid, because, ladies and gentlemen, these
are basically throwaway claims.  There's no dispute that the
electrode belt and belt connector of claim 4, which
basically says you can have a cover enclosing it, there's no
question McIntire shows it, there's no question that putting
a sticker on this thing would not save the validity of the
patent.

| | |
|---|---|
| 11:48:28 | 1 |

                    There was no testimony from Dr. -- I literally

think that Nox in its case never mentioned claim 5 anywhere

during this case.  Mr. Oslan didn't try to defend it.  There

was no testimony that would save the claim based on that

limitation of putting a sticker, fabric sticker or plastic

sticker, whatever it may be.

                    Claim 9, claim 9 has the additional limitation

that the belt is a textile belt with a wire woven into it.

This is the prior art RES belt.  No question that it is a

textile belt with a wire woven into it.  Again, a limitation

in claim 9 that was never mentioned by Nox in this trial.

Didn't even touch on these.  These were a distraction to

make Natus defend itself against more invalid claims.

                    You also might remember there was a whole roll

of this material bouncing around during the trial that

precedes even the RES belt.  That idea of a flexible textile

belt that has a wire woven into it is well-known.

                    So we ask that for the same reasons, that you

find claims 5 and 9 invalid as obvious both in view of the

RES belt alone and as invalid, invalid as obvious in view of

the RES belt plus McIntire.

                    Now, Mr. Nydegger in his closing, they didn't

talk about this during the trial very much, but in

instruction 4.6, he talked about the secondary

considerations you can look at to decide whether your going

11:49:57  1    to uphold the validity of the claim.  And I will caution

11:50:00  2    you, when you read through those, it has to tie, there has

11:50:04  3    to be a nexus between some other consideration that's out

11:50:07  4    there in the ether and the claim elements.  There's nothing

11:50:12  5    about this female snap connector that relates to those

11:50:16  6    secondary considerations.

11:50:17  7                Now, as I mentioned, if you answer that claims

11:50:29  8    1, 5 and 9 are invalid, you don't ever get to questions 2

11:50:33  9    and 3, but, again, it's for you, the jury, and only you to

11:50:35  10   make that decision.  It's not our decision.

11:50:37  11               So if you find them valid, then you have to

11:50:39  12   answer questions 2 and 3.  And I will hit the willfulness

11:50:44  13   question first, which is number 3.

11:50:45  14               You will recall that in this case, Mr. Nydegger

11:50:51  15   put a timeline up in the beginning of the case and he

11:50:54  16   referenced it again in his closing.  And there was not a

11:51:00  17   single thing on there, and I pointed this out in the

11:51:02  18   beginning and it never came out in this case, there is not a

11:51:06  19   single thing that was on that timeline that is after the

11:51:09  20   issue date of the patent.  It was all about activities prior

11:51:12  21   to the issuance of the patent, and everything in this trial

11:51:14  22   was about activities prior to the issuance of the patent.

11:51:18  23               I don't know if you can really appreciate how

11:51:19  24   rare that is.  Patent cases usually start with, I have my

11:51:22  25   U.S. patent and now let's see what the defendant did after

that fact.

In addition to it all being activity before the issuance of the patent, you also probably noticed, and actually Mr. Nydegger kind of confirmed it, that a lot of that activity, not all of it, but almost all of that activity that is before the issue date of the patent occurred in either France or China.

So U.S. patent liability cannot be founded on activities outside of the United States regardless of when they happened, but as I said, all of this stuff is before the patent issued, and I've said this in the beginning, I will say it again.  You cannot infringe a patent before it issues.  The Court instructed you in that regard and you'll see that in your instructions when you take them back.  You cannot infringe a patent before it issues.  You cannot infringe a pending patent or a patent pending.  You cannot infringe an invalid patent.  You certainly can't willfully infringe because of those same reasons.

Now, when Natus began sourcing its product from its Chinese supplier, it was a year-and-a-half before the '532 patent issued.  Natus never imagined that a patent could or should issue on a female plastic snap connector, but what it did in June of 2015, when that patent issued, Nox very quickly sued Natus and from that day, and actually in Europe, even before that, Natus said, this is a bad

11:52:49  1    patent.  This is a patent that should never have issued,

11:52:51  2    because the most important prior art, the RES belt and the

11:52:57  3    McIntire patent, were not provided to the Patent Office.

11:53:01  4    And as the Court instructed you, Sections 4. -- Section 4.4

11:53:07  5    says specifically that.  RES belt and McIntire are prior

11:53:10  6    art, but were not in front of the Examiner, and instruction

11:53:14  7    4.1 says, therefore, you can give that kind of prior art

11:53:17  8    more weight.

11:53:18  9            Now, one other little thing that Mr. Nydegger

11:53:26  10   put up was this whole e-mail chain with Mr. Duffy, and you

11:53:32  11   probably heard Mr. Duffy testify by deposition in this case.

11:53:35  12   And it's important to read the entire e-mail, which says

11:53:39  13   that Mr. Duffy, after the Chinese suppliers are already in

11:53:45  14   the mix, they already responded to a request for a proposal,

11:53:49  15   we put our request for proposal to multiple vendors.  You

11:53:53  16   heard that.  One of them was a Chinese vendor.

11:53:55  17            After they are already working on that project,

11:53:57  18   then looking at competitive products, Nox's belt gets sent

11:54:01  19   to the Chinese supplier and says specifically, make a belt

11:54:06  20   not like this, this one, because he was just sending other

11:54:09  21   competitors' products.

11:54:11  22            He says, make a belt like Natus' reusable belt,

11:54:14  23   but we want to make a disposable version of it.  Here are

11:54:17  24   some disposable belts, other competitors' belts to take a

11:54:20  25   look at.  And all of that came after Natus was already

| | |
|---|---|
| 11:54:25 | 1 |

engaged with suppliers, working on designs.

Now, again, question 3, we ask that you find that, no, there was no willful infringement, and the verdict form flips back and forth a little bit.  The left side on question 1 is Natus, but then on question 3, the right side is for Natus and we ask that you don't even get to that question because of the invalidity one, but if you do get to it, we ask you find that there was no willful infringement.

Now, lastly is damages.  If we could put up slide 1 from the damages presentation.

Again, this is the -- the threshold question is invalidity, but if you find the patent is valid, you have to find what amount of damages Nox would be entitled to.

As the Court instructed you, it is Nox's burden, they have to show you what a reasonable rate would be. They're the ones who have to build a tower like Mr. Nydegger had here.  And you'll notice, he was faulting Mr. Bero for having a faulty foundation.

Mr. Craigun pulled a number out of thin air to start with when building his tower for his royalty.  He had literally no foundation.  So not only would you not have the theatrics of pulling a box out from a tower, but you would have no tower in the first place under Mr. Craigun's analysis.

| | |
|---|---|
| 11:55:52 | 1 |
| 11:55:55 | 2 |
| 11:55:58 | 3 |
| 11:56:01 | 4 |
| 11:56:02 | 5 |
| 11:56:05 | 6 |
| 11:56:09 | 7 |
| 11:56:12 | 8 |
| 11:56:15 | 9 |
| 11:56:19 | 10 |
| 11:56:20 | 11 |
| 11:56:23 | 12 |
| 11:56:26 | 13 |
| 11:56:31 | 14 |
| 11:56:36 | 15 |
| 11:56:39 | 16 |
| 11:56:43 | 17 |
| 11:56:46 | 18 |
| 11:56:48 | 19 |
| 11:56:51 | 20 |
| 11:56:53 | 21 |
| 11:56:55 | 22 |
| 11:57:01 | 23 |
| 11:57:04 | 24 |
| 11:57:07 | 25 |

As the Court instructed you, a hypothetical negotiation considers a royalty a willing licensor, and, again, this is a hypothetical negotiation if you find the patent valid.

What would Nox have been willing to pay -- I'm sorry, what would Natus have been willing to pay and what would Nox have accepted right before infringement, approximately 2015, while allowing -- this is very important -- while allowing Natus to make some sort of a reasonable profit?

In this hypothetical negotiation, you have to assume that Natus is a reasonable businessperson.

If we go to the next slide, you may remember that Natus' profit is $4.34 on its belts.  What reasonable person would give away 70 percent of its profit for the privilege of making and selling belts?  If you are going to go through all of that work of making and selling belts and you are going to pay a royalty to somebody, just your common business experience would tell you that you wouldn't give away 70 percent of that profit.

And, frankly, you may have heard Mr. Ferrelli say that that $4.34 is not even fully costs.  So there are other costs that would come out of that if you really were doing an analysis.  The point is, 70 percent is an unreasonably high royalty rate.  That's what $3 is.  $3 is

| | |
|---|---|
| 11:57:12 | 1 |

what Nox is asking you for.  That's not unreasonable.
That's reasonable.

Now, the undisputed facts in this case also say
that there are about 296,000 belts sold.  As Mr. Nydegger
said, there's no dispute about that.  We all agree what the
pool of stuff is we're looking at.  But both Mr. Craigun and
Mr. Bero both acknowledged about a third of those are sold
in the rest of the world, ROW.

Basically, it means that they are not sold in
the United States, they're sold in countries outside the
United States.  And this is a U.S. patent, so we have to
consider issues regarding the rest of the world and the U.S.
sales separately.  Okay.  You have to do that, too, when you
are analyzing these questions.

There's a major important factor when you are
considering the rest of the world sales, and that is this
idea of this Gort, Ireland thing.  The idea there is in a
hypothetical negotiation, you have to ask yourselves, if I'm
Natus and I know to avoid any royalty at all, I could just,
instead of selling my products from China, having them come
and touch the United States and go back out to, you know,
Europe, let's say, that would be a royalty I have to pay
because it sat in the United States for one day.

If I'm negotiating a license, I would say, guys,
we're not going to pay you $3 for that third of our sales,

11:58:27   1   because I can just reroute them through a mirror image

11:58:29   2   warehouse we have in Ireland and then I won't owe you any

11:58:33   3   royalty on that.  If I'm going to pay you a royalty, that

11:58:36   4   has to be reasonable in light of that very important fact.

11:58:39   5          Then with regard to the U.S., there are three

11:58:40   6   major facts that Mr. Bero pointed out.  The first is that

11:58:45   7   the $3 royalty rate that Nox proposes completely discounts

11:58:49   8   Natus selling other belts.  They sold a cut-to-fit built.

11:58:53   9   They sold a reusable belt.  They sold third-party belts.

11:58:57   10  Their analysis did not consider that important fact, which

11:58:59   11  would tend to say the royalty would be lower.

11:59:02   12         Fact number two.  It ignores that Natus belts

11:59:05   13  are primarily sold to Natus installs.  That means in this

11:59:08   14  industry in the United States, the Natus devices that a

11:59:12   15  customer has, that's the primary customer that Natus is

11:59:16   16  going to be selling its belts to.  That was not considered.

11:59:19   17  That would tend to push the royalty down.

11:59:20   18         And, lastly, and probably most importantly --

11:59:25   19  lastly and most importantly is this fact that Nox belts are

11:59:32   20  only sold in the United States to Nox install bases.  It's a

11:59:36   21  customer who already has a Nox device.  That's the only

11:59:39   22  customers that in the United States Nox sells through

11:59:42   23  CareFusion, its distributor, its belts to.

11:59:44   24         So you have to think to yourself in negotiating

11:59:46   25  a royalty, Nox would be willing to take a really low

royalty, because through Natus, if they tap into Natus' customer base, they're going to be able to sell into a whole new market that they otherwise would not have.  That would tend to show the royalty should be lower.

So, ladies and gentlemen, as I said, we believe that in light of all of these facts, that the royalty rate of $3 is unreasonable and a royalty rate of $1 done with an analysis that Mr. Bero pointed out to you that did start with some foundation -- they can take issue with it, but Mr. Craigun had zero foundation -- would be more around $1.  And given the total sales of 296,750, a $1 royalty, of course, reveals a total damages of $296,750.

Now, we don't think you should get to that question because of the invalidity one, but if you do, it's your decision and your decision own.  We ask that $296,750 be awarded in damages.

So, ladies and gentlemen, this past week Natus finally got to appeal to you, a jury of our peers, and asked whether you believe the '532 patent should have ever issued. The Patent Examiner in this case did not have the RES belt, did not have McIntire, did not have the tools to do the job that you have been given in this case to do.

As we said earlier, it's not that the Examiner did a bad job.  It's simply he didn't have the full set of tools that you are being given now in this case, and

| | | |
|---|---|---|
| 12:01:28 | 1 | instruction 4.1 and 4.4 that I already mentioned to you |
| 12:01:31 | 2 | specifically talks about that scenario, where you have tools |
| 12:01:34 | 3 | the Patent Office did not.  We look to you, the jury, to end |
| 12:01:38 | 4 | this dispute and find the '532 patent invalid. |
| 12:01:40 | 5 | And it's very important to note, ladies and |
| 12:01:43 | 6 | gentlemen, that is not a question that's just important to |
| 12:01:45 | 7 | Natus.  It's a question that's important to every juror, |
| 12:01:49 | 8 | everybody in this room.  It's a question that's important to |
| 12:01:54 | 9 | other medical device manufacturers and the public in |
| 12:01:55 | 10 | general.  And why is that?  Because this is not just Nox's |
| 12:01:58 | 11 | claim to a plastic snap connector against Natus.  This is |
| 12:02:03 | 12 | their claim against anybody in the United States who wants |
| 12:02:06 | 13 | to make, use and sell a product like that. |
| 12:02:09 | 14 | Patents are a limited monopoly and they should |
| 12:02:14 | 15 | only be granted on true inventions because the owner of the |
| 12:02:16 | 16 | patent gets to take that out of the public use.  It's not |
| 12:02:19 | 17 | just an issue regarding Natus. |
| 12:02:21 | 18 | The evidence shows that using a plastic snap |
| 12:02:26 | 19 | connector on an electrode belt was obvious, and Nox should |
| 12:02:29 | 20 | not be allowed to prevent all others from using that idea. |
| 12:02:33 | 21 | Monopolies are abhorred in the United States.  You probably |
| 12:02:36 | 22 | have heard that.  We are a free trade, free competition kind |
| 12:02:39 | 23 | of a country.  We promote those sorts of things and a patent |
| 12:02:46 | 24 | is the exception.  For true inventions, we let somebody take |
| 12:02:48 | 25 | something out of the public use.  We submit to you that |

12:02:51  1    looking at the RES belt and looking at the McIntire patent,

12:02:55  2    that this idea of a basic female snap connector for an

12:02:58  3    electrode should not be allowed to be taken out of public

12:03:02  4    use.

12:03:02  5            If I have the idea to replace a pop top on a

12:03:05  6    beer bottle with a twist top, a screw top, I can't go get a

12:03:10  7    patent on it because pop tops, twist tops, have been known

12:03:14  8    for years.  To do so would be completely unfair.  You simply

12:03:17  9    can't do that.

12:03:18  10           The '532 patent covers exactly what it says it

12:03:25  11   covers.  It covers the basic structure for a plastic snap

12:03:30  12   connector.  It does not cover a snap connector that provides

12:03:33  13   better or worse signal quality.  That's not in the claims.

12:03:35  14   It does not provide a snap connector that provides easier or

12:03:38  15   less or more ease of use.  It does not provide a snap

12:03:42  16   connector that is cheaper or more expensive.  Those are not

12:03:44  17   part of this claim.  And you will notice that when

12:03:46  18   Mr. Nydegger questioned our expert, Dr. Williams, not once

12:03:49  19   did he mention any of those things, because he knows it's

12:03:52  20   the words of the claims that cover the invention, not these

12:03:55  21   other benefits or side concepts.  Those were all a

12:03:59  22   distraction to avoid the analytical approach that you are

12:04:01  23   going to have to follow when you go back into the jury room

12:04:04  24   and look at claim 1, look at the RES belt, and look at

12:04:07  25   McIntire.

| 12:04:07 | 1 | And you can be sure, ladies and gentlemen, if |
| 12:04:13 | 2 | Natus or any other medical device manufacturer were to make |
| 12:04:15 | 3 | a claim or make a product that had all of these structural |
| 12:04:18 | 4 | limitations, but it had a different ease of use or a |
| 12:04:21 | 5 | different cost or signal quality was different, you can be |
| 12:04:25 | 6 | sure that Nox would still assert that patent against this |
| 12:04:28 | 7 | company.  They know that the words cover it and you couldn't |
| 12:04:30 | 8 | go out there and make one of these things.  They say, oh, it |
| 12:04:34 | 9 | has a different signal quality.  You are outside our claims. |
| 12:04:36 | 10 | They know it's the words.  The words read on the RES belt |
| 12:04:39 | 11 | and McIntire. |
| 12:04:40 | 12 | Ladies and gentlemen, Natus now places this case |
| 12:04:44 | 13 | in your hands.  You, the jury, and only you hold the power |
| 12:04:47 | 14 | to do what the Patent Office could not do, to decide whether |
| 12:04:52 | 15 | Nox is going to be able to maintain a monopoly on a female |
| 12:04:56 | 16 | snap connector for an electrode belt, or whether this |
| 12:04:59 | 17 | invention would have been obvious to one of ordinary skill |
| 12:05:01 | 18 | in the art. |
| 12:05:02 | 19 | Would this invention have been obvious to an |
| 12:05:04 | 20 | engineer with some work experience?  You have to go back |
| 12:05:09 | 21 | there and think to yourself, what is it about this claim |
| 12:05:11 | 22 | that is not obvious, what is it that's inventive, and |
| 12:05:14 | 23 | decide, are you going to allow this patent to be upheld or |
| 12:05:18 | 24 | are you going to decide that it should never have issued at |
| 12:05:21 | 25 | all? |

12:05:21    1           We ask that you consider the evidence you've

12:05:23    2   heard and, of course, while we hope that you read claims 1,

12:05:27    3   5 and 9 and find them invalid in light of the RES belt and

12:05:31    4   McIntire, we know that you will consider that evidence

12:05:34    5   carefully and fairly and do your best job to reach a

12:05:37    6   decision that is just and right in this case.

12:05:39    7           Thank you.

12:05:40    8           THE COURT:  All right.  Thank you, Mr. Reynolds.

12:05:43    9           Mr. Nydegger?

12:05:44   10           MR. NYDEGGER:  Thank you, your Honor.

12:05:48   11           Where is the evidence, Mr. Reynolds?  He did not

12:05:53   12   show you one piece of evidence, not one piece of testimony,

12:05:56   13   not one exhibit.

12:05:59   14           The charade continues.  I told you and -- you

12:06:02   15   can leave that up -- everything that you heard me say came

12:06:06   16   to pass.

12:06:07   17           Mr. Reynolds, he said that everything that is in

12:06:10   18   claim 1 is in RES.  But when did he cross this out with his

12:06:17   19   red marker?  Not when he talked about the RES.  Not until he

12:06:21   20   talked about McIntire.  It's fancy words and sleight of

12:06:24   21   hand.

12:06:24   22           He says that Mr. Oslan wasn't on the stand, so

12:06:27   23   you should find for them.  Nox Medical does not have the

12:06:29   24   burden of proof on validity.  Natus does.  We don't have to

12:06:32   25   say a word.  They have to prove it's invalid and they

12:06:36   1   couldn't.  They didn't.

12:06:38   2            Mr. Oslan was on the stand for ten minutes

12:06:41   3   because that's all the time I had left.

12:06:43   4            They talked about Mr. Herrmansson.

12:06:45   5   Mr. Herrmansson is not an employee.  We couldn't make him

12:06:48   6   come here.  He's running his own business in Iceland.  They

12:06:51   7   are trying to distract you here.

12:06:53   8            He says I was trying to distract you with my

12:06:55   9   demonstrations.  No.  My demonstrations exposed the fallacy

12:06:59   10   of their arguments and positions.  That's not a distraction.

12:07:03   11   That's exposure.

12:07:05   12            Once again, Mr. Reynolds, he says, consider the

12:07:07   13   evidence, but he doesn't show you any evidence.  He only

12:07:11   14   gets up here and he does it himself.  Where is the

12:07:14   15   testimony?  Where are the exhibits?

12:07:16   16            They can't rely on them because they don't

12:07:18   17   support their position.  If the facts don't support your

12:07:23   18   position, you don't show them up, because it hurts you, and

12:07:26   19   that's what has happened here.

12:07:28   20            He said that you may consider the other

12:07:30   21   considerations of real world what happened when finding a

12:07:33   22   claim obvious.  The instruction says, you must consider

12:07:36   23   those considerations.  It's the law.  It's required.  Once

12:07:40   24   again, little changes in words that result in a big, big

12:07:44   25   difference in the outcome.

| | | |
|---|---|---|
| 12:07:45 | 1 | He says that it passes through the hole, but he |
| 12:07:52 | 2 | has no response for the fact that there's a space between |
| 12:07:54 | 3 | the hole and the dimple and that's where it sits.  He has no |
| 12:07:59 | 4 | response for that.  He didn't show you any evidence, any |
| 12:08:02 | 5 | testimony.  It doesn't pass through the hole.  It's all |
| 12:08:07 | 6 | contrived.  It's all smoke and mirrors.  You have to decide, |
| 12:08:11 | 7 | who do you believe? |
| 12:08:13 | 8 | We walked you through testimony.  We took you to |
| 12:08:16 | 9 | the exhibits.  We showed you what the evidence shows you. |
| 12:08:20 | 10 | They got up here and just spoke and talked and more smoke |
| 12:08:24 | 11 | and mirrors. |
| 12:08:25 | 12 | We ask you, go back to the evidence.  That is |
| 12:08:34 | 13 | where you find the truth. |
| 12:08:38 | 14 | THE COURT:  All right.  Thank you, Mr. Nydegger. |
| 12:08:47 | 15 | Members of the jury, let me finish up by |
| 12:08:52 | 16 | explaining some things about you deliberations in the jury |
| 12:08:52 | 17 | room and your possible verdict. |
| 12:08:55 | 18 | Once you start deliberating, do not talk to the |
| 12:08:58 | 19 | jury officer, or to me, or to anyone else except each other |
| 12:09:02 | 20 | about the case.  If you have any questions or messages, you |
| 12:09:04 | 21 | must write them down on a piece of paper, sign them, and |
| 12:09:07 | 22 | then give them to the jury officer.  The officer will give |
| 12:09:10 | 23 | them to me, and I will respond as soon as I can. |
| 12:09:12 | 24 | I may have to talk to the lawyers about what you |
| 12:09:14 | 25 | have asked, so it may take me some time to get back to you. |

| | |
|---|---|
| 12:09:18 | 1 |

Any questions or messages are normally sent to me through
your foreperson, who by custom of the court is Juror Number
1.

One more thing about messages.  Do not ever
write down or tell anyone how you stand on your votes.  For
example, do not write down or tell anyone that you are split
4 to 4, or 6 to 2, or whatever your vote happens to be.
That should stay secret until you are finished.

Your verdict must represent the considered
judgment of each juror.  In order for you as a jury to
return a verdict, it is necessary that each juror agree to
the verdict.  Your verdict must be unanimous.

It is your duty, as jurors, to consult with one
another and to deliberate with a view towards reaching an
agreement, if you can do consistent with your individual
judgment.  Each of you must decide the case for yourself,
but do so only after an impartial consideration of the
evidence with your fellow jurors.

In the course of your deliberations, do not
hesitate to re-examine your own views and change your
opinion if convinced it is erroneous.  But do not surrender
your honest conviction as to the weight or effect of
evidence solely because of the opinion of your fellow
jurors, or for the purpose of returning a verdict.  Remember
at all times that you are not partisans.  You are the judges

of the facts.  Your sole interest is to seek the truth from the evidence in the case.

A form of verdict has been prepared for you, and you have already seen it during closing arguments.  You will take this form to the jury room, and when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date and sign the form.  You will then return to the courtroom and your foreperson will give your verdict.

It is proper to add the caution that nothing said in these instructions and nothing in the form of verdict is meant to suggest or convey in any way or manner any hint as to what verdict I think you should find.  What the verdict shall be is the sole and exclusive duty and responsibility of the jury.

Now that all the evidence is in and the arguments are completed, you are free to talk about the case in the jury room.  In fact, it is your duty to talk with each other about the evidence, and to make every reasonable effort you can to reach unanimous agreement.  Talk with each other, listen carefully and respectfully to each other's views, and keep an open mind as you listen to what your fellow jurors have to say.  Try your best to work out your differences.  Do not hesitate to change your mind if you are convinced that other jurors are right and that your original

12:11:56    1    position was wrong.

12:11:56    2         But do not ever change your mind just because

12:11:59    3    other jurors see things differently, or just to get the case

12:12:01    4    over with.  In the end, your vote must be exactly that --

12:12:04    5    your own vote.  It is important for you to reach unanimous

12:12:07    6    agreement, but only if you can do so honestly and in good

12:12:10    7    conscience.

12:12:12    8         No one will be allowed to hear your discussions

12:12:15    9    in the jury room, and no record will be made of what you

12:12:17    10    say.  So you should all feel free to speak your minds.

12:12:20    11         Listen carefully to what the other jurors have

12:12:22    12    to say, and then decide for yourself.

12:12:30    13         During your deliberations, you can only discuss

12:12:32    14    the case in the jury room with your fellow jurors.  While

12:12:34    15    you are deliberating, you must not communicate with or

12:12:38    16    provide any information about this case to anyone else by

12:12:41    17    any means.  You may not use any electronic device or media,

12:12:44    18    such as the telephone, a cellphone, smart phone, iPhone,

12:12:47    19    Blackberry or computer, the Internet, any Internet service,

12:12:51    20    any text or instant messaging service, any Internet chat

12:12:54    21    room, blog, or website such as Facebook, Snap Chat,

12:12:59    22    Instagram, LinkedIn, You Tube or Twitter, to communicate to

12:13:04    23    anyone any information about this case or to conduct any

12:13:08    24    research about this case until I accept your verdict.

12:13:17    25         If that is not clear enough, in other words,

12:13:19    1    you cannot talk to anyone on the phone, correspond with

12:13:21    2    anyone, or electronically communicate with anyone about the

12:13:24    3    case.

12:13:27    4             Let me finish up by repeating something that I

12:13:29    5    said to you earlier.  Nothing that I have said or done

12:13:32    6    during this trial was meant to influence your decision in

12:13:34    7    any way.  You must decide the case yourselves based on the

12:13:37    8    evidence presented.

12:13:37    9             So if we could ask the Court Security Officer to

12:13:40   10    come forward to be sworn.

12:13:45   11             And, members of the jury, while he's coming

12:13:46   12    forward, let me just tell you, the normal practice is that

12:13:50   13    we expect you to deliberate until 5:00 o'clock, assuming you

12:13:55   14    haven't reached a verdict before then.  Unless I hear from

12:13:59   15    you otherwise that you want to have a different schedule, I

12:14:06   16    will, assuming you have not reached a verdict, I will expect

12:14:10   17    to see you at 5:00 o'clock and give you some instructions

12:14:15   18    for overnight.  Presumably, you would come back tomorrow

12:14:18   19    morning to start deliberating again at 9:30.

12:14:20   20             All right.  Come on forward.

12:14:22   21             (Court Security Officer sworn.)

12:14:44   22             THE COURT:  All right.  If you could follow the

12:14:50   23    Court security officer back to the jury room.

12:14:52   24             (The jury was excused to the jury room at

12:14:56   25    12:15 p.m.)

| | | |
|---|---|---|
| 12:15:13 | 1 | THE COURT:  All right.  So we'll be in recess |
| 12:15:16 | 2 | until 1:15.  That's when we'll start.  Okay? |
| 12:15:19 | 3 | MR. NYDEGGER:  Thank you. |
| 12:15:25 | 4 | MR. REYNOLDS:  Thank you. |
| 12:15:26 | 5 | (Luncheon recess taken.) |
| 12:16:22 | 6 | - - - |
| 12:16:22 | 7 | Afternoon Session, 1:14 p.m. |
| 13:13:58 | 8 | THE COURT:  All right.  Good afternoon, |
| 13:13:59 | 9 | everyone. |
| 13:13:59 | 10 | MR. NYDEGGER:  Good afternoon. |
| 13:14:00 | 11 | THE COURT:  Please be seated.  Why don't we |
| 13:14:02 | 12 | begin with opening statements. |
| 13:14:04 | 13 | MR. LORIMER:  Your Honor, when we spoke to your |
| 13:14:07 | 14 | staff this morning, we indicated there were a couple of |
| 13:14:09 | 15 | evidentiary issues that we thought we would put off until |
| 13:14:13 | 16 | this afternoon so we could get to the jury this morning. |
| 13:14:15 | 17 | THE COURT:  I'm the one that's going to do it. |
| 13:14:17 | 18 | Why don't we just deal with them as they come up.  Right? |
| 13:14:19 | 19 | It's not like we're excluding something if I have to rule on |
| 13:14:22 | 20 | an evidentiary objection. |
| 13:14:24 | 21 | MR. LORIMER:  If that's the Court's preference, |
| 13:14:25 | 22 | that's what we'll do. |
| 13:14:26 | 23 | THE COURT:  All right.  Go ahead, Mr. Adelson. |
| 13:14:34 | 24 | MR. ADELSON:  Your Honor, there's one other |
| 13:14:36 | 25 | issue that we would like to address. |

13:14:37  1          THE COURT:  All right.  The clock is running, so

13:14:40  2    we can address it.

13:14:41  3          MR. ADELSON:  Okay.  So we would like to request

13:14:43  4    that the witnesses be sequestered.

13:14:44  5          THE COURT:  All right.  Well, so,

13:14:52  6    Mr. Halldorsson obviously doesn't have to be sequestered,

13:14:54  7    but Mr. Hoskuldsson should be sequestered.

13:14:56  8          MR. LORIMER:  He's the first witness.

13:14:58  9          MR. ADELSON:  Our intention was to call Mr.

13:15:01  10   Hoskuldsson first.  If that's your Honor's preference, we

13:15:03  11   can reverse that order.

13:15:04  12          THE COURT:  I don't care what order you call

13:15:05  13   them in.

13:15:06  14          MR. ADELSON:  Okay.

13:15:06  15          THE COURT:  But they have a right to have Mr.

13:15:09  16   Halldorsson as their representative of Nox, so he's not

13:15:13  17   going to be sequestered.

13:15:14  18          MR. ADELSON:  Understood, your Honor.

13:15:23  19          THE COURT:  But if you are going to call

13:15:25  20   Mr. Halldorsson first, then Mr. Lorimer or someone will

13:15:28  21   explain to Mr. Hoskuldsson what we're doing here?

13:15:31  22          MR. LORIMER:  Sure.

13:15:32  23          The order they gave us --

13:15:33  24          THE COURT:  No.  I understand.  But they can

13:15:36  25   switch it up if they want.

| | |
|---|---|
| 13:15:37 | 1 |

MR. LORIMER:  Sure.

Are you going to call -- are you switching?

MR. ADELSON:  Yes.

(Pause.)

MR. ADELSON:  Your Honor, inequitable conduct is
an offense against the Patent Office and the public and
deserves its harsh penalties because the public trust has
been violated.

The Patent Office and indeed the entire U.S.
patent system relies on applicants to abide by their duty of
candor and to be forthright in their dealings with the
Patent Office.  This duty of candor applies to inventors,
prosecuting attorneys, and anyone who substantially is
involved.  Enforcements of this duty falls to the Court
because the Patent Office simply cannot investigate these
matters.

Now, most often inequitable conduct happens when
a material piece of prior art is withheld or when misleading
statements are made to the Patent Office.

Inequitable conduct is proven by clear and
convincing evidence that material information is withheld or
misrepresented with intent to deceive.  And the PTO ruled,
and specifically 37 C.F.R. 1.56(a), require applicants to
provide all, very clearly even all information known to be
patentable.  I would have projected that up here, but it's

13:17:42  1   stated three times in that section.

13:17:43  2        And materiality is but for materiality in that a

13:17:47  3   claim would have not been allowed if the Examiner knew it

13:17:51  4   was withheld information.  And there is, however, no but for

13:17:55  5   requirement when a patentee engages in affirmative acts of

13:18:00  6   egregious misconduct such as the filing of an unmistakably

13:18:04  7   false affidavit.

13:18:04  8        Because the direct evidence of intent to deceive

13:18:09  9   is rare, district courts may infer intent from indirect and

13:18:14  10  circumstantial evidence.  The clear and convincing

13:18:17  11  evidentiary standard, however, requires that the intent to

13:18:20  12  deceive be the single most reasonable inference drawn from

13:18:24  13  the evidence.

13:18:25  14       In this case, the evidence overwhelmingly showed

13:18:28  15  that every single prior art reference relating to Nox's own

13:18:33  16  products was withheld or otherwise concealed from the Patent

13:18:38  17  Office.  All three individuals, Mr. Herrmansson, Mr.

13:18:42  18  Hoskuldsson and Mr. Fridriksson owed a duty of candor to the

13:18:45  19  Patent Office at the relevant time.

13:18:48  20       Now, Mr. Herrmansson is a named inventor, so

13:18:50  21  there's no question about his duty requirement.  Mr.

13:18:55  22  Hoskuldsson has now been named an inventor on the '532

13:18:58  23  patent.  Now, there are some serious questions as to whether

13:19:01  24  he truly is an inventor on that patent.  He was subsequently

13:19:05  25  involved in the prosecution of the '532 patent, having taken

an active role in responding to office actions, yet he did
not make his status as an inventor known until after the
patent issued.  Regardless of whether he is an inventor or
not, he owed a duty of candor to the Patent Office by a
substantial effort in support of its prosecution and by his
later representation to the Patent Office that he should be
named an inventor.

Mr. Fridriksson was the original patent agent in
Iceland that Nox hired to help with patent prosecution, and
although he is not an attorney, he, too, was substantively
involved in the prosecution of the application that ended up
as the '532 patent.  And the list of withheld references is
long.

First, the application that issued as the '539
patent, which we have discussed in this case as the
Herrmansson reference, was concealed from being prior art
until after the '532 patent issued, and it only became prior
art with Nox's change to the inventorship to add Mr.
Hoskuldsson.

Second, the Nox RES belt or the semi-disposable
belt, which was first sold more than a year before the
priority date of the '532, has a flexible textile belt with
a plastic connector and a mating, for mating for a biometric
device.

Third, the 2009 CareFusion catalogue, which

advertises the sale of the Nox RES belt.

Fourth, international design registrations on the Nox RES belt connector design, which disclose the end connector of the Nox RES belt.

Fifth, the Nox PRIT belt, an earlier design shown in the United States in March of 2008, which has the same type of plastic connector and flexible belt using a metal snap instead.

The completeness with which Nox's own prior art was withheld or concealed from the Patent Office goes a long way evidencing an intent to deceive the Patent Office.

In addition, Mr. Hoskuldsson's purported status as an inventor was concealed from the Patent Office, assuring that the Herrmansson reference could not be legally considered prior art.  For the entirety of the prosecution, the application just listed Mr. Herrmansson.  So while the earlier Herrmansson application was uncovered in an international search and provided to the PTO, it was not legally available as invalidating prior art.

There is also evidence that Mr. Herrmansson, the originally named inventor, who still consults for Nox, identified additional prior art and provided to Messrs. Hoskuldsson and Halldorsson, but that prior art never made it to the Patent Office.

And then there are Mr. Fridriksson's admissions.

| | |
|---|---|
| 13:21:50 | 1 |
| 13:21:50 | 2 |
| 13:21:54 | 3 |
| 13:21:57 | 4 |
| 13:22:02 | 5 |
| 13:22:07 | 6 |
| 13:22:09 | 7 |
| 13:22:11 | 8 |
| 13:22:14 | 9 |
| 13:22:18 | 10 |
| 13:22:21 | 11 |
| 13:22:26 | 12 |
| 13:22:30 | 13 |
| 13:22:31 | 14 |
| 13:22:35 | 15 |
| 13:22:38 | 16 |
| 13:22:41 | 17 |
| 13:22:45 | 18 |
| 13:22:50 | 19 |
| 13:22:52 | 20 |
| 13:22:56 | 21 |
| 13:22:59 | 22 |
| 13:23:03 | 23 |
| 13:23:07 | 24 |
| 13:23:10 | 25 |

He is the Icelandic patent agent who initially controlled U.S. prosecution.  He admitted that while not being admitted to practice before the Patent Office, he usurped the role of U.S. counsel by making his own determination on materiality and not submitting prior art identified by his client.

Finally, there is the fact that eight months after issuance and six months into this litigation, Nox changed the inventorship on the '532 patent.  Even though this litigation was pending, Nox did not inform Natus of its inventorship change.  In fact, the prosecution history that Nox submitted to the Court as Plaintiff's Trial Exhibit 129 notably admits all documents relating to this inventorship change.

Natus only ended up uncovering this inventorship change while investigating Nox's further threats against Natus.  And Nox continues to play games with its inventorship issue by persisting in arguments that have absolutely no basis in the law.  There is no substance to Nox's position.  It is a poorly conceived attempt to argue that the withheld disclosures were cumulative of the Herrmansson reference.  The reality is that Herrmansson, the reference, could not be considered prior art, because Mr. Hoskuldsson didn't identify himself as an inventor, and none of the other material prior art could be considered because none of it was submitted to the Patent Office.

13:23:12  1        Now, Nox doesn't deny that Herrmansson was not

13:23:16  2   available as prior art, but yet we heard last Friday, Nox

13:23:20  3   argues that because an Examiner marked an IDS form

13:23:24  4   considered, that means that the Examiner substantively

13:23:27  5   considered Herrmansson's disclosures.  That's nonsense.  All

13:23:31  6   the Examiner did was acknowledge receipt of a listing of

13:23:34  7   references.  It would have been legal error for the Examiner

13:23:38  8   to have subsequently considered Herrmansson, which goes

13:23:41  9   against the longstanding proposition that Government

13:23:44  10  officials like an Examiner do their job correctly.

13:23:48  11       To sustain its unbelievable position, Nox would

13:23:51  12  need clear and convincing evidence that the Examiner did, in

13:23:54  13  fact, commit legal error, but Nox doesn't have any of that

13:23:59  14  evidence, and there's absolutely no basis for Nox to

13:24:01  15  continue to argue that the withheld references are

13:24:03  16  cumulative of Herrmansson.

13:24:04  17       There is also no question that the withheld

13:24:08  18  references, and at a minimum, the Nox RES belt and the

13:24:11  19  concealed availability of Herrmansson as prior art are but

13:24:14  20  for material.  The international search report in the file

13:24:18  21  history of the '532 patent identified Herrmansson as a

13:24:22  22  document of particular relevance over which on its own, the

13:24:26  23  claimed invention could not be considered novel.

13:24:29  24       Moreover, Mr. Hoskuldsson on multiple occasions

13:24:32  25  identified the claimed subject matter of the '532 patent as

| | |
|---|---|
| 13:24:35 | 1 |

a simplified version of the Nox RES belt, removing any doubt

to its essential materiality.

Separately, there are other questions as to

whether Mr. Hoskuldsson is truly an inventor that should be

named on the '532 patent.  He was highly involved in the

prosecution of the '532 patent as evidenced by a report he

prepared in response to the Patent Office's rejection of

that application.  In that report, he specifically

identified the hook of the '532 patent as a key feature that

he now claimed he invented, but inexplicably, he didn't know

in 2014 that he was the inventor.  He then became to realize

only later that he was an inventor in the middle of this

litigation is frankly unbelievable.

Something simply just isn't right.  He either

withheld his inventorship in 2014 or falsely claims to be an

inventor now.  Either way, it doesn't matter.  Falsely

representing to be an inventor is a misrepresentation, and

whatever the motivation behind it, its egregious conduct

does not require a showing of materiality.

That leaves intent to deceive, which this trial

is about.

Rarely, if ever, there's a smoking gun, a memo

evidencing a specific intent to deceive the Patent Office,

but here, there's a chain of evidence that leads without

doubt to the conclusion that these individuals sought to

13:25:57  1   deceive the Patent Office.

13:25:58  2         Tellingly, despite adding Mr. Hoskuldsson as

13:26:02  3   an inventor here in the United States, Nox hasn't added

13:26:05  4   him as an inventor in Europe.  It has the same claims in

13:26:11  5   Europe, but he's not an inventor there, he's only an

13:26:13  6   inventor here.

13:26:15  7         Now, we don't truly understand the reasons

13:26:17  8   behind Nox's conduct, but its selective inventorship reeks

13:26:23  9   of deceit.  This phase of the trial is independent from the

13:26:25  10  jury's verdict.  Even if the '532 patent is upheld by the

13:26:29  11  jury, we believe the evidence shows that but for material

13:26:31  12  evidence, information sufficient for an Examiner to reject

13:26:35  13  claims of the '532 patent was knowingly and intentionally

13:26:39  14  withheld from the Patent Office by one or more of these

13:26:42  15  individuals, rendering the '532 patent and its progeny

13:26:46  16  unenforceable.

13:26:47  17        Thank you, your Honor.

13:26:48  18        THE COURT:  Thank you, Mr. Adelson.

13:27:07  19        MR. LORIMER:  Your Honor, there's a great story

13:27:09  20  told about Abraham Lincoln.  He used to ride circuit

13:27:13  21  Illinois, and one day somebody approached him and said,

13:27:15  22  Mr. Lincoln, see that dog over there?  He said, yeah.  He

13:27:19  23  said, if I call that tail a leg, how many legs does the dog

13:27:25  24  have?  And Lincoln is reported to have said, he still has

13:27:30  25  four.  I don't care whether you call the tail a leg, he has

| | |
|---|---|
| 13:27:33 | 1 |
| 13:27:36 | 2 |
| 13:27:42 | 3 |
| 13:27:46 | 4 |
| 13:27:50 | 5 |
| 13:27:51 | 6 |
| 13:27:54 | 7 |
| 13:27:59 | 8 |
| 13:28:02 | 9 |
| 13:28:04 | 10 |
| 13:28:08 | 11 |
| 13:28:11 | 12 |
| 13:28:13 | 13 |
| 13:28:18 | 14 |
| 13:28:20 | 15 |
| 13:28:23 | 16 |
| 13:28:25 | 17 |
| 13:28:28 | 18 |
| 13:28:34 | 19 |
| 13:28:38 | 20 |
| 13:28:41 | 21 |
| 13:28:45 | 22 |
| 13:28:50 | 23 |
| 13:28:56 | 24 |
| 13:28:59 | 25 |

1   still got four legs.  That is what we're about here.

2          Natus is making all sorts of wild accusations

3   about these, about Mr. Hoskuldsson, about Mr. Herrmansson,

4   about Mr. Halldorsson, accusations that have zero basis in

5   fact.

6          Let's talk about, first of all, I think the

7   Court may have noted that Mr. Adelson said that Nox has the

8   burden of proving by clear and convincing evidence that Mr.

9   Hoskuldsson was properly named an inventor or that the

10  Examiner didn't consider Herrmansson.  Nox doesn't have a

11  burden on inequitable conduct.  Zero burden.

12          THE COURT:  Yes.  I take that to be more

13  rhetorical than an actual statement of fact.

14          MR. LORIMER:  I think rhetorical is perhaps

15  generous.

16          And so let's talk about the factual

17  underpinnings of this argument.  The factual underpinnings

18  of the argument are these.  That Mr. Hoskuldsson, a citizen

19  of Iceland, Mr. Herrmansson, a citizen of Iceland, neither

20  of whom are trained in patent law of any sort,

21  Mr. Fridriksson, who is an Icelandic patent agent, not a

22  U.S. patent agent, somehow knew in their heart of hearts

23  that Mr. Hoskuldsson was an inventor, and then they decided,

24  oh, shoot, we can't name him as an inventor, because if we

25  name him as an inventor, the '539 patent will be considered,

13:29:03  1    and if the '539 patents are considered, our claims are

13:29:07  2    toast.

13:29:08  3              That is just unbelievable.  They have in their

13:29:15  4    depositions not asked a single witness if they understood

13:29:18  5    that concept, not one.  There is absolutely no evidence on

13:29:22  6    the intent issue that anybody understood Section 102(e), had

13:29:26  7    ever heard of it or knew of its practical effects, zero.  So

13:29:31  8    the notion that there was somehow this grand, almost

13:29:35  9    criminal conspiracy is just silly.

13:29:38  10             They have to prove that intent is the single

13:29:42  11   most reasonable inference, not just an inference, but the

13:29:46  12   single most reasonable inference, and they have to prove it

13:29:49  13   by clear and convincing evidence.

13:29:51  14             Intent to deceive is not even a reasonable

13:29:53  15   inference much less the single most reasonable inference.

13:29:57  16             Now, Mr. Adelson got up here said, well, it's

13:30:02  17   clear that the Examiner did not consider Herrmansson '539.

13:30:06  18   We have a disagreement with Mr. Adelson about that.

13:30:10  19             If you could put up PTX-2 for a moment, please.

13:30:13  20   This is, of course, the face page of the '532 patent.  Now,

13:30:18  21   if you go to page 2.

13:30:19  22             Right there on the right-hand side under the

13:30:22  23   references considered is Herrmansson.  That's the

13:30:26  24   application that became Herrmansson.

13:30:28  25             Now, if you go to the prosecution history, which

| | |
|---|---|
| 13:30:31 | 1 |
| 13:30:40 | 2 |
| 13:30:45 | 3 |
| 13:30:48 | 4 |
| 13:30:51 | 5 |
| 13:30:54 | 6 |
| 13:30:59 | 7 |
| 13:31:03 | 8 |
| 13:31:08 | 9 |
| 13:31:13 | 10 |
| 13:31:16 | 11 |
| 13:31:18 | 12 |
| 13:31:21 | 13 |
| 13:31:24 | 14 |
| 13:31:27 | 15 |
| 13:31:33 | 16 |
| 13:31:36 | 17 |
| 13:31:39 | 18 |
| 13:31:42 | 19 |
| 13:31:45 | 20 |
| 13:31:48 | 21 |
| 13:31:52 | 22 |
| 13:31:55 | 23 |
| 13:31:58 | 24 |
| 13:32:02 | 25 |

is PTX-129, this is an IDS, and if you put up page 16 or 7 I think of that it is, this is an IDS that was submitted in that case, an IDS submitted by Nox.

Right there, the second line is Herrmansson. That's the same application we saw on the face of the patent.  And at the bottom of this page, Mr. Patel, who was the Examiner in this case, says, all references considered except where lined through HP.  Well, Herrmansson isn't lined through.  That says to anybody who has got any common sense that they were considered.  But Mr. Adelson says, no, as a matter of law, they can't.

He suggests to the Court that examiners who are presumed to have done their duty correctly never make mistakes, and if they do make a mistake, then the patent is invalid.  Well, that is clearly not the law.  Examiners make mistakes all the time and it doesn't invalidate the patent, it doesn't invalidate the presumption of validity.

Now, this Examiner may have made a mistake.  It says that he considered this.  This IDS, he says that there was no substantive analysis of the Herrmansson reference in the prosecution history.  That happens all the time.  The patent owner, the applicant, submits a bunch of references to the office.  The office says, I considered them or I didn't.  Some of them it relies on and some of them it doesn't.  But that doesn't mean that it wasn't considered,

13:32:06   1    the fact that he didn't cite it in an office action.  It

13:32:09   2    says it was considered.

13:32:10   3              But put aside for a minute whether the Examiner

13:32:12   4    did or did not consider it.  There's no -- by the way,

13:32:16   5    there's no evidence from the Examiner about what he did.

13:32:18   6    This legal presumption that Mr. Adelson cites to is

13:32:23   7    inconsistent with the facts on the face of the patent.

13:32:25   8              But let's assume for a moment that the Court

13:32:28   9    accepts that notion that he couldn't consider it.  One has

13:32:34   10   to ask this question.  If I were an applicant for a patent,

13:32:40   11   and I wanted to hoodwink the Examiner, I wanted to deceive

13:32:44   12   him, and I wanted to withhold a reference so that he

13:32:47   13   couldn't consider it, it seems pretty unlikely that I would

13:32:51   14   put it smack dab in front of the Examiner and say, here it

13:32:55   15   is, it's on my IDS, please consider it, and hope in my evil

13:33:01   16   heart that the Examiner would say, no, can't do it.  You

13:33:06   17   know, we have inventive -- unity of inventorship here, so I

13:33:14   18   can't do it.

13:33:14   19             So I've got all of these things concocted in my

13:33:17   20   brain, and the reference I'm trying to hide I put right in

13:33:19   21   front of him instead of going outside, digging a hole and

13:33:22   22   burying it and burning it.  That's what happened in this

13:33:24   23   case.  Put it right smack in front of the inventor -- excuse

13:33:28   24   me, the Examiner.  That hardly bespeaks clear and convincing

13:33:32   25   evidence of intent to deceive.

| | |
|---|---|
| 13:33:34 | 1 |
| 13:33:43 | 2 |
| 13:33:46 | 3 |
| 13:33:49 | 4 |
| 13:33:51 | 5 |
| 13:33:55 | 6 |
| 13:34:01 | 7 |
| 13:34:03 | 8 |
| 13:34:07 | 9 |
| 13:34:11 | 10 |
| 13:34:16 | 11 |
| 13:34:19 | 12 |
| 13:34:21 | 13 |
| 13:34:24 | 14 |
| 13:34:27 | 15 |
| 13:34:30 | 16 |
| 13:34:36 | 17 |
| 13:34:38 | 18 |
| 13:34:44 | 19 |
| 13:34:47 | 20 |
| 13:34:53 | 21 |
| 13:34:58 | 22 |
| 13:35:05 | 23 |
| 13:35:10 | 24 |
| 13:35:12 | 25 |

Now, let's talk for a moment about materiality.
Mr. Adelson talked to the Court for a minute about -- and
they've got some exhibits that we've objected to, about what
happened in Europe.  There were some applications that were
pending in Europe off the PCT case.  And he says, oh, well,
you know, wasn't named as a co-inventor over there.  We've
got these inconsistencies.  It all tells the Court that this
guy is a bad guy and he's lying.

There's a serious problem with that.  This is
about a claim of inequitable conduct in this country, not in
Europe.  The standards in Europe are different than the
standards in the United States.  The claims are different in
the European patent than they are in the U.S. case.  The
claims in the European patent were broader than they are in
the U.S. case.  They're completely different standards, and,
again, somehow, Natus has imbued Mr. Hoskuldsson and
Mr. Herrmansson and Mr. Halldorsson not only with the
knowledge U.S. patent law, but European patent law for which
there is zero, zero factual basis, none.

And then we have this supposedly long list of
prior art that, notwithstanding they gave it to the Patent
Office, was supposedly concealed.  The ones he references
were the Herrmansson patent, the '539, the Nox RES belt, the
CareFusion.

I would like to talk about those together.

13:35:13   1   There isn't any doubt they're all about the same thing.

13:35:15   2   They are all about the semi-disposable belt.  Certainly, if

13:35:21   3   you find that there was no intent to withhold the

13:35:23   4   Herrmansson reference, you've gotten rid of the other two,

13:35:26   5   because they're the same thing.  It's cumulative.  There is

13:35:29   6   no obligation, no duty to disclose cumulative references.

13:35:32   7   That's black letter law.

13:35:34   8            Let's talk about the other ones he named.  The

13:35:39   9   other ones he named were the international design

13:35:41   10  registrations, which are design patents, basically.  They

13:35:47   11  are European design patent applications.  And those European

13:35:52   12  design patent applications are simply the ornamental

13:35:58   13  non-functional appearance of a product.  They show one face

13:36:01   14  of the product.  They show the face that you would normally

13:36:04   15  insert the stud through.  They don't say whether they're

13:36:07   16  plastic, whether they are steel, whether they are

13:36:10   17  fiberglass.  They don't show anything about what fastens the

13:36:13   18  snap, the electrode.  They don't show anything about the

13:36:16   19  inside.  They don't show anything about a belt.  They don't

13:36:18   20  show anything about engaging members.  They don't show

13:36:21   21  anything about a conductor wire.  They show nothing.

13:36:25   22            So Herrmansson, '539, which was submitted to the

13:36:28   23  Patent Office, independent of whether it was considered, it

13:36:31   24  was submitted.  The international design registrations are

13:36:35   25  really a very small subset of Herrmansson '539.

13:36:41   1       And then we've got what they call this PRIT

13:36:45   2   belt.  The PRIT belt, you will see as the evidence comes in,

13:36:48   3   was a metal snap.  It was a metal snap that was not elastic.

13:36:57   4   It did not have the radial flexibility of the hole that is

13:36:59   5   talked about in this patent.  It was never produced.  It was

13:37:03   6   never sold.  I mean, there are a couple samples, but it was

13:37:06   7   never sold to anybody.  And it has the interior spring wire

13:37:10   8   just like the RES belt.  It's nothing like the patent in

13:37:15   9   suit, nothing like the claims of the '532 patent.

13:37:18   10       Now, they talk about materiality, and Mr.

13:37:27   11   Adelson was correct when he said materiality is a but-for

13:37:30   12   test.  That is, the defendant in this case has the burden of

13:37:34   13   proof to prove by clear and convincing evidence that if this

13:37:38   14   reference had been submitted, the claims would not have been

13:37:40   15   allowed but for, wouldn't happen.

13:37:45   16       Well, we're fortunate in this case.  We know the

13:37:48   17   answer to that question.  And if I could share the answer to

13:37:51   18   that question how I know that.

13:37:53   19       Let's put up Exhibit 108.

13:37:58   20       As the Court is aware, this case was involved in

13:38:01   21   an IPR, and at the beginning of an IPR, they filed, the

13:38:06   22   petitioner filed the petition.  Six months later, the office

13:38:11   23   decides whether it's going to institute trial or it isn't.

13:38:13   24       And in this case, one of the references they

13:38:16   25   relied on heavily was the Herrmansson '539.  Now, it's

13:38:23    1    important to realize that in the IP, the burden of proof is

13:38:26    2    preponderance just like it is in the Patent Office.  And

13:38:31    3    they used the broadest reasonable interpretation claim

13:38:33    4    construction just like they do in the Patent Office.  They

13:38:37    5    say that in order to institute an IPR, a trial in an IPR,

13:38:41    6    all you have to do is prove a reasonable likelihood -- not

13:38:45    7    but for, but a reasonable likelihood that one or more of the

13:38:47    8    claims would be rejected based on the reference or the

13:38:50    9    combination that you are asserting.  That's why this is

13:38:53    10    really interesting.

13:38:53    11          Now, let's go to, I believe it's page 16 or 7 of

13:38:57    12    this exhibit.

13:38:58    13          This is what they said about Herrmansson '539.

13:39:03    14    We agree with the patent owner and find that Herrmansson

13:39:05    15    does not teach the limitation of the conductor passing

13:39:08    16    through the receiving hole because the wire conductor does

13:39:11    17    not appear to penetrate the receiving hole, and then it goes

13:39:14    18    on and talks about that.

13:39:15    19          It says, instead that Herrmansson describes a

13:39:21    20    loop of wire that lies over the hole.  Remember, the claims

13:39:25    21    require that it pass through, which the Court has determined

13:39:26    22    means it enters, it passes through and it exits.  And here

13:39:30    23    they say, Herrmansson doesn't teach that because it's over

13:39:32    24    the hole.  And more importantly, the PTAB, a branch of the

13:39:40    25    Patent and Trademark Office, said, we will not institute on

13:39:43   1    Herrmansson.  In other words, there is no but for

13:39:47   2    materiality.  The same, the same governmental office who is

13:39:52   3    examining patents has examined this reference in light of

13:39:55   4    these claims and said, no go.  It's not material.  It's not

13:40:00   5    even material enough to institute a trial in the PTAB, which

13:40:04   6    is a very low standard.  It's a lot lower than but for.

13:40:09   7          So, your Honor, at the end of the day, this

13:40:16   8    claim of inequitable conduct is specious.  There's another

13:40:23   9    example of Natus coming after a small company, trying to

13:40:28   10   spend it under the table and making scurrilous allegations

13:40:32   11   against good people.  They have not proven materiality.

13:40:34   12   They can't prove it.  They can't prove intent, and the claim

13:40:37   13   is just silly.

13:40:41   14         THE COURT:  All right.  Thank you.

13:40:43   15         MR. ADELSON:  Your Honor, may I have a couple

13:40:45   16   minutes to respond?

13:40:46   17         THE COURT:  No.  Call a witness.

13:40:53   18         MR. ADELSON:  Natus calls Mr. Peter Halldorsson.

13:41:00   19          DEFENDANT's TESTIMONY

13:41:04   20          PETUR MAR HALLDORSSON, having been

13:41:08   21      duly sworn as a witness, was examined and testified as

13:41:12   22      follows ...

13:41:50   23         MR. ADELSON:  May I approach with binders?

13:41:52   24         THE COURT:   Sure.

13:41:52   25       (Mr. Adelson handed binders to the Court.)

Halldorsson - direct

13:42:06  1          MR. ADELSON:  May I approach the witness, your

13:42:12  2   Honor?

13:42:12  3          THE COURT:  Sure.

13:42:12  4          (Mr. Adelson handed a binder to the witness.)

13:42:17  5                    DIRECT EXAMINATION

13:42:25  6   BY MR. ADELSON:

13:42:25  7   Q.    Thank you for being here today, Mr. Halldorsson.  I do

13:42:27  8   understand that there was some confusion regarding your need

13:42:29  9   to be here for testimony today.  We hope that you can shed

13:42:33  10  some light on some matters for us.

13:42:36  11          You've previously testified that you joined Nox

13:42:39  12  in 2011; is that correct?

13:42:41  13  A.    Yes.  October 2011.

13:42:43  14  Q.    And when you joined, you became the CEO of Nox; is

13:42:43  15  that correct?

13:42:48  16  A.    That is correct.

13:42:48  17  Q.    And when you joined Nox, who had been the previous

13:42:53  18  CEO?

13:42:54  19  A.    Sveinbjorn Hoskuldsson.

13:42:59  20  Q.    Mr. Hoskuldsson remained at Nox after you became the

13:43:02  21  CEO; is that correct?

13:43:03  22  A.    Oh, yes, he did.

13:43:04  23  Q.    And at the time you joined Nox, who at Nox was

13:43:07  24  responsible for intellectual property matters?

13:43:07  25  A.    Kormakur Hermannsson.

Halldorsson - direct

13:43:31  1    Q.    Was anyone else handling intellectual property

13:43:33  2    matters?

13:43:34  3    A.    No.

13:43:36  4    Q.    And when you arrived at Nox, what firms were handling

13:43:40  5    intellectual property matters for Nox?

13:43:43  6    A.    When I joined, it was Arnason Faktor.

13:44:00  7    Q.    And was that the only firm that was handling

13:44:04  8    intellectual property matters?

13:44:06  9    A.    To the best of my knowledge, yes.

13:44:08  10   Q.    And when you joined Nox, did Nox have direct contact

13:44:11  11   with any U.S. firm on patent issues?

13:44:17  12   A.    Not to my knowledge, no.

13:44:20  13   Q.    Did there come a time in your role as CEO where you

13:44:23  14   became the person responsible for handling intellectual

13:44:26  15   property matters?

13:44:30  16   A.    No.

13:44:33  17   Q.    Do you recall testifying on this matter before,

13:44:36  18   Mr. Halldorsson?

13:44:37  19   A.    I have -- I have been handling conversations with our

13:44:42  20   agent, with our experts, experts, provide advice on the

13:44:49  21   matter.

13:44:56  22              MR. ADELSON:  Ben, if you could please pull up

13:45:00  23   deposition transcript 97, line 3.

13:45:11  24   BY MR. ADELSON:

13:45:11  25   Q.    Do you see on the screen there, Mr. Halldorsson, a

Halldorsson - direct

| | | |
|---|---|---|
| 13:45:14 | 1 | question by Mr. Nicgorski:  Regarding part of your |
| 13:45:17 | 2 | responsibilities as CEO, do you also manage legal matters? |
| 13:45:22 | 3 | A.    Would you tell me the line? |
| 13:45:23 | 4 | Q.    Line 3. |
| 13:45:24 | 5 | A.    Line 3. |
| 13:45:26 | 6 | Q.    And your response is, that sits on my table to manage |
| 13:45:31 | 7 | that and consult with advisors? |
| 13:45:33 | 8 | MR. LORIMER:  Objection, your Honor.  This is |
| 13:45:35 | 9 | not impeachment.  It's what he said. |
| 13:45:37 | 10 | THE COURT:  It's marginally different. |
| 13:45:37 | 11 | BY MR. ADELSON: |
| 13:45:44 | 12 | Q.    Do you recall this now? |
| 13:45:45 | 13 | A.    That sits on my table to manage that and consult with |
| 13:45:49 | 14 | advisors. |
| 13:45:49 | 15 | Q.    Are you the person that's then in contact with your |
| 13:45:53 | 16 | legal counsel on intellectual property matters? |
| 13:45:55 | 17 | A.    I have been in contact with them, yes. |
| 13:45:57 | 18 | Q.    Okay.  When did Nox first directly engage with a U.S. |
| 13:46:01 | 19 | firm to handle its patent matters? |
| 13:46:05 | 20 | A.    It was in August 2014. |
| 13:46:11 | 21 | Q.    August 2014? |
| 13:46:12 | 22 | A.    That is to the best of my knowledge and memory, yes. |
| 13:46:15 | 23 | Q.    And was that firm Workman Nydegger? |
| 13:46:18 | 24 | A.    That is correct. |
| 13:46:21 | 25 | Q.    And was there some issue with the fact that Arnason |

Halldorsson - direct

13:46:27    1    Faktor was doing for you that wanted you to switch firms?

13:46:29    2    A.    We had been -- it had been brought to our attention

13:46:33    3    that our products were being copied, and we were of the

13:46:36    4    opinion after having consulted with probably the largest

13:46:39    5    company in Iceland that handles IP matters in the medical

13:46:44    6    device arena, Ossur, that Workman Nydegger had been working

13:46:50    7    with them, and we got some good advice.

13:46:52    8        And it was clear to me at that time that we

13:46:57    9    would be doing the right thing and engaging with a U.S.

13:47:01   10    experts on the matters, yes.

13:47:04   11    Q.    And since that time, I think you said August 2014, has

13:47:08   12    Workman Nydegger been Nox's exclusive representation on U.S.

13:47:12   13    patent matters?

13:47:13   14    A.    Yes.

13:47:18   15    Q.    And at the time that Nox first engaged Workman

13:47:20   16    Nydegger, did you or anyone else meet directly with

13:47:23   17    attorneys from Workman Nydegger?

13:47:25   18    A.    I did, yes.

13:47:27   19    Q.    And who else met with them?

13:47:30   20    A.    I was -- the first meeting that we had was with Mr.

13:47:35   21    Hoskuldsson.

13:47:35   22    Q.    Okay.  Was that in Iceland or did you come to the

13:47:37   23    United States for that meeting?

13:47:39   24    A.    That meeting was in Iceland.

13:47:42   25    Q.    And at that time that you had the meeting, did you

Halldorsson - direct

13:47:45   1   discuss your pending patent application?

13:47:47   2              MR. LORIMER:  That's a yes or no.  We're getting

13:47:50   3   very close to privilege here.

13:47:52   4   BY MR. ADELSON:

13:47:53   5   Q.    It is a yes-or-no question.

13:47:55   6   A.    Could you repeat the question, please.

13:47:56   7   Q.    At that time that meeting, did you discuss Nox's

13:47:59   8   pending U.S. application?

13:48:03   9   A.    Yes.  I think that was one of the topics discussed.

13:48:08  10   Q.    And one of the pending Nox applications that Workman

13:48:12  11   Nydegger assumed responsibility for was the application that

13:48:15  12   issued as the '532 patent; is that correct?

13:48:18  13   A.    The '532, you said?

13:48:20  14   Q.    Yes.

13:48:21  15   A.    That is correct.

13:48:23  16   Q.    Was that the only pending Nox application at the time?

13:48:27  17   A.    No.  I think there were others.

13:48:29  18   Q.    And were the other ones in at least partially naming

13:48:33  19   Mr. Hoskuldsson as an inventor?

13:48:35  20   A.    That is correct.

13:48:39  21   Q.    Did you coordinate the transfer of files from Arnason

13:48:43  22   Faktor to Workman Nydegger?

13:48:45  23   A.    I participated in that, yes.

13:48:47  24   Q.    And when you say participated, can you give us a brief

13:48:49  25   explanation of what you mean?

Halldorsson - direct

13:48:53   1   A.      In the transfer of information to Workman Nydegger, we

13:48:57   2   did need to share with them information about the

13:49:03   3   technology, information about the RIP technology and quite a

13:49:06   4   substantial amount of information that were needed to have

13:49:11   5   them to understand the matters and the technology that we

13:49:14   6   had at stake.

13:49:17   7   Q.      Okay.  Just to be clear, my question was really more

13:49:19   8   directed, were you involved in directing Arnason Faktor to

13:49:23   9   transfer their files to Workman Nydegger?

13:49:27   10   A.      Yes.  I think I did -- I think that is what I did,

13:49:32   11   informing Arnason Faktor that we had engaged with a specific

13:49:35   12   firm in the U.S. for handling our matters, yes.

13:49:39   13   Q.      And does Nox still use Arnason Faktor for its

13:49:43   14   international patent work outside the United States?

13:49:49   15   A.      In some instances, yes.

13:49:54   16   Q.      And is Mr. Karl Einar Fridriksson the person at

13:49:59   17   Arnason Faktor that Nox works with?

13:50:01   18   A.      One of them, yes.  We work with others.

13:50:06   19   Q.      Are you the only person at Nox who corresponds with

13:50:11   20   Workman Nydegger on intellectual property matters?

13:50:16   21   A.      No.

13:50:18   22   Q.      Who else does?

13:50:21   23   A.      That would be quite a large -- during this case, the

13:50:26   24   whole correspondence with gathering information, providing

13:50:28   25   all the information that we have into the case, that had

Halldorsson - direct

13:50:32  1   been quite a lot of people within my organization that have

13:50:35  2   gotten involved in those discussions, but I had been, I

13:50:42  3   think it's fair to say, the one that's channeling this

13:50:45  4   discussion, but there are other people that have got

13:50:48  5   involved during our obligation to provide information as

13:50:51  6   requested into this Court case.

13:50:54  7   Q.    Okay.  Setting aside the court case, strictly on

13:50:57  8   matters relating to prosecution matters, are you the person

13:51:01  9   that corresponds with Workman Nydegger?

13:51:04  10  A.    Not the only one, no.

13:51:06  11  Q.    Is there anyone else other than yourself and Mr.

13:51:10  12  Hoskuldsson that communicates with Workman Nydegger on those

13:51:12  13  matters?

13:51:12  14  A.    Yes.

13:51:13  15  Q.    And who are those individuals?

13:51:17  16  A.    One of them is the leader of what we call the research

13:51:20  17  team, the specific team that works on new technology and new

13:51:24  18  developments.  His name is Jon Skyrniragustsson.  I really

13:51:48  19  hope that I'm spelling this correctly.  It can be confusing

13:51:51  20  sometimes.  But that is the name.

13:51:56  21  Q.    And kind of switching now to before you started

13:51:58  22  working at Nox, where had you been working prior to running

13:52:02  23  Nox in 2011?

13:52:04  24  A.    Where do you want to start?

13:52:06  25  Q.    Immediately prior?

Halldorsson - direct

13:52:07    1    A.      Immediately prior I was working with a company, an

13:52:09    2    investment company -- sorry.  I was working under a

13:52:13    3    consultancy agreement with CareFusion.

13:52:17    4    Q.      Okay.  And how long had you been working at

13:52:21    5    CareFusion -- excuse me, under a consultancy agreement for

13:52:24    6    CareFusion?

13:52:25    7    A.      I was self-employed during that time as a consultant

13:52:28    8    for CareFusion.  The engagement is signed in December 2010,

13:52:35    9    and I entered that, I entered that engagement or entered the

13:52:40    10   consultancy the first half of January 2011.

13:52:48    11   Q.      Can you give us just a brief description of your

13:52:50    12   responsibilities working in this consul tan see for

13:52:54    13   CareFusion?

13:52:57    14   A.      At that time, CareFusion was the exclusive distributor

13:53:00    15   for Nox Medical products entirely, in all markets.  They had

13:53:12    16   certain issues with their distribution channels.  They were

13:53:15    17   deciding on the strategies.  They were deciding what to do

13:53:19    18   in that sleep field.

13:53:21    19           They were trying to investigate whether sleep --

13:53:28    20   whether the sleep business was a future opportunity for

13:53:31    21   them, so my engagement was working in my best capacity to

13:53:37    22   provide strategies and work with them in building those

13:53:40    23   strategies.

13:53:46    24   Q.      So while you were at CareFusion, you were obviously

13:53:48    25   aware of Nox Medical?

Halldorsson - direct

13:53:51    1    A.    Absolutely, yes.  Very much so.

13:53:53    2    Q.    And you were familiar with Nox's products at that

13:53:55    3    time?

13:53:57    4    A.    During my consultancy, I became aware of the products

13:54:02    5    and started to learn exactly what they were doing.

13:54:07    6    Q.    Did you only become aware of Nox Medical's products

13:54:11    7    through your consultancy for CareFusion or had you known

13:54:15    8    about them before?

13:54:16    9    A.    I knew about the establishment of the company.  I had

13:54:18    10   worked with all these guys during my time at Flaga, from

13:54:21    11   2001 until 2006, but I cannot say that I was involved or

13:54:26    12   knew their products through the details.  I was very busy

13:54:31    13   doing other businesses and under other employment from 2006

13:54:35    14   until 2010.

13:54:38    15   Q.    During your consultancy for CareFusion, you were

13:54:41    16   familiar with the Nox T3 device; is that correct?

13:54:44    17   A.    Yes.

13:54:44    18   Q.    All right.  And you were also familiar with the

13:54:47    19   accessories that go with the Nox T3 device at that time; is

13:54:50    20   that correct?

13:54:51    21   A.    Obviously, yes, I was.

13:54:52    22   Q.    And, for example, you knew that Nox's semi-disposable

13:54:57    23   or the RES belt was a product of Nox at that time; is that

13:55:01    24   correct?

13:55:02    25   A.    Yes, I did.

Halldorsson - direct

13:55:03    1    Q.      And just to be clear when we talk about the

13:55:05    2    semi-disposable belt, you understand we're talking about the

13:55:08    3    same devices that we had in this trial, you know, had

13:55:13    4    physical samples of it?

13:55:14    5    A.      That's correct.  We have seen the semi-disposable belt

13:55:17    6    in the trial.

13:55:18    7    Q.      And there's no dispute that the Nox RES belt or the

13:55:22    8    semi-disposable prior art is the '532 patent; is that

13:55:26    9    correct?

13:55:26    10    MR. LORIMER:  Your Honor, this is expert

13:55:28    11    testimony for Pete's sake.

13:55:29    12    THE COURT:  Well, you know, there is no dispute,

13:55:32    13    but I'm going to sustain the objection.  If you want to ask

13:55:36    14    him what his opinion is, sure.

13:55:38    15    MR. ADELSON:  Sure.

13:55:39    16    BY MR. ADELSON:

13:55:40    17    Q.      The Nox RES belt has a connector that snaps on an

13:55:42    18    electrode; is that correct?

13:55:43    19    A.      That is correct.

13:55:44    20    Q.      Okay.  And were you familiar with CareFusion's catalog

13:55:48    21    prior to joining Nox?

13:55:53    22    A.      Familiar with it?  I -- that would probably be a wrong

13:55:56    23    assumption, but I had seen it.

13:55:58    24    Q.      Okay.  Did you know that Nox Medical's products were

13:56:01    25    advertised in a CareFusion catalog?

Halldorsson - direct

13:56:04   1   A.    Yes.   I had seen it to that extent, Nox products were

13:56:11   2   images and they were being mentioned in that catalog since

13:56:14   3   distributed by CareFusion.

13:56:15   4   Q.    And the Nox RES belt was advertised in the 2009

13:56:18   5   CareFusion catalog; is that correct?

13:56:22   6   A.    There was an image of the RES belt in that catalog,

13:56:24   7   correct.

13:56:25   8   Q.    And at any time did you ever provide information to

13:56:27   9   U.S. counsel showing the Nox RES belt in the CareFusion

13:56:31   10  catalog?

13:56:34   11  A.    What time frame are you talking about now.

13:56:36   12  Q.    Let's start with any time.

13:56:41   13  A.    During this whole trial and gathering of information,

13:56:45   14  I -- I have heard the RES, the CareFusion catalog

13:56:49   15  terminology many, many, many times.   But whether I did

13:56:55   16  provide it to our counsel, I -- I do not remember.   I may

13:56:59   17  well have, but I do not remember whether that was some

13:57:04   18  document that I gathered and got over to them.   That may

13:57:08   19  well have been the case.

13:57:09   20  Q.    Okay.   And you mentioned that you were just discussing

13:57:11   21  this during this litigation.   Did you do it at any time

13:57:13   22  prior to this litigation?

13:57:16   23  A.    I don't think so, no.

13:57:18   24  Q.    Do you know if anyone else at Nox provided information

13:57:22   25  on the CareFusion catalog, the 2009 catalog, to U.S.

Halldorsson - direct

| | |
|---|---|
| 13:57:27 | 1 |
| 13:57:31 | 2 |
| 13:57:34 | 3 |
| 13:57:39 | 4 |
| 13:57:42 | 5 |
| 13:57:46 | 6 |
| 13:57:48 | 7 |
| 13:57:48 | 8 |
| 13:57:50 | 9 |
| 13:57:51 | 10 |
| 13:57:53 | 11 |
| 13:57:55 | 12 |
| 13:57:59 | 13 |
| 13:58:00 | 14 |
| 13:58:00 | 15 |
| 13:58:01 | 16 |
| 13:58:05 | 17 |
| 13:58:07 | 18 |
| 13:58:12 | 19 |
| 13:58:15 | 20 |
| 13:58:18 | 21 |
| 13:58:19 | 22 |
| 13:58:22 | 23 |
| 13:58:26 | 24 |
| 13:58:30 | 25 |

1    counsel?  And, again, prior to this litigation.

2

3    A.    No.  To the best of my knowledge, I don't think so.

4    Q.    And do you have any understanding as to why it wasn't

5    provided before the '532 patent issued?

6            MR. LORIMER:  Foundation, your Honor,

7    particularly relating to him.

8            THE COURT:  I'm sorry, Mr. Lorimer.  You'll have

9    to speak up a little bit.

10           MR. LORIMER:  I object on foundation for anyone

11   except the witness.

12           THE COURT:  Well, if he knows.

13           THE WITNESS:  Could you repeat the question,

14   please?

15   BY MR. ADELSON:

16   Q.    Sure.  Let's start with:  Do you know if anyone ever

17   provided -- you already answered that you don't believe

18   anyone ever provided the CareFusion catalog to U.S. counsel

19   prior to the issuance of the '532 patent; is that correct?

20   A.    You asked me prior to litigation, but not prior to the

21   issuance.

22   Q.    Okay.  Do you still believe that it was provided after

23   the issuance and before this litigation?

24   A.    If I had provided it, that was definitely before the

25   issuance, which is June 16th, 2015.

Halldorsson - direct

13:58:36  1   Q.    I'm sorry.  You are saying now that you did provide

13:58:38  2   the CareFusion catalog?

13:58:40  3   A.    If I had provided it, that must have been before the

13:58:43  4   issuance.

13:58:44  5   Q.    You would have provided --

13:58:46  6

13:58:47  7   A.    My memory.

13:58:47  8   Q.    Okay.  And you are aware that the CareFusion catalog

13:58:52  9   does not appear on the face of the '532 patent, is that

13:58:55  10  correct, as a cited reference?

13:58:57  11  A.    I'm aware of that, yes, because it demonstrates a

13:59:00  12  different product, a different connector.

13:59:03  13  Q.    Okay.  Mr. Hoskuldsson, do you recall from your

13:59:11  14  earlier testimony that we discussed your letter to a Ms.

13:59:17  15  Cookie Wei?

13:59:18  16  A.    My name is Halldorsson.  You says Hoskuldsson.

13:59:21  17  Q.    I apologize.  Mr. Halldorsson, do you recall that you

13:59:27  18  previously provided testimony that, regarding a letter that

13:59:30  19  you sent to Ms. Cookie Wei?

13:59:32  20  A.    I do.

13:59:33  21  Q.    Okay.

13:59:35  22        MR. ADELSON:  If we can show that, please.

13:59:37  23  BY MR. ADELSON:

13:59:38  24  Q.    This is that letter; is that correct?

13:59:40  25  A.    That is correct.

974

Halldorsson - direct

13:59:41   1    Q.    And did you prepare this letter?

13:59:42   2    A.    I did.

13:59:43   3    Q.    Okay?

13:59:46   4                MR. ADELSON:   And, Ben, if you could go to the

13:59:48   5    last page.   If you can blow that up, please.

13:59:58   6    BY MR. ADELSON:

14:00:00   7    Q.    This is a listing characterized as a summary of

14:00:06   8    granted and pending patents of Nox; is that correct?

14:00:11   9    A.    That is correct.

14:00:12   10   Q.    Did you prepare this summary?

14:00:14   11   A.    I pulled this together, yes, from documents that I had

14:00:17   12   and, yes, I did.   I wrote that letter and signed it.

14:00:21   13   Q.    Okay.   And at the time of this letter, which was

14:00:27   14   February 10th, 2014, both the international application and

14:00:29   15   the U.S. publication relating to the '532 patent had both

14:00:34   16   published; is that correct?

14:00:35   17   A.    That is correct.

14:00:38   18   Q.    Now, if you were informing Ms. Wei about the Nox

14:00:42   19   intellectual property relating to the disposable belt, why

14:00:45   20   aren't those listed?

14:00:48   21   A.    I cannot answer that question, but there is, as I have

14:00:51   22   pointed out earlier, a very clear reference to the PCT

14:00:56   23   application that had to do with the same product, and I have

14:01:00   24   to state that this was done, as I have stated previously,

14:01:05   25   just before midnight.

Halldorsson - direct

| | | |
|---|---|---|
| 14:01:07 | 1 | It has been brought to our attention that our |
| 14:01:09 | 2 | product is being copied and I'm sending out the notice to |
| 14:01:13 | 3 | Sinbon, and a few hours later, or a few days later I'm on an |
| 14:01:18 | 4 | airplane sitting down with them to have a discussion about |
| 14:01:21 | 5 | this. |
| 14:01:21 | 6 | So this was done in a pretty much rush I had to |
| 14:01:24 | 7 | notify them, and whether I could have added something else |
| 14:01:27 | 8 | there, that must have been an oversight. |
| 14:01:29 | 9 | Q.    Okay.  Now, the last line of this listing includes the |
| 14:01:38 | 10 | EU registered design. |
| 14:01:40 | 11 | Do you see that? |
| 14:01:41 | 12 | A.    I do. |
| 14:01:42 | 13 | Q.    And that references a design registration on the Nox |
| 14:01:46 | 14 | RES belt; is that correct? |
| 14:01:50 | 15 | A.    Not necessarily on the RES belt, no, it does not show |
| 14:01:55 | 16 | any mechanical design.  It doesn't show any functionality. |
| 14:02:00 | 17 | It's the face of a hole.  That's what it is, but it has -- |
| 14:02:05 | 18 | has nothing to do with the mechanical function of what you |
| 14:02:08 | 19 | classify as the RES belt or the semi-disposable belt. |
| 14:02:11 | 20 | Q.    Is it a reference that relates to the disposable belt |
| 14:02:14 | 21 | design? |
| 14:02:17 | 22 | A.    I would say no. |
| 14:02:19 | 23 | Q.    Okay.  And since while we're talking about that, could |
| 14:02:22 | 24 | you please put up DTX-18 and 21.  You can put them up side |
| 14:02:29 | 25 | by side. |

Halldorsson - direct

14:02:33  1          So this is the design registration, the design

14:02:36  2   registration for the two halves of the Nox RES belt for the

14:02:39  3   connector; is that correct?

14:02:44  4   A.    Are they the same or are they different?

14:02:52  5   Q.    And the description here says that the snap-on

14:02:54  6   respiratory belt connector with key lock design, doesn't it?

14:03:00  7   A.    I do see that.

14:03:01  8   Q.    Okay.  And if we could scroll, turn to the next page.

14:03:08  9   You can use Exhibit 18, please.

14:03:11  10         And is that a picture of the connector end in

14:03:16  11  the upper left-hand corner?

14:03:19  12  A.    It's the -- it's the image of the face, front of the

14:03:24  13  face of what we call front face of a connector, but not

14:03:27  14  necessarily the semi-disposable connector.

14:03:32  15  Q.    All right.  Now at the bottom of the page here,

14:03:37  16  there's an entry discussing the exhibition priority; is that

14:03:42  17  correct?

14:03:42  18  A.    I do see that.

14:03:45  19  Q.    Now, do you see that this says this was exhibited at

14:03:47  20  Sleep 2008 in Baltimore?

14:03:51  21  A.    I do read that as well as you, yes.

14:03:55  22  Q.    Okay.  So did you happen to attend the Sleep 2008

14:03:59  23  conference in Baltimore?

14:04:01  24  A.    Absolutely.  I was not employed with the company,

14:04:04  25  neither CareFusion, so I was doing something totally

Halldorsson - direct

1    different then.

2    Q.    Okay.  When you joined Nox as evidenced by your letter

3    to Ms. Wei, you knew about these design registrations; is

4    that correct?

5    A.    These had been brought to my attention.  I had not

6    seen those design documents, but I knew about the design.

7    At that time, I knew about the design, design application or

8    design documents.

9    Q.    Did you ever provide information on this design

10   registration to U.S. patent counsel for Nox?

11   A.    I do not remember that and I couldn't say out of the

12   thousands and thousands of documents that I've been provided

13   whether this was one of them.  I couldn't say.

14   Q.    Do you know if anyone at Nox provided these design

15   registrations to counsel prior to the issuance of the '532

16   patent?

17   A.    I could not say whether -- whether it was or not,

18   no.

19   Q.    Okay.

20            MR. ADELSON:  You can take them down now.

21   BY MR. ADELSON:

22   Q.    When you joined Nox, Mr. Herrmansson was an employee;

23   is that correct?

24   A.    That is correct.

25   Q.    And Mr. Herrmansson is no longer an employee of Nox;

Halldorsson - direct

14:05:27  1    is that correct?

14:05:27  2    A.    He's not employed with Nox, no.

14:05:29  3    Q.    When did Mr. Herrmansson leave his employment with

14:05:32  4    Nox?

14:05:36  5    A.    2014 springtime, or first half of 2014.

14:05:42  6    Q.    Okay.  Now, Nox has an arrangement where they still

14:05:46  7    utilize his services for consulting once in awhile; is that

14:05:49  8    correct?

14:05:50  9    A.    That is correct, yes.

14:05:51  10   Q.    And in 2014, after he left, you asked Mr. Herrmansson

14:05:57  11   to identify relevant patents in the field of RIP belts; is

14:06:01  12   that correct?

14:06:02  13   A.    Yes.  We had a conversation after he left, yes.

14:06:08  14   Q.    Okay.  And after that conversation, he then sent you

14:06:10  15   an e-mail listing the RIP belt patents; is that correct?

14:06:15  16   A.    I remember that he did, yes.

14:06:16  17            MR. ADELSON:  And, Ben, could you please put up

14:06:18  18   DTX-26.

14:06:28  19   BY MR. ADELSON:

14:06:28  20   Q.    Now, this is a translation of that e-mail that he

14:06:30  21   transmitted to you; is that correct?

14:06:34  22   A.    Yes, but I pointed out previously in depositions that

14:06:38  23   those translations are incredibly inaccurate.  This is an

14:06:41  24   English translation.  That is correct.

14:06:44  25   Q.    I understood --

Halldorsson - direct

14:06:45    1

14:06:45    2    A.    I pointed out that they were wrong at the deposition.

14:06:48    3    Q.    I will represent to you and the Court that it's very

14:06:50    4    difficult to find a good Icelandic translator.

14:06:53    5                   If you could please go to --

14:06:55    6                   MR. LORIMER:  If this isn't what the original

14:06:58    7    says, it's not proper evidence, it should not be admitted.

14:07:02    8    He says it's not correct.

14:07:03    9                   THE COURT:  Yes.  Well, that does seem to be

14:07:05    10   what he's saying, and the fact that it's hard to get a

14:07:08    11   correct version doesn't mean, okay.

14:07:10    12                  MR. ADELSON:  It has been certified, your Honor.

14:07:13    13   Sorry for my levity.

14:07:14    14                  I was just trying to -- you know, this is an

14:07:18    15   e-mail that's clearly directed to Mr. Halldorsson and

14:07:22    16   Hoskuldsson and it gave from Mr. Herrmansson.

14:07:26    17                  MR. LORIMER:  What he wants to talk about is the

14:07:28    18   words, and Mr. Halldorsson says the words are not properly

14:07:31    19   translated.

14:07:33    20                  MR. ADELSON:  You do not know what I want to

14:07:35    21   talk about, and I don't want to talk about --

14:07:37    22                  THE COURT:  All right.  So let's not have a back

14:07:40    23   and forth.  All right?

14:07:42    24                  MR. ADELSON:  Sorry, your Honor.

14:07:44    25                  THE COURT:  So he has got a certified

14:07:47  1  translation, so I'm going to let it in, recognizing that for

14:07:52  2  sure, Mr. Halldorsson does not think it's accurate and I

14:07:59  3  will take that into account.

14:08:02  4          Perhaps, Mr. Lorimer, on your cross you'll have

14:08:05  5  an opportunity to ask him why it's inaccurate or how it's

14:08:08  6  inaccurate.

14:08:09  7          Go ahead, Mr. Adelson.

14:08:10  8          MR. ADELSON:  Thank you, your Honor.  Again, I

14:08:13  9  apologize.  I was just trying to have levity.

14:08:16  10          If we could go, please, to page 5 of this

14:08:18  11  document, Ben.

14:08:22  12  BY MR. ADELSON:

14:08:23  13  Q.    This is an Excel spreadsheet that was attached to the

14:08:29  14  e-mail; is that correct?

14:08:31  15  A.    That is correct, yes.

14:08:33  16  Q.    And this is not a translated version.  This is how it

14:08:36  17  was provided?

14:08:37  18  A.    Correct.  Original is written in English.

14:08:39  19  Q.    Okay.  And then if you could go on page 7, please.

14:08:47  20          This is an additional spreadsheet that was

14:08:52  21  attached to that e-mail, also all in English; is that

14:08:52  22  correct.

14:08:56  23  A.    Yes.  I think this is the first beige and the one you

14:08:58  24  showed me previously is the second page of this list.

14:09:01  25  Q.    Okay.

Halldorsson - direct

14:09:02  1   A.     The first of two pages.

14:09:04  2   Q.     Now, at the time Mr. Herrmansson sent you this listing

14:09:07  3   in 2014, you were involved in coordinating legal activities

14:09:13  4   in the United States relating to Nox's patent prosecution;

14:09:16  5   is that correct?

14:09:19  6   A.     I was -- yes, I was in communication with our

14:09:23  7   attorneys and had a conversation with them.

14:09:26  8   Q.     Okay.  And did you provide a listing of this prior art

14:09:30  9   to U.S. counsel?

14:09:34  10   A.     The e-mail that is provided to me, this list that is

14:09:38  11   provided to me from Herrmansson is part of what I provided,

14:09:44  12   yes.

14:09:45  13   Q.     All right.  Are you aware that multiple references

14:09:47  14   on this list were not sent to the United States Patent

14:09:50  15   Office?

14:09:55  16   A.     I couldn't say.  Probably I didn't know at that time,

14:09:58  17   but I do know now.  But I have to admit that the purpose of

14:10:01  18   this document was exactly to talk about the RIP technology,

14:10:04  19   and no one is ever claiming that we are claiming title to

14:10:07  20   the RIP technology.  We are bringing our attorneys up to

14:10:10  21   speed what has relevance to even RIP technology.

14:10:13  22   Q.     At the time that Mr. Herrmansson provided this list to

14:10:17  23   you, was he the only named inventor on the '532 patent?

14:10:21  24   A.     That is correct.

14:10:22  25   Q.     So this is a listing -- just to be clear, this is a

14:10:24   1   listing of references provided to you by the only named

14:10:27   2   inventor that did not end up on the face of the patent; is

14:10:30   3   that correct?

14:10:31   4             MR. LORIMER:  Objection.  I think that misstates

14:10:34   5   the witness' testimony.

14:10:35   6             THE COURT:  Well, so make it less argumentative.

14:10:38   7   Ask him what he knows.  What's on the face of the patent,

14:10:42   8   that's a different question.

14:10:43   9             MR. ADELSON:  I can move on, your Honor.

14:10:45   10             THE COURT:  Okay.

14:10:46   11   BY MR. ADELSON:

14:10:49   12   Q.    In August of 2015, Mr. Herrmansson sent you an e-mail

14:10:55   13   with an attachment comparing the commercial embodiments of

14:10:58   14   the '532 patent and its earlier product, the Nox RES belt,

14:11:03   15   was covered by the '539 or Herrmansson patent; is that

14:11:06   16   correct?

14:11:09   17   A.    I received a lot of e-mails from Mr. Herrmansson.  I

14:11:12   18   do not know what e-mail you are referring to.  It may well

14:11:16   19   be the case.

14:11:19   20             MR. ADELSON:  DTX-22, please.

14:11:22   21   BY MR. ADELSON:

14:11:25   22   Q.    Okay.  This is an e-mail from Mr. Herrmansson to you,

14:11:29   23   Mr. Halldorsson; is that correct?

14:11:34   24   A.    That is correct.

14:11:37   25   Q.    All right.  And then if you could please pull up slide

Halldorsson - direct

14:11:40  1   3 and 4 side by side.

14:11:42  2            MR. LORIMER:  Your Honor, I object to this.

14:11:44  3   This is in October -- excuse me, April and August -- August

14:11:47  4   of 2015, April of 2016, after the patent issued, after the

14:11:51  5   duty of candor expired after the issuance of the patent.

14:11:56  6            THE COURT:  All right.  I'm going to allow

14:11:57  7   it.

14:12:00  8            It may be irrelevant, but it's being charged to

14:12:03  9   his time, so I'm going to spend his time doing what he

14:12:06  10  wants.  However, let's take a time out here, because I have

14:12:09  11  a note from the jury.  All right?  So we're off the clock

14:12:11  12  for this.

14:12:13  13           So the jury sends the following note, dated

14:12:19  14  2:10 p.m. today.  It is by my watch 2:12 p.m.

14:12:25  15           Your Honor, if we find claims 5 or 9 to be

14:12:30  16  invalid, does this affect the validity of claim number

14:12:34  17  one?  That's what they wrote.

14:12:46  18           And I take it that a copy of this has actually

14:12:49  19  now been handed to you.  Right?

14:12:51  20           MR. NYDEGGER:  Yes, your Honor.

14:12:55  21           MR. ADELSON:  Yes, your Honor.

14:12:56  22           THE COURT:  So any suggestions from plaintiff as

14:13:10  23  to how they would like me to answer this question?

14:13:12  24           MR. NYDEGGER:  Your Honor, it appears the jury

14:13:19  25  may be confused about whether claims 5 or 9 incorporate by

Halldorsson - direct

1    reference all the elements of claim 1, and that seems to be

2    the genesis behind this question.

3               And so we would request an instruction to the

4    jury that reminds them that claims 5 and 9 incorporate all

5    the elements of claim 1, and claims 5 and 9 can only be

6    found invalid if all of the claim elements from claim 1 are

7    also satisfied.

8               THE COURT:  All right.  What does defense think

9    here?

10              MR. REYNOLDS:  I think the answer to the

11   question is yes, and that the instructions that they already

12   have incorporates what Mr. Nydegger just said, so that's

13   already in the instructions.

14              I think reiterating it would be improperly

15   pointing to -- giving them something specific.  I think the

16   answer to the question is a yes-or-no question.  The answer

17   I think is yes.

18              THE COURT:  And as a matter of patent law, it

19   is, in fact, the case, is it not, Mr. Nydegger, that if

20   claim 5 or 9 is invalid as obvious, that claim 1 is also

21   invalid as obvious.  Right?

22              MR. NYDEGGER:  Assuming that the analysis is

23   performed, then, yes, that's correct.  But if -- like I

24   said, this question suggests that they're performing the

25   analysis backwards, saying, we find the elements found in

14:14:46  1   claim 5 and 9, but if they had gone through all the elements

14:14:52  2   of claim 1 before reaching claim, the elements of claim 5

14:14:55  3   and 9, this question would not be answered because they

14:14:58  4   would have already decided the validity of claim 1.

14:15:02  5        So deciding the validity of claim 1 precedes

14:15:06  6   even arriving at this question, so the fact that they're

14:15:09  7   asking it, like I said, it's I think a clear indication that

14:15:14  8   what is going on is that they're finding that the elements

14:15:17  9   listed only in 5 and 9 may be taught in the prior art, but

14:15:23  10  that they have not performed an analysis of claim 1 to find

14:15:26  11  that claim invalid.

14:15:28  12       THE COURT:  So what about this.  What about if I

14:15:31  13  read them the paragraph that is at the bottom of page 14 in

14:15:34  14  the instructions, which explains the relationship of

14:15:38  15  dependent claims to independent claims.  In particular,

14:15:43  16  claim 9 and claim 5 and claim 1, and followed up that by

14:15:49  17  saying something along the lines of, therefore, since a

14:16:03  18  dependent claim includes all the claim limitations of the

14:16:07  19  independent claim, if the dependent claim is invalid as

14:16:17  20  obvious, the independent claim is also necessarily invalid

14:16:25  21  as obvious.

14:16:25  22       I think that's the question they are asking.

14:16:27  23       MR. NYDEGGER:  Well, your Honor, we would -- I

14:16:29  24  think that puts the horse of about the cart.  It's actually

14:16:33  25  the other way around.  Claim 9 can't be found invalid unless

Halldorsson - direct

14:16:38  1    claim 1 is first found invalid.

14:16:40  2             THE COURT:  Well, no, it doesn't actually -- we

14:16:43  3    didn't tell them -- one of the jury instructions says you

14:16:45  4    don't have to do them in any particular order.

14:16:48  5             MR. NYDEGGER:  You don't have to do them in

14:16:50  6    order, but like I said, you can't -- because it's

14:16:53  7    incorporated by reference as a dependent claim, it's

14:16:55  8    impossible to get to claim 5 and 9 without going through all

14:17:00  9    the elements of claim 1 first.  So to say that if you find

14:17:05  10   claim 5 invalid, claim 1 must also be invalid, that puts the

14:17:09  11   horse before the cart.

14:17:10  12            THE COURT:  So if I answered the question, if

14:17:15  13   you -- so what you would like me to say is, in order for you

14:17:21  14   to find claim 5 or 9 to be invalid, you necessarily have to

14:17:25  15   find claim 1 to be invalid?

14:17:28  16            MR. NYDEGGER:  Yes.  Yes.  You must, you must --

14:17:30  17   well, that is a little tricky, because --

14:17:37  18            MR. REYNOLDS:  Your Honor, I wonder whether just

14:17:38  19   for now pointing them back to 2.1 in its entirety.  You were

14:17:44  20   reading from instruction 2.1.  Correct?

14:17:46  21            THE COURT:  Yes.

14:17:47  22            MR. REYNOLDS:  That I wonder if they just were

14:17:50  23   directed to 2.1, if that might answer the question for them.

14:17:59  24            THE COURT:  Hold on a minute.

14:18:02  25            (Pause.)

14:18:51    1          MR. NYDEGGER:  Your Honor, looking more closely

14:18:54    2     at the question submitted by the jury, they say, does the

14:18:56    3     invalidity of claim 5 or 9 affect the validity of claim 1,

14:19:00    4     and the answer to that question is no.  A dependent claim

14:19:03    5     cannot affect the validity of an independent claim.  But the

14:19:11    6     reverse is true.  But the way they phrased their question,

14:19:16    7     claim 5 and 9 cannot affect the validity of claim 1.

14:19:46    8          THE COURT:  I'm sorry.  Hold on a minute.

14:19:48    9              (Pause.)

14:20:20   10          THE COURT:  Stay here a minute.  I will be right

14:20:23   11     back in just a second.

14:20:24   12              (Short recess taken.)

14:20:32   13                   -   -   -

14:20:32   14              (Proceedings resumed after the short recess.)

14:21:33   15          THE COURT:  All right.  Some of you, Mr. Adelson

14:21:37   16     son and perhaps Mr. Lorimer -- you all can be seated.

14:21:40   17          THE WITNESS:  Thank you.

14:21:41   18          THE COURT:  You may recall that one of my

14:21:43   19     brilliant ideas was to strike a couple of sentences from

14:21:46   20     page 22 of the proposed instruction, which --

14:21:53   21          MR. LORIMER:  I recall, your Honor.

14:21:55   22          THE COURT:  You all can be seated.

14:21:56   23          Which includes these two sentences:  Because the

14:22:01   24     dependent claim incorporates all the features of the

14:22:03   25     independent claims to which it refers, if you find the

14:22:06    1    independent claim would not have been obvious, you must also

14:22:11    2    find the claims that depend from that independent claim also

14:22:13    3    would not have been obvious.

14:22:14    4            Conversely, if you find the dependent claim

14:22:17    5    would have been obvious, you must also find the associated

14:22:20    6    independent claim would have been obvious.

14:22:23    7            That's -- I don't know.  I've got a black and

14:22:28    8    white version.  One of you wanted me to say that, which is a

14:22:33    9    standard kind of thing.  I think it's a correct statement of

14:22:37   10    law.  I think it probably answers the question, too.

14:22:39   11            MR. NYDEGGER:  Your Honor, that does adequately

14:22:42   12    answer the question and explain the law as it currently

14:22:45   13    stands.

14:22:45   14            MR. REYNOLDS:  I think that's correct, your

14:22:46   15    Honor, yes.

14:22:50   16            THE COURT:  So why don't I just start off by

14:22:52   17    responding by reading them those two sentences and send them

14:22:58   18    back, and if they find it confusing or whatever, they'll

14:23:00   19    send more notes.  Okay?

14:23:02   20            MR. REYNOLDS:  Sounds good.

14:23:03   21            MR. NYDEGGER:  Thank you, your Honor.

14:23:04   22            THE COURT:  All right.  So, Mr. Halldorsson,

14:23:11   23    would you mind going and sitting back with your counsel?

14:23:14   24    Then we'll get the jury.

14:23:16   25            MR. NYDEGGER:  May we bring in Mr. Hoskuldsson,

14:23:17  1   please?

14:23:18  2                   THE COURT:  If you would like, yes.

14:23:19  3                   MR. NYDEGGER:  Thank you.

14:23:20  4                   THE WITNESS:  Thank you.

14:23:20  5                   (Witness excused.)

14:23:26  6           MR. ADELSON:  Your Honor, excuse me.  Can you

14:23:29  7   just instruct that no one is supposed to speak with Mr.

14:23:32  8   Hoskuldsson about the testimony that has been heard at very

14:23:34  9   point?

14:23:34  10                  MR. LORIMER:  We stipulate to that.

14:23:36  11                  THE COURT: All right.  Yes.

14:23:40  12                  MR. ADELSON:  Thank you.

14:23:41  13                  THE COURT:  Thank you, Mr. Lorimer.

14:24:24  14                  (The jury entered the courtroom.)

14:24:29  15                  THE COURT:  Go ahead and have a seat.  Yes.

14:24:41  16           All right.  Welcome, members of the jury.

14:24:43  17   Everyone, you may be seated.

14:24:44  18           So, members of the jury, I received a note,

14:24:47  19   which asks, said as follows:  "If we find claims 5 or 9 to

14:24:54  20   be invalid, does this affect the validity of claim number

14:24:58  21   1."

14:24:59  22           So I talked to the attorneys, and what we agreed

14:25:03  23   that I should tell you is something that I didn't instruct

14:25:11  24   you the first time around, but it does accurately capture

14:25:16  25   the law related, that's related to the topic you've raised.

Halldorsson - direct

14:25:20    1    Whether or not it specifically answers your question, I'm

14:25:24    2    not a hundred percent sure.  But let me instruct you as

14:25:28    3    follows.

14:25:28    4         Because a dependent claim incorporates all the

14:25:34    5    features of the independent claim to which it refers, if you

14:25:40    6    find the independent claim would not have been obvious, then

14:25:46    7    you must also find that the claims that depend from that

14:25:49    8    independent claim also would not have been obvious.

14:25:54    9    Conversely, if you find that the dependent claim would have

14:25:58    10   been obvious, you must also find the associated independent

14:26:03    11   claim would have been obvious.

14:26:06    12        Everything else I've given you in writing, if

14:26:12    13   anyone would like me to read those two sentences again --

14:26:15    14   yes, I will read them again.

14:26:17    15        Because a dependent claim incorporates all the

14:26:21    16   features of the independent claim to which it refers, if you

14:26:25    17   find the independent claim would not have been obvious, then

14:26:30    18   you must also find that the claims that depend from that

14:26:33    19   independent claim also would not have been obvious.

14:26:38    20        Conversely, if you find a dependent claim would

14:26:43    21   have been obvious, you must also find the associated

14:26:48    22   independent claim would have been obvious.

14:26:53    23        All right.  So thank you.  Can we take the jury

14:26:56    24   back to the jury room?

14:26:56    25             (The jury was excused.)

Halldorsson - direct

| | |
|---|---|
| 14:27:14 | 1 |
| 14:27:17 | 2 |
| 14:27:18 | 3 |
| 14:27:21 | 4 |
| 14:27:24 | 5 |
| 14:27:26 | 6 |
| 14:27:45 | 7 |
| 14:27:48 | 8 |
| 14:27:52 | 9 |
| 14:27:53 | 10 |
| 14:27:54 | 11 |
| 14:27:57 | 12 |
| 14:28:05 | 13 |
| 14:28:06 | 14 |
| 14:28:12 | 15 |
| 14:28:16 | 16 |
| 14:28:18 | 17 |
| 14:28:20 | 18 |
| 14:28:20 | 19 |
| 14:28:21 | 20 |
| 14:28:24 | 21 |
| 14:28:29 | 22 |
| 14:28:33 | 23 |
| 14:28:38 | 24 |
| 14:28:43 | 25 |

1    THE COURT:  And so, Mr. Halldorsson, if you can

2  come back.

3    Mr. Hoskuldsson, if you can leave.

4    My deputy clerk, if you can take what I think is

5  the original, it looks like the original.

6    And, Mr. Adelson, you can continue.

7  BY MR. ADELSON:

8  Q.    Mr. Halldorsson, do you see DTX-22 on the screen

9  there?

10  A.    I do.

11  Q.    Okay.  And did you ask Mr. Herrmansson to prepare this

12  analysis?

13  A.    Yeah, I believe I did.

14  Q.    Okay.  And if Mr. Hoskuldsson was an inventor on the

15  '532 patent, why didn't you ask him to perform this

16  analysis?

17  A.    Could you ask that question again, please?

18    If --

19  Q.    Sure.

20    If Mr. Hoskuldsson was an inventor on the '532

21  patent, why didn't you ask him to prepare this analysis?

22  A.    Mr. Hoskuldsson was not mentioned as an inventor on

23  the '532 patent when this is being requested.

24  Q.    Okay.  But he is now listed as an inventor; is that

25  correct?

Halldorsson - direct

| | |
|---|---|
| 14:28:43 | 1 |
| 14:28:44 | 2 |
| 14:28:48 | 3 |
| 14:28:52 | 4 |
| 14:28:55 | 5 |
| 14:28:58 | 6 |
| 14:29:03 | 7 |
| 14:29:07 | 8 |
| 14:29:15 | 9 |
| 14:29:20 | 10 |
| 14:29:23 | 11 |
| 14:29:25 | 12 |
| 14:29:28 | 13 |
| 14:29:31 | 14 |
| 14:29:32 | 15 |
| 14:29:36 | 16 |
| 14:29:36 | 17 |
| 14:29:37 | 18 |
| 14:29:40 | 19 |
| 14:29:40 | 20 |
| 14:29:46 | 21 |
| 14:29:52 | 22 |
| 14:29:57 | 23 |
| 14:29:58 | 24 |
| 14:30:01 | 25 |

A.    That is correct.

Q.    So his knowledge or what he did or didn't do didn't change because now he's listed as an inventor; is that correct?

A.    That is a question that I could not answer.  That requires expertise to answer the question, I believe.  But it was totally obvious to me to answer -- to ask that question, to ask to pull that information together.

Q.    Now, as the date of this analysis, Natus had already challenged the validity of Nox's European patent; is that correct?

A.    Remind me of the date of this one.

Q.    August 2015.

A.    Yes, I believe that was before that date.  Yes.

Q.    Okay.

A.    I'm not entirely sure, but I believe I was before, yeah.

Q.    Okay.  And Natus' challenge was partially based on the Herrmansson earlier patent, which we've talked about as the '529 patent.  And when I am talking about, I mean in Europe?

A.    Yes.  The Herrmansson reference, what we saw in the U.S.

993

Halldorsson - direct

| 14:30:02 | 1 | Q.    Okay.   Was Mr. Herrmansson's analysis here an attempt |
| 14:30:06 | 2 | to help you in your challenge in Europe? |
| 14:30:08 | 3 |           MR. LORIMER:   Your Honor, again, we're talking |
| 14:30:10 | 4 | about the U.S. Patent Office, candor to the U.S. Patent |
| 14:30:13 | 5 | Office.   What happens in Europe doesn't seem to be relevant |
| 14:30:16 | 6 | to this claim. |
| 14:30:18 | 7 |           THE COURT:   All right.   You may usually be |
| 14:30:20 | 8 | right, but I'm going to overrule you. |
| 14:30:22 | 9 |           THE WITNESS:   Could you repeat the question, |
| 14:30:23 | 10 | please? |
| 14:30:24 | 11 | BY MR. ADELSON: |
| 14:30:25 | 12 | Q.    Was this analysis that you asked Mr. Herrmansson to |
| 14:30:27 | 13 | conduct in connection with Natus' challenge of the related |
| 14:30:31 | 14 | European patent? |
| 14:30:35 | 15 | A.    I could not state whether it was or wasn't, but I |
| 14:30:39 | 16 | think it highly likely that that information has been |
| 14:30:42 | 17 | provided to the attorneys in the case in Europe as well. |
| 14:30:49 | 18 | Q.    Now, Mr. Halldorsson, you were involved in the |
| 14:30:52 | 19 | decision to request a change of inventorship to the '532 |
| 14:30:57 | 20 | patent; is that correct? |
| 14:30:59 | 21 | A.    That is correct. |
| 14:31:00 | 22 | Q.    And you even signed a statement agreeing that that |
| 14:31:04 | 23 | inventorship should be made to include Mr. Hoskuldsson; is |
| 14:31:09 | 24 | that correct? |
| 14:31:10 | 25 | A.    Could you -- would not include. |

Halldorsson - direct

14:31:12    1    Q.    Should include?

14:31:13    2    A.    Should include, yes.

14:31:16    3    Q.    Okay.  How did you come to believe that Mr.

14:31:19    4    Hoskuldsson should be named on the patent?

14:31:24    5              MR. LORIMER:  Your Honor, if this question is

14:31:26    6    soliciting privileged communications, I object to it.

14:31:30    7              THE COURT:  All right.  Well, all right.  So I

14:31:34    8    think the question is what did he believe, so whatever he

14:31:40    9    believed probably is not privileged.

14:31:43   10              MR. LORIMER:  If that's the question, I have no

14:31:45   11    objection to it.

14:31:49   12              THE WITNESS:  And now could you repeat the

14:31:51   13    question, please?

14:31:51   14    BY MR. ADELSON:

14:31:53   15    Q.    How did you come to believe that Mr. Hoskuldsson

14:31:56   16    should be named as an inventor on the '532 patent?

14:31:59   17              THE COURT:  So let me just ask it simpler:  Why

14:32:02   18    did you believe he should be named as an inventor?

14:32:05   19              THE WITNESS:  We had conversations with our

14:32:07   20    advisors.  As I stated previously, there were thousands and

14:32:11   21    thousands of documents and copies of diaries and lab books

14:32:15   22    being provided as a part of our obligation, and going

14:32:20   23    through those documents with those advisors, that came up

14:32:24   24    during that conversation.

14:32:26   25              And I was being approached that that would be a

14:32:29  1  question, and just around Christmas, I knew those

14:32:33  2  conversations were taking place.  I know that Mr.

14:32:37  3  Hoskuldsson was on vacation, and conversations were being

14:32:45  4  had where drawing some objects could have been, could have

14:32:51  5  been the nature of that discussion.

14:32:53  6  BY MR. ADELSON:

14:32:53  7  Q.    Did you ever talk with Mr. Hoskuldsson directly and

14:32:55  8  ask him what he invented?

14:33:01  9  A.    What time frame are you referring to now?  After or

14:33:04  10  before.

14:33:05  11  Q.    Let's just say at any time, did you have a

14:33:06  12  conversation with Mr. Hoskuldsson asking him what his

14:33:09  13  contribution to the '532 patent was?

14:33:17  14  A.    After being changed inventorship, definitely, but it

14:33:21  15  was clear to me in my honest belief and totally the case

14:33:24  16  that he was not the inventor of the -- what resulted in the

14:33:33  17  '532 patent before that caught my attention.

14:33:35  18  Q.    And what is it that you believe Mr. Hoskuldsson

14:33:37  19  contributed to the '532 patent?

14:33:40  20  A.    It has been brought to my attention that there were

14:33:43  21  some sketches or images or drawings long before I joined the

14:33:49  22  company, at least before I joined the company, that might

14:33:53  23  have some reference to some embodiment that was in the '532

14:34:00  24  patent.

14:34:00  25  Q.    What specific feature?

Halldorsson - direct

14:34:01   1    A.     It had to do with the fastening mechanism of the, of

14:34:05   2    the elastic belt, those teeth that grab into the belt and

14:34:12   3    keep them firmly in place so they do not slide.  Those --

14:34:18   4    that kind of sketches.

14:34:23   5    Q.     But you weren't at Nox at the time that he purportedly

14:34:26   6    invented this; is that correct?

14:34:30   7    A.     Invented or drafting those, drafted those sketches?  I

14:34:34   8    was not.

14:34:34   9    Q.     Okay.  And do you -- how do you know that those

14:34:37   10   sketches are his sketches?

14:34:43   11   A.     Only his word for that.  I was not there at the time,

14:34:46   12   and obviously, during the whole process, we have had

14:34:49   13   conversations.  I know that those sketches were in his

14:34:53   14   notebook.  Nobody else's.  And I think no one else writes,

14:34:57   15   or -- writes into his notebook.

14:35:07   16   Q.     All right.  During last week's trial we heard that Nox

14:35:09   17   has a European counterpart to the '532 patent; is that

14:35:12   18   correct?

14:35:13   19   A.     Yes.  There's a patent that recites from the same PCT

14:35:18   20   application.

14:35:19   21   Q.     Okay.

14:35:20   22          MR. ADELSON:  And can you bring up PTX-1027,

14:35:23   23   please.

14:35:23   24   BY MR. ADELSON:

14:35:24   25   Q.     Is this that European equivalent?

Halldorsson - direct

| | | |
|---|---|---|
| 14:35:27 | 1 | MR. LORIMER:  Your Honor, I don't want to burden |
| 14:35:28 | 2 | the Court, but I'm wondering if I might have a continuing |
| 14:35:31 | 3 | objection to this European stuff? |
| 14:35:32 | 4 | THE COURT:  No.  You should make objections as |
| 14:35:37 | 5 | you go along because maybe there's something that there will |
| 14:35:39 | 6 | be an objection that something can be done about, but I'm |
| 14:35:44 | 7 | going to continue to overrule them. |
| 14:35:46 | 8 | MR. LORIMER:  I just don't want to trouble the |
| 14:35:48 | 9 | Court too much. |
| 14:35:48 | 10 | We object to this because this is not -- it's |
| 14:35:55 | 11 | not a European patent at issue, it's a U.S. patent. |
| 14:35:58 | 12 | THE COURT:  I understand the objection. |
| 14:35:59 | 13 | Overruled.  And when I say "overruled," if we have |
| 14:36:01 | 14 | post-trial briefing, you can raise these things. |
| 14:36:03 | 15 | MR. LORIMER:  Sure. |
| 14:36:05 | 16 | BY MR. ADELSON: |
| 14:36:05 | 17 | Q.    Now, Mr. Halldorsson, Mr. Hoskuldsson is not named as |
| 14:36:12 | 18 | an inventor on this patent; is that correct? |
| 14:36:14 | 19 | A.    That is correct. |
| 14:36:15 | 20 | Q.    Okay.  And if you can please go to, I believe it's |
| 14:36:25 | 21 | page 8. |
| 14:36:34 | 22 | Sorry.  Can you go back one page, please?  Make |
| 14:36:39 | 23 | that a couple more.  Stop there, please. |
| 14:36:45 | 24 | Okay.  If you can blow up claim 10, please. |
| 14:36:52 | 25 | BY MR. ADELSON: |

14:36:54   1    Q.     Do you see here that this limitation of the European

14:36:57   2    patent includes an adjustment slot with teeth, Mr.

14:37:02   3    Hoskuldsson, or Halldorsson?

14:37:06   4    A.     That is what I read, yes.

14:37:08   5    Q.     Is that the same feature your you believe Mr.

14:37:12   6    Hoskuldsson contributed at the time to the '532 patent?

14:37:14   7    A.     I believe that is, that is -- yes, the same as -- as

14:37:18   8    mentioned in the '532 patent.

14:37:20   9    Q.     Okay.

14:37:21   10

14:37:22   11   A.     Whether the wording is the same, I couldn't say, but

14:37:24   12   the embodiment, the text is the same.

14:37:30   13   Q.     Okay.

14:37:30   14          MR. ADELSON:  I would like to move DTX-1027 into

14:37:33   15   evidence.

14:37:34   16          MR. LORIMER:  We object for the reasons

14:37:36   17   previously stated.

14:37:37   18          THE COURT:  All right.  Objection noted and

14:37:38   19   overruled.

14:37:38   20          (Defendant's Trial Exhibit Number 1027 was

14:37:41   21   admitted into evidence.)

14:37:41   22   BY MR. ADELSON:

14:37:41   23   Q.     Now, Nox has not done anything to add Mr. Hoskuldsson

14:37:46   24   as an inventor on this patent, has it?

14:37:50   25   A.     No, we have not.  I have to admit that we seek advice

Halldorsson - direct

14:37:55   1   from our counsel in Europe.

14:37:58   2   Q.    And this patent, as we've discussed, was challenged by

14:38:06   3   Natus previously?

14:38:08   4   A.    I know that it was challenged, yes.

14:38:10   5   Q.    Okay?

14:38:12   6           MR. ADELSON:  If you can put up DTX-1025,

14:38:18   7   please.

14:38:18   8   BY MR. ADELSON:

14:38:19   9   Q.    And this, do you recognize this document, Mr.

14:38:23   10  Halldorsson?

14:38:29   11  A.    Yes, I do.

14:38:30   12  Q.    And this is a document that was prepared by

14:38:35   13  Mr. Fridriksson; is that correct?

14:38:37   14  A.    Yes.

14:38:38   15  Q.    And do you authorize his preparation and filing of

14:38:41   16  this document?

14:38:44   17  A.    Yes.

14:38:52   18  Q.    If we look at the document, it bears the date of

14:38:55   19  November 23rd, 2015; is that correct?

14:38:58   20  A.    Yes.

14:38:59   21  Q.    If you look at the middle of the page, it says, this

14:39:01   22  is a response to the opposition with a that was filed

14:39:05   23  June 10, 2015; is that correct?

14:39:08   24  A.    Where are you now exactly?  In the second paragraph.

14:39:11   25  Q.    The first sentence of the document?

Halldorsson - direct

| | | |
|---|---|---|
| 14:39:16 | 1 | A.    Yes, I do see that. |
| 14:39:17 | 2 | Q.    So Natus was challenging the document before the '532 |
| 14:39:21 | 3 | patent had issued; is that correct? |
| 14:39:23 | 4 | A.    That is correct. |
| 14:39:27 | 5 | MR. ADELSON:  I would like to move DTX-1025 into |
| 14:39:30 | 6 | evidence, please. |
| 14:39:31 | 7 | THE COURT:  All right. |
| 14:39:31 | 8 | (Defendant's Trial Exhibit Number 1025 was |
| 14:39:37 | 9 | admitted into evidence.) |
| 14:39:37 | 10 | MR. LORIMER:  Objection, your Honor. |
| 14:39:38 | 11 | THE COURT:  Okay. |
| 14:39:40 | 12 | MR. ADELSON:  If you could go up to paragraph |
| 14:39:42 | 13 | 1.1, please. |
| 14:39:44 | 14 | BY MR. ADELSON: |
| 14:39:45 | 15 | Q.    All right.  And this paragraph identifies that the |
| 14:39:46 | 16 | applicant for this invention was Kormakur Herrmansson; is |
| 14:39:52 | 17 | that correct? |
| 14:39:53 | 18 | A.    That is correct. |
| 14:39:55 | 19 | Q.    So there's no mention of Mr. Hoskuldsson at all; is |
| 14:39:58 | 20 | that correct? |
| 14:39:58 | 21 | A.    That is correct. |
| 14:40:04 | 22 | Q.    Now, on January 8th, 2016, you signed paperwork |
| 14:40:13 | 23 | changing the inventorship in the United States; is that |
| 14:40:15 | 24 | correct? |
| 14:40:18 | 25 | A.    January 8th.  Did you say 2016. |

Halldorsson - direct

14:40:21  1    Q.    Yes.

14:40:22  2

14:40:22  3    A.    Yes.   No.   I think that was January 8th, 2017, I

14:40:26  4    believe.

14:40:27  5    Q.    If you could --

14:40:29  6

14:40:29  7    A.    I -- I have to apologize.   Could you pull out?   Do you

14:40:33  8    have those --

14:40:34  9    Q.    I do.

14:40:35  10          MR. ADELSON:   If you could put up DTX-1024 at

14:40:39  11   three, please.

14:40:41  12   BY MR. ADELSON:

14:40:48  13   Q.    And this is the document that you signed; is that

14:40:50  14   correct?

14:40:54  15   A.    Yes.

14:40:55  16   Q.    Okay.   So somewhere between the 23rd of November 2015

14:41:00  17   and the 8th of January 2016, Mr. Hoskuldsson suddenly became

14:41:07  18   an inventor; is that correct?

14:41:09  19          MR. LORIMER:   Objection, your Honor.   This is

14:41:10  20   argumentative.   Suddenly became an inventor?

14:41:12  21          THE COURT:   You know, your right, so I'm going

14:41:15  22   to strike the question.   Ask it again.

14:41:17  23   BY MR. ADELSON:

14:41:18  24   Q.    Between November 23rd, 2015, and January 8th, 2016,

14:41:22  25   Mr. Hoskuldsson became an inventor?

Halldorsson - direct

| | | |
|---|---|---|
| 14:41:27 | 1 | A.    That is correct. |
| 14:41:28 | 2 | Q.    Okay. |
| 14:41:30 | 3 | |
| 14:41:31 | 4 | A.    We applied for the correction of inventorship. |
| 14:41:34 | 5 | Q.    In the United States only; is that correct? |
| 14:41:36 | 6 | A.    Correct. |
| 14:41:37 | 7 | MR. ADELSON:  Thank you.  No further questions. |
| 14:41:45 | 8 | THE COURT:  Don't feel obligated to cross just |
| 14:41:47 | 9 | because there was direct, but go ahead. |
| 14:41:50 | 10 | CROSS-EXAMINATION |
| 14:42:21 | 11 | BY MR. LORIMER: |
| 14:42:21 | 12 | Q.    Now, Mr. Adelson asked you if the inventor named |
| 14:42:24 | 13 | there, the applicant named there was Kormakur Herrmansson. |
| 14:42:27 | 14 | Is that the only applicant name there? |
| 14:42:31 | 15 | A.    That is the only applicant name there. |
| 14:42:33 | 16 | Q.    Is Nox Medical named as an applicant? |
| 14:42:39 | 17 | A.    The individual is -- the only individual is Kormakur |
| 14:42:41 | 18 | Herrmansson from Nox Medical. |
| 14:42:42 | 19 | Q.    Do you know, Mr. Halldorsson, whether the requirements |
| 14:42:45 | 20 | for listing inventor in Europe are the same as they are in |
| 14:42:48 | 21 | the U.S.? |
| 14:42:49 | 22 | MR. ADELSON:  Objection.  Calls for a legal |
| 14:42:51 | 23 | conclusion. |
| 14:42:52 | 24 | MR. LORIMER:  I asked him if he knew. |
| 14:42:53 | 25 | THE COURT:  In any event, I'm going to overrule |

Halldorsson - cross

| | | |
|---|---|---|
| 14:42:55 | 1 | the objection.  I am not taking it as a statement of what |
| 14:42:59 | 2 | the law is in Europe as opposed to what his impression of it |
| 14:43:04 | 3 | is. |
| 14:43:05 | 4 | BY MR. LORIMER: |
| 14:43:05 | 5 | Q.    Do you know, sir? |
| 14:43:06 | 6 | A.    That is my impression. |
| 14:43:07 | 7 | Q.    Do you think they are the same? |
| 14:43:09 | 8 | A.    I think they are not exactly the same. |
| 14:43:11 | 9 | Q.    Okay. |
| 14:43:11 | 10 | A.    But I'm not a legal expert. |
| 14:43:13 | 11 | Q.    Okay. |
| 14:43:19 | 12 | MR. LORIMER:  Would you put up DTX-26, please. |
| 14:43:26 | 13 | BY MR. LORIMER: |
| 14:43:26 | 14 | Q.    Do you recall that Mr. Adelson asked you some |
| 14:43:28 | 15 | questions about this?  Go to the end of this where the |
| 14:43:31 | 16 | spreadsheet is. |
| 14:43:36 | 17 | Now, he asked you some questions about the |
| 14:43:38 | 18 | spreadsheet, and I believe asked you if any of those were |
| 14:43:42 | 19 | sent to U.S. counsel. |
| 14:43:44 | 20 | Do you know the content of those references? |
| 14:43:48 | 21 | A.    Briefly. |
| 14:43:49 | 22 | Q.    Have you read them all? |
| 14:43:51 | 23 | A.    I have not read them all, no. |
| 14:43:54 | 24 | Q.    Did you ever do a comparison to see how close they |
| 14:43:56 | 25 | were to the '532 patent? |

Halldorsson - cross

14:43:59  1   A.    I did not do such comparison myself, no.

14:44:04  2   Q.    Now, Mr. Halldorsson, are you a member of the U.S.

14:44:15  3   Patent Bar?

14:44:17  4   A.    Could you say that again, please.

14:44:19  5   Q.    Are you admitted to the Patent Bar of the United

14:44:21  6   States Patent and Trademark Office?

14:44:22  7   A.    No, I'm not.

14:44:26  8   Q.    And are you a patent agent?

14:44:28  9   A.    No, I'm not.

14:44:30  10  Q.    Are you admitted to the European Patent Office Bar?

14:44:36  11  A.    No, I'm not.

14:44:37  12  Q.    Now, look at PTX-2, if you would, please.  And now you

14:44:46  13  see there that the application for the '532 patent, the

14:44:53  14  application, the provisional application down here at line

14:44:56  15  60, were you an employee of Nox at that time?

14:45:00  16  A.    I was not.

14:45:02  17  Q.    Okay.  Now, did you ever make any changes to the

14:45:07  18  claims of the '532 patent?

14:45:11  19  A.    No, I did not.

14:45:14  20  Q.    Prior to June 16th of 2015, did you ever have any

14:45:17  21  discussion with anybody anywhere about whether Mr.

14:45:23  22  Hoskuldsson should have been named as an inventor on the

14:45:24  23  application that became the '532 patent?

14:45:27  24  A.    No, I did not.

14:45:30  25  Q.    Prior to June 16th of 2015, did you have any reason to

Halldorsson - cross

14:45:33  1    believe that Mr. Hoskuldsson should have been named as an

14:45:36  2    inventor on that application?

14:45:38  3    A.    No.

14:45:47  4              MR. LORIMER:  Now, would you put up slide 102-E.

14:45:54  5    BY MR. LORIMER:

14:45:54  6    Q.    This slide here shows 35 USC Section 102(e).

14:45:59  7              Prior to June 16th of 2015, had you ever seen

14:46:02  8    that before?

14:46:03  9    A.    No.

14:46:03  10   Q.    Did you ever talk to anybody about it before?

14:46:05  11   A.    No, I have not.

14:46:11  12   Q.    And prior to the issuance of the '532 patent in June

14:46:14  13   of 2015, had you ever heard the phrase, unity of

14:46:18  14   inventorship?

14:46:18  15   A.    I had not heard that, no.

14:46:21  16   Q.    Have you ever discussed that concept with anybody?

14:46:24  17   A.    I have not.

14:46:33  18              MR. LORIMER:  Now, put up DTX, I think it's

14:46:37  19   1017, if you would, please.

14:46:41  20   BY MR. LORIMER:

14:46:41  21   Q.    Do you recognize that as the '539 patent?

14:46:45  22   A.    Yes, I do.

14:46:47  23   Q.    Now, prior to June the 16th of 2015, did you have any

14:46:56  24   understanding as to the effect on the availability of this

14:47:01  25   reference to be considered by the Examiner in the '532

| 14:47:06 | 1 | patent as to whether Mr. Hoskuldsson had been named as a |
| 14:47:10 | 2 | co-inventor on the '532? |
| 14:47:12 | 3 | Did you have any understanding of that? |
| 14:47:14 | 4 | A.    No, I didn't.  I did not have an understanding. |
| 14:47:17 | 5 | Q.    Did you ever talk to anybody about that prior to the |
| 14:47:18 | 6 | issuance of the '532? |
| 14:47:20 | 7 | A.    No, not at all. |
| 14:47:26 | 8 | Q.    Now, go back to PTX-2, if you would, for a moment. |
| 14:47:31 | 9 | All right.  And you see there at the top, do you |
| 14:47:33 | 10 | see who is listed as the inventor?  The person?  Do you see |
| 14:47:41 | 11 | the person. |
| 14:47:41 | 12 | |
| 14:47:41 | 13 | A.    Yes.  Kormakur Herrmansson. |
| 14:47:43 | 14 | Q.    Prior to the issue date of that patent on June 16th of |
| 14:47:48 | 15 | 2015, did you believe anybody else was an inventor on that |
| 14:47:54 | 16 | patent? |
| 14:47:55 | 17 | A.    You are now referring to the '532 patent. |
| 14:47:57 | 18 | Q.    I am? |
| 14:47:58 | 19 | A.    I don't see the full extent -- |
| 14:48:00 | 20 | MR. LORIMER:  I'm sorry.  Would you make that a |
| 14:48:02 | 21 | little bigger so he can see the rest of it? |
| 14:48:07 | 22 | BY MR. LORIMER: |
| 14:48:07 | 23 | Q.    So the question is:  Prior to June 16th of 2015, did |
| 14:48:11 | 24 | you have any reason to believe that anybody other than |
| 14:48:14 | 25 | Mr. Kormakur Herrmansson was a proper inventor on this |

Halldorsson - cross

14:48:17  1    patent?

14:48:17  2    A.    No, I have no reason to believe so.

14:48:23  3    Q.    Go to page 2 of this, if you would, please, down there

14:48:31  4    on the lower right-hand corner.

14:48:32  5          Do you see that line that says Herrmansson on

14:48:36  6    it?

14:48:36  7    A.    I do.

14:48:36  8    Q.    Did you have any reason to believe that Herrmansson

14:48:39  9    '539 had not been submitted to the Patent Office prior to

14:48:42  10   the issuance of the patent?

14:48:43  11   A.    No.

14:48:46  12   Q.    Did you, prior to the issuance of the patent, did you

14:48:52  13   have any idea or any concept of the notion that if Mr.

14:48:58  14   Hoskuldsson were named as an inventor on the '532

14:49:04  15   application, that the '539 could not be considered by the

14:49:06  16   Examiner?

14:49:07  17   A.    No.

14:49:09  18   Q.    Did you ever instruct anybody not to name Mr.

14:49:13  19   Hoskuldsson as an inventor on the '532 so that the 53 --

14:49:17  20   Herrmansson '539 could not be considered?

14:49:20  21   A.    No.  Absolutely not.

14:49:21  22   Q.    Did you ever discuss that with anybody?

14:49:24  23   A.    No.

14:49:24  24   Q.    Did you ever make a conscious decision to hide the

14:49:26  25   fact that Mr. Hoskuldsson should have been named as an

14:49:29  1   inventor on the '532 application so that the Examiner

14:49:32  2   couldn't see the '539?

14:49:34  3   A.    No.

14:49:38  4            MR. LORIMER:  Let's put Exhibit 18, DTX-18 and

14:49:42  5   21.

14:49:42  6            Let's start with 18.  Go to the second page of

14:49:48  7   18, if you would, please.  And go to the second page of 21

14:49:52  8   while your at it.

14:49:53  9   BY MR. LORIMER:

14:49:53  10  Q.    Now, let's talk about the view on 18 here.

14:49:59  11           Does that illustration depict any of the inner

14:50:05  12  parts of whatever that thing is?

14:50:07  13  A.    No, absolutely not.

14:50:09  14  Q.    Does it disclose how an electrode snap might be

14:50:12  15  attached to this device?

14:50:14  16  A.    No.

14:50:14  17  Q.    Does it disclose how a connector wire might connect

14:50:17  18  with that male snap?

14:50:20  19  A.    No, it doesn't.

14:50:23  20  Q.    And is there any disclosure in these drawings as to

14:50:25  21  what the device depicted there was made out of, what

14:50:30  22  material?

14:50:31  23  A.    No.

14:50:34  24  Q.    Does it depict whether that hole that's shown there

14:50:36  25  was flexible or not?

Halldorsson - cross

14:50:37  1   A.    No.

14:50:42  2   Q.    And briefly, let's look at the other one for a minute

14:50:45  3   on 21.

14:50:48  4         Does that depict -- does that say anything about

14:50:51  5   what it's made out of.

14:50:52  6

14:50:52  7   A.    No.

14:50:52  8   Q.    All right.  Does it depict anything about the inner

14:50:55  9   parts of it?

14:50:55  10  A.    No.

14:50:55  11  Q.    Or how it works?

14:50:57  12  A.    No.

14:50:58  13  Q.    Or how it's fastened to an electrode?

14:51:00  14  A.    No.

14:51:01  15  Q.    Or what kind of wiring is inside?

14:51:03  16  A.    No.

14:51:09  17  Q.    Now, who owns the '532 patent currently, sir?

14:51:12  18  A.    Nox Medical.

14:51:15  19  Q.    Now, after Mr. Hoskuldsson was named an inventor, who

14:51:18  20  owned the '532 patent?

14:51:21  21  A.    Nox Medical.

14:51:22  22  Q.    Did it make any difference whether Mr. Hoskuldsson was

14:51:25  23  or was not named as an inventor in terms of who owned the

14:51:29  24  patent?

14:51:35  25  A.    No.  The ownership is Nox Medical.

Halldorsson - cross

14:51:36    1    Q.    Okay.   Are you aware that there was an IPR proceeding

14:51:39    2    filed in which Natus challenged the validity of the '532

14:51:41    3    patent?

14:51:42    4    A.    Oh, yes, I was.

14:51:44    5    Q.    And were you involved in that?

14:51:47    6    A.    Yes.

14:51:49    7    Q.    Are you aware that one of the grounds that they

14:51:51    8    asserted in that IPR was the Herrmansson '539 patent?

14:51:55    9    A.    Yes, I am.

14:51:58   10    Q.    Let's put up PTX-108.

14:52:10   11           MR. LORIMER:   Your Honor, we would ask the

14:52:12   12    Court to take judicial notice of this.   It's an official

14:52:14   13    document.

14:52:15   14           THE COURT:   It's admitted.

14:52:15   15           MR. LORIMER:   Thank you.

14:52:16   16           (PTX-108 wad admitted into evidence.)

14:52:21   17    BY MR. LORIMER:

14:52:21   18    Q.    Mr. Halldorsson, let's go to page 6 of this document,

14:52:25   19    if you would.

14:52:28   20           Do you see the first reference there?

14:52:30   21    A.    Yes, I do.

14:52:31   22    Q.    Is that the Herrmansson '539 patent?

14:52:38   23    A.    Yes.

14:52:39   24    Q.    It's listed as a 102(e) reference?

14:52:41   25    A.    That is correct.

Halldorsson - cross

14:52:42  1   Q.    Okay.  Now, do you know whether the PTAB instituted

14:52:48  2   trial based on that reference?

14:52:51  3   A.    Yes, they did.

14:52:53  4   Q.    On the Herrmansson '539?

14:52:55  5   A.    Excuse me?  Could you repeat the question, please.

14:52:58  6   Q.    Let's move on to the next section.

14:53:01  7          Let's go to page 11 of that decision, under

14:53:06  8   anticipation by Herrmansson, that paragraph, please.

14:53:09  9          Here you see that the Patent Trial and Appeal

14:53:15  10  Board agreed with the patent owner, that the petitioner has

14:53:18  11  failed to show that it is likely to prevail based on

14:53:21  12  Herrmansson.

14:53:22  13          Do you see that?

14:53:23  14  A.    Yes, I do.

14:53:26  15  Q.    Let's go to now page 15, I believe it is.  Blow up

14:53:35  16  beginning with petition -- excuse me.  I think it's on page

14:53:41  17  14.  Forgive me.  We agree with the patent owner, right

14:53:47  18  there.

14:53:48  19          Now, in the middle of that paragraph, it says --

14:53:54  20  well, in the beginning, that first sentence, what is your

14:53:56  21  understanding of that first sentence in the paragraph?

14:54:02  22  A.    That the Patent Office agrees with the patent owner

14:54:05  23  and finds that the Herrmansson patent does not teach the

14:54:08  24  limitation because the wire conductor does not penetrate.

14:54:13  25  Q.    Okay.  And at the end of the day, sort of in layman's

Halldorsson - cross

14:54:19    1    terms, do you know whether Nox or Natus prevailed with

14:54:22    2    respect to the Herrmansson '539 patent in the IPR?

14:54:32    3    A.    Could you explain who prevailed, who won that case.

14:54:35    4            THE COURT:  Why don't you move on.  At the end

14:54:37    5    of the day, I don't care what his opinions are about the

14:54:39    6    IPR.  Sorry, sir.

14:54:42    7            MR. LORIMER:  I will move on.

14:54:44    8            THE WITNESS:  Okay.

14:54:49    9    BY MR. LORIMER:

14:54:49   10    Q.    Now, prior to the issuance of the Nox '532 patent, did

14:54:53   11    you review all the prior art that had been submitted?

14:54:57   12    A.    No.

14:55:00   13    Q.    Prior to the issuance of the '532 patent, did you have

14:55:03   14    any reason to believe that any relevant prior art had not

14:55:06   15    been submitted?

14:55:07   16    A.    No.

14:55:13   17    Q.    Prior to the issuance of the '532 patent, did you have

14:55:16   18    any reason to believe that the Herrmansson '539 patent, if

14:55:18   19    considered by the Examiner, would prevent the patent, any

14:55:22   20    claim of the patent from issuing?

14:55:24   21    A.    No.

14:55:32   22    Q.    During this whole process, Mr. Halldorsson, did you do

14:55:35   23    anything to prevent the Examiner in the '532 application

14:55:38   24    from considering the Herrmansson '539 patent?

14:55:42   25    A.    No, absolutely not.

Halldorsson - cross

14:55:48  1  Q.    Now, Mr. Adelson talked to you about the CareFusion

14:55:51  2  catalog.

14:55:51  3          Was that -- and he talked to you about the

14:55:54  4  semi-disposable device that was displayed in that

14:55:59  5  catalog.

14:55:59  6          Do you recall that?

14:56:00  7  A.    I do.

14:56:00  8  Q.    Is there any difference between that semi-disposable

14:56:03  9  device and what was disclosed in the Herrmansson '539

14:56:07  10 patent?

14:56:07  11 A.    What is shown on the picture there is -- is what you

14:56:12  12 saw within the '539 patent.  The physical embodiment of the

14:56:16  13 '539 Herrmansson patent.

14:56:19  14 Q.    He also talked to you about the physical device, the

14:56:23  15 Nox semi-disposable or RES belt.

14:56:28  16          Is there any difference between that device and

14:56:30  17 what is disclosed in the Herrmansson '539 patent?

14:56:33  18 A.    No.

14:56:36  19 Q.    And referring to Exhibit 18 and DTX-18 and 21, which

14:56:41  20 are the international registrations, is there anything in

14:56:43  21 those documents that -- do those documents include more

14:56:50  22 information about the semi-disposable belt than was

14:56:56  23 disclosed in Herrmansson '539?

14:56:58  24 A.    No.  They disclose much less.

14:57:01  25          MR. LORIMER:  Thank you.

Hoskuldsson - direct

| | | |
|---|---|---|
| 14:57:02 | 1 | THE COURT:  Anything more? |
| 14:57:08 | 2 | MR. ADELSON:  All I wish to do is move in some |
| 14:57:11 | 3 | exhibits that the witness already identified. |
| 14:57:13 | 4 | THE COURT:  All right. |
| 14:57:13 | 5 | So, Mr. Halldorsson, your done.  You may step |
| 14:57:15 | 6 | down.  Okay? |
| 14:57:16 | 7 | THE WITNESS:  Thank you. |
| 14:57:16 | 8 | THE COURT:  Sure. |
| 14:57:17 | 9 | (Witness excused.) |
| 14:57:18 | 10 | THE COURT:  Why don't you just treat everything |
| 14:57:20 | 11 | that has been mentioned as moved in and let's move on. |
| 14:57:23 | 12 | MR. ADELSON:  Thank you, your Honor. |
| 14:57:24 | 13 | (Exhibits admitted into evidence.) |
| 14:57:25 | 14 | THE COURT:  Maybe we should take a ten-minute |
| 14:57:31 | 15 | break here.  Why don't we do that. |
| 14:57:33 | 16 | (Short recess taken.) |
| 14:57:48 | 17 | - - - |
| 14:57:48 | 18 | (Proceedings resumed after the short recess.) |
| 15:09:18 | 19 | THE COURT:  All right.  Everyone be seated. |
| 15:09:22 | 20 | Let's continue. |
| 15:09:23 | 21 | MR. ADELSON:  Natus calls Mr. Sveinbjorn |
| 15:09:27 | 22 | Hoskuldsson. |
| 15:09:27 | 23 | THE COURT:  All right. |
| 15:09:40 | 24 | ... SVEINBJORN HOSKULDSSON, having |
| 15:09:58 | 25 | been duly sworn as a witness, was examined and |

Hoskuldsson - direct

15:10:00    1                 testified as follows ...

15:10:18    2                 MR. ADELSON:  May I approach?

15:10:19    3                 THE COURT:  Sure.

15:10:30    4            (Mr. Adelson handed binders to the Court.)

15:10:34    5                 MR. ADELSON:  May I approach the witness, your

15:10:35    6    Honor?

15:10:35    7                 THE COURT:  Sure.

15:10:36    8            (Mr. Adelson handed a binder to the witness.)

15:10:40    9                      DIRECT EXAMINATION

15:10:41   10    BY MR. ADELSON:

15:10:44   11    Q.     Thank you for being here today, Mr. Hoskuldsson.

15:10:46   12            You are one of the original founders of Nox; is

15:10:49   13    that correct?

15:10:49   14    A.     That is correct.

15:10:50   15    Q.     And your currently the chief technology officer for

15:10:52   16    Nox?

15:10:53   17    A.     I am.

15:10:54   18    Q.     Prior to that, you were the CEO of Nox?

15:10:58   19    A.     Yes, I was the chief executive officer of Nox.

15:11:03   20    Q.     And you and your wife are the largest shareholders of

15:11:05   21    Nox; is that correct?

15:11:08   22    A.     We don't have a major deal, but combined, we would be

15:11:13   23    the largest shareholder, if you will, yes.

15:11:20   24    Q.     In 2010, at the time of the provisional application

15:11:24   25    that resulted in the '532 patent was filed, what firm was

Hoskuldsson - direct

15:11:28    1    Nox using for its U.S. prosecution work?

15:11:31    2    A.    Excuse me.  What patent are you referring to.

15:11:35    3    Q.    The '532 patent?

15:11:36    4    A.    Yes.

15:11:37    5    Q.    When the provisional applications was filed?

15:11:39    6    A.    Yes.  We were using the Icelandic Patent Office

15:11:45    7    Arnason Faktor.

15:11:45    8    Q.    And were you working with Mr. Karl Einar Fridriksson

15:11:50    9    at that time?

15:11:51   10    A.    Yes.  He was our contact at the office.

15:11:53   11    Q.    And who was responsible for communicating with him?

15:11:57   12    A.    It was mostly Herrmansson, so he handled all the daily

15:12:04   13    communications with arrest Arnason Faktor.

15:12:09   14    Q.    Did you also communicate with Arnason Faktor?

15:12:12   15    A.    They came to the office, or maybe came to the office

15:12:16   16    once in awhile and I met him there.

15:12:19   17    Q.    Did you recall meeting with him and Mr. Herrmansson to

15:12:23   18    discuss the application that ultimately became the '532

15:12:27   19    patent?

15:12:30   20    A.    I think there was a meeting or -- yes, with him.

15:12:39   21    Q.    Did you review the draft of the application that

15:12:41   22    ultimately issued as the '532 patent?

15:12:44   23    A.    The draft of the -- of the provisional.

15:12:47   24    Q.    Yes.

15:12:48   25    A.    Yes.  I saw -- yes.  I think that was before it was

1017

Hoskuldsson - direct

15:12:51    1   filed, the final draft.

15:12:55    2   Q.    Nox currently uses the firm of Workman Nydegger; is

15:12:58    3   that correct?

15:12:59    4   A.    That is correct.

15:12:59    5   Q.    And that's the only firm that does U.S. prosecution

15:13:02    6   for Nox at this time; is that correct?

15:13:06    7   A.    I don't know if I have done anything to stop using

15:13:11    8   Arnason Faktor, something like that, but currently, yes,

15:13:16    9   everything through Workman Nydegger as an arrangement in the

15:13:21    10  U.S., yes.

15:13:22    11  Q.    Okay.  And at the time that Nox first engaged Workman

15:13:28    12  Nydegger, did you meet with the attorneys from Workman

15:13:31    13  Nydegger?

15:13:34    14  A.    At the time of the engagement.

15:13:35    15  Q.    Yes.

15:13:38    16  A.    We met with them in -- regularly, sometime in -- I

15:13:44    17  don't know exactly the timing of it, but the initial,

15:13:47    18  initial -- it was just a visit, but on occasion, so I

15:13:55    19  talked with someone -- someone with Workman Nydegger at that

15:14:02    20  time.

15:14:02    21  Q.    All right.  And did you, once they were engaged, did

15:14:04    22  you discuss the pending applications that Nox had in the

15:14:07    23  United States?

15:14:10    24  A.    Yes.

15:14:13    25  Q.    And one of those pending applications ultimately

Hoskuldsson - direct

15:14:16  1  issued as the '532 patent; is that correct?

15:14:19  2  A.    Yes.

15:14:21  3  Q.    And did you have other pending applications at that

15:14:24  4  time?

15:14:26  5  A.    I believe I did, or two.

15:14:29  6  Q.    And have those also been transferred to Workman

15:14:32  7  Nydegger?

15:14:32  8  A.    Yes, they have.

15:14:38  9  Q.    Was Mr. Herrmansson part of those meetings when

15:14:40  10  Workman Nydegger became the new firm for Nox?

15:14:46  11  A.    I don't believe he was.

15:14:48  12  Q.    Even though he was an inventor on the '532 patent

15:14:52  13  application, or the application that issued as the '532

15:14:55  14  patent, he was not present; is that correct?

15:14:57  15  A.    I think we engaged with Workman Nydegger after he left

15:15:02  16  Nox, so it was probably not.

15:15:07  17  Q.    To your knowledge, has Mr. Herrmansson had any contact

15:15:10  18  with Workman Nydegger regarding that application?

15:15:14  19  A.    Well, after this case started, for example, did the --

15:15:23  20  went to Iceland to question him, and Workman Nydegger was

15:15:26  21  there, so obviously, yes.

15:15:29  22  Q.    Prior to the issuance of the '532 patent, do you know

15:15:32  23  of any contact he had between the two, between Workman

15:15:35  24  Nydegger and Mr. Herrmansson?

15:15:37  25  A.    So prior to the '532 patent?  No, I don't believe that

1019

Hoskuldsson - direct

15:15:40   1    was the case.

15:15:42   2    Q.    And did Nox use Arnason Faktor for its non-U.S. patent

15:15:48   3    prosecution matters?

15:15:50   4    A.    Yes.  At least indirectly.

15:15:58   5    Q.    Now, in addition to the '532 patent, your listed as an

15:16:02   6    inventor on other patents and patent applications; is that

15:16:05   7    correct?

15:16:06   8    A.    I'm listed on other patent applications, yes.

15:16:10   9    Q.    Okay.  And I would like to pull up 1, please.  Is this

15:16:17   10   one of those applications?

15:16:21   11          MR. LORIMER:  Your Honor, we object to this.  It

15:16:23   12   was late identified last night and, again, I don't know what

15:16:26   13   it has to do with inequitable conduct on the '532.

15:16:29   14          THE COURT:  It seems pretty marginal in terms of

15:16:32   15   relevance, but I will allow it.

15:16:34   16   BY MR. ADELSON:

15:16:36   17   Q.    Your listed on this publication; is that correct?

15:16:38   18   A.    Yes.  Yes, I am.

15:16:40   19   Q.    And your also listed as an inventor with Gudmundsson?

15:16:47   20   A.    Yes.  That was my other co-founder.

15:16:50   21   Q.    Okay.  And you signed an inventor's oath in connection

15:16:54   22   with this application; is that correct?

15:16:58   23   A.    Yes, I did.

15:16:59   24          MR. ADELSON:  Could you please bring up 2 and

15:17:02   25   put them up, side by side.  Actually, bring up 2.  It's just

15:17:14  1  a two-page document.

15:17:16  2  BY MR. ADELSON:

15:17:22  3  Q.    Do you recognize this document?

15:17:26  4  A.    I have to read it, so...

15:17:30  5            (Pause while witness reviewed exhibit.)

15:17:35  6            MR. LORIMER:  Same objection, your Honor.

15:17:37  7  Disclosed last night.

15:17:39  8            THE WITNESS:  Okay.

15:17:40  9            THE COURT:  All right.  I assume it has

15:17:41  10  something to do with his purported knowledge, so I will

15:17:44  11  overrule it.

15:17:48  12            THE WITNESS:  Okay.  Yes.  It's probably the

15:17:50  13  declaration for the patent application and power of

15:17:56  14  attorney.

15:17:56  15  BY MR. ADELSON:

15:17:57  16  Q.    And in the middle of this text that has been blown

15:17:59  17  up, do you see that your acknowledgments to disclose

15:18:04  18  information which is material to the patentability of the

15:18:07  19  application?

15:18:08  20  A.    Yes.

15:18:09  21  Q.    Okay.  And that's in accordance with the rules of the

15:18:11  22  Patent Office; is that correct?

15:18:13  23  A.    Yes, it is.

15:18:15  24  Q.    All right.  And you signed this document; is that

15:18:17  25  correct?

Hoskuldsson - direct

| | | |
|---|---|---|
| 15:18:18 | 1 | A.    Yes.   Probably.   It's a long time, so -- this must be |
| 15:18:25 | 2 | the document that I signed when I got Arnason Faktor in the |
| 15:18:30 | 3 | case. |
| 15:18:31 | 4 | MR. ADELSON:   If you could blow up the signature |
| 15:18:33 | 5 | block, please. |
| 15:18:35 | 6 | THE WITNESS:   Okay.   Yes.   That's my signature. |
| 15:18:38 | 7 | BY MR. ADELSON: |
| 15:18:39 | 8 | Q.    Okay.   So you signed this document in 2012; is that |
| 15:18:42 | 9 | correct? |
| 15:18:43 | 10 | A.    Yes, I did. |
| 15:18:45 | 11 | Q.    And that was during the period of time before the '532 |
| 15:18:50 | 12 | patent issued; is that correct? |
| 15:18:51 | 13 | A.    That was before the -- the '532. |
| 15:18:54 | 14 | Q.    The patent issued; is that correct? |
| 15:18:57 | 15 | A.    We issued that in 2010, did we. |
| 15:18:59 | 16 | Q.    Well, you filed it 2010? |
| 15:19:01 | 17 | A.    Yes. |
| 15:19:01 | 18 | Q.    And it issued in 2015? |
| 15:19:04 | 19 | A.    Yes, yes.   Your right.   Yes. |
| 15:19:05 | 20 | Q.    Okay.   So during -- |
| 15:19:07 | 21 | |
| 15:19:07 | 22 | A.    Yes. |
| 15:19:07 | 23 | Q.    -- the pendency of that application? |
| 15:19:10 | 24 | A.    Yes. |
| 15:19:10 | 25 | Q.    So at that time you were then familiar with the duty |

Hoskuldsson - direct

| | |
|---|---|
| 15:19:13 | 1 | to disclose material information; is that correct? |
| 15:19:17 | 2 | A.    In this document, yes. |
| 15:19:23 | 3 | MR. ADELSON:  Could you please bring up IVC-3, |
| 15:19:26 | 4 | please? |
| 15:19:27 | 5 | BY MR. ADELSON: |
| 15:19:27 | 6 | Q.    You have another application in your name; is that |
| 15:19:30 | 7 | correct? |
| 15:19:30 | 8 | MR. LORIMER:  As irrelevant as this is, it's |
| 15:19:32 | 9 | certainly cumulative. |
| 15:19:33 | 10 | THE COURT:  Well, it's all true.  Overruled. |
| 15:19:37 | 11 | THE WITNESS:  Yes. |
| 15:19:38 | 12 | BY MR. ADELSON: |
| 15:19:39 | 13 | Q.    This is another application; is that correct? |
| 15:19:40 | 14 | A.    It is. |
| 15:19:41 | 15 | Q.    Okay.  And you also signed an inventor's oath in |
| 15:19:45 | 16 | connection with this application; is that correct? |
| 15:19:48 | 17 | A.    Yes.  I believe I did. |
| 15:19:50 | 18 | Q.    All right.  So at least on two occasions you have |
| 15:19:53 | 19 | signed an inventor's oath attesting to your understanding |
| 15:19:57 | 20 | about the duty to disclose material information; is that |
| 15:19:59 | 21 | correct? |
| 15:19:59 | 22 | |
| 15:19:59 | 23 | A.    I signed the oath, yes. |
| 15:20:01 | 24 | Q.    Did you ever sign an oath in connection with the '532 |
| 15:20:03 | 25 | patent? |

Hoskuldsson - direct

15:20:06  1   A.    I don't believe I did.

15:20:07  2   Q.    Okay.  And on this application, you have two other

15:20:13  3   co-inventors; is that correct?  Mr. Hallgrimason,

15:20:22  4   Mr. Sigurdason?

15:20:24  5   A.    That is correct.

15:20:25  6   Q.    How did you know you were an inventor on this

15:20:28  7   application?

15:20:29  8   A.    Well, this is actually my expertise, so I'm engineer

15:20:35  9   of -- with -- I've learned about signal processing and stuff

15:20:39  10  like that, and this definitely is something that I was

15:20:43  11  heavily involved in, so I would say I was the primary

15:20:50  12  inventor on this one.  The other guys helped me out.  So

15:20:53  13  it's very different than what we've been talking about, the

15:20:57  14  '532 patent, for example.

15:20:58  15  Q.    Okay.  Your contention is you helped out

15:21:01  16  Mr. Herrmansson on the '532 patent?

15:21:06  17  A.    I discussed the '532 patent with Herrmansson but I was

15:21:10  18  not the assistant.

15:21:20  19  Q.    Now, prior to the development of the Nox disposable

15:21:24  20  belt, Nox sold a different belt; is that correct?

15:21:27  21  A.    Yes.

15:21:27  22  Q.    And in this case, we've talked about it as the Nox RES

15:21:30  23  belt and the semi-disposable belt; is that correct?

15:21:33  24  A.    That is correct.

15:21:34  25  Q.    Okay.  And that was sold in the United States as early

Hoskuldsson - direct

15:21:40  1    as January of 2009; is that correct?

15:21:43  2    A.     Yes.   It was exported to the States in January of

15:21:49  3    2009, I believe.   From March maybe, something like that.

15:21:52  4    Q.     And it was also advertised for sale in the CareFusion

15:21:56  5    catalog as early as March of 2009; is that correct?

15:21:59  6    A.     Yes.

15:22:00  7    Q.     And did you provide a copy of the 2009 CareFusion

15:22:09  8    catalog to U.S. patent counsel?

15:22:14  9    A.     No.   It was actually described in the '539 patent or

15:22:19  10   the Herrmansson patent, so we believed we disclosed

15:22:23  11   everything by -- using that patent as a reference.

15:22:28  12   Q.     Do you understand that the duty of candor requires

15:22:30  13   that all material references be submitted to the Patent

15:22:33  14   Office?

15:22:34  15            MR. LORIMER:   That's a misstatement of the law,

15:22:36  16   your Honor.

15:22:36  17            THE COURT:   Well, he can ask the question

15:22:39  18   anyhow.

15:22:40  19            THE WITNESS:   Did I --

15:22:41  20   BY MR. ADELSON:

15:22:42  21   Q.     Do you understand that the duty of candor under 37 CFR

15:22:45  22   1.56 requires what you attested to your agreement, requires

15:22:50  23   that all material art be submitted?

15:22:55  24   A.     Well, I'm no lawyer, but I understand that you are

15:22:58  25   supposed to acknowledge or to notify the Patent Office about

Hoskuldsson - direct

15:23:05  1    any prior art.  But to what degree, I don't know what is

15:23:10  2    expected to be, let's say --

15:23:18  3    Q.    Okay.  Are you familiar with the phrase belt and

15:23:21  4    suspenders?

15:23:22  5    A.    Sorry.

15:23:23  6    Q.    Are you familiar with the phrase belt and suspenders?

15:23:27  7    A.    Belt and suspenders.  Like suspenders for holding up

15:23:30  8    trousers.

15:23:31  9    Q.    Exactly.

15:23:32  10

15:23:32  11   A.    Yes.

15:23:33  12   Q.    You're an engineer?

15:23:34  13   A.    Yes, but maybe not a word I use every day.  Yes, I

15:23:39  14   know what that is.

15:23:40  15   Q.    Okay.  So when someone talks -- have you ever heard

15:23:42  16   that in the context of engineering?

15:23:45  17   A.    Suspenders?  I don't believe I did.  Not to -- not to

15:23:51  18   my -- what I recall now at least.

15:23:53  19   Q.    Okay.  Have you ever as an engineer, when you've

15:23:57  20   designed things, you put some redundancy into your design?

15:24:01  21   A.    We do that all the time.

15:24:03  22   Q.    Okay.  Do you understand that if you submit a single

15:24:06  23   reference to the Patent Office and for maybe a reason you

15:24:10  24   don't even know, it's not considered, the Patent Office then

15:24:15  25   will have no basis to properly evaluate the patent?

Hoskuldsson - direct

| | |
|---|---|
| 15:24:19 | 1 |

            MR. LORIMER:  Your Honor, speculation,

foundation.  It calls for a legal conclusion.

            THE COURT:  All right.  Overruled.

            THE WITNESS:  We basically trust the Patent

Office that we -- we -- that we engage to -- sorting out

what to -- how to notify the Patent Office and stuff like

that.

            So it is basically really provides everything

that they ask for and that's it.  So in this case, for

example, you are asking if -- the question was what?  If I

knew of the --

BY MR. ADELSON:

Q.    If the Patent Office could evaluate certain prior art

if you didn't provide it?  Would that be possible?

A.    If you provide a full description, then why would you

provide a half description?

            Well, I know what you are asking for, but the --

the truth is that we believed that it was all in the '539

patent.  It had the drawings.  It had everything.  So we

believed it was complete.

Q.    Do you believe that the disclosures of the '539 patent

are identical to what you can learn from the physical

device?

A.    Well, to the degree, that is very well to the case

against.

The line timestamps and numbers in the left margin are:

15:24:19  1
15:24:21  2
15:24:23  3
15:24:25  4
15:24:29  5
15:24:35  6
15:24:39  7
15:24:39  8
15:24:42  9
15:24:45  10
15:24:53  11
15:24:55  12
15:24:56  13
15:25:04  14
15:25:06  15
15:25:10  16
15:25:12  17
15:25:16  18
15:25:20  19
15:25:26  20
15:25:27  21
15:25:29  22
15:25:33  23
15:25:35  24
15:25:41  25

Hoskuldsson - direct

15:25:42  1    Q.    Can you tell from the '539 patent that it is the, the

15:25:45  2    connector end is a molded piece of plastic?

15:25:50  3    A.    I'm -- I don't have the claims exactly in my mind, but

15:25:55  4    if you say that it was injection molding --

15:26:02  5    Q.    Just molded.

15:26:03  6

15:26:03  7    A.    Just molded?   Okay.   So molded is at least a word that

15:26:08  8    would help the Patent Office to understand what it meant.

15:26:12  9    Q.    Now, in the -- you understand that there is a -- there

15:26:16  10   has been a challenge to the European equivalent of the '532

15:26:19  11   patent?

15:26:22  12   A.    There was a challenge in Europe, but it's not an

15:26:24  13   equivalent patent.   It has different claims.

15:26:28  14   Q.    It's based on the same subject matter; is that

15:26:30  15   correct?

15:26:31  16   A.    Yes.   But other claims than the U.S. patent.

15:26:36  17   Q.    And did Nox challenge the invalidity -- strike that.

15:26:40  18         In defending against that challenge, did Nox

15:26:45  19   make arguments that the Herrmansson reference doesn't teach

15:26:49  20   injection molding?

15:26:52  21   A.    Well, I don't recall exactly the details of that case,

15:26:57  22   so sorry about --

15:26:59  23   Q.    If I were to tell you that those arguments were made,

15:27:02  24   would you be surprised by that argument?

15:27:05  25   A.    I did not -- injection molding?

Hoskuldsson - direct

15:27:07  1          THE COURT:  So most of the time I'm willing to

15:27:09  2     go with that kind of question, but not here.

15:27:12  3          MR. ADELSON:  Okay.

15:27:14  4     BY MR. ADELSON:

15:27:16  5     Q.    Now, Mr. Hoskuldsson, when a male snap is inserted

15:27:21  6     into the electrode belt of the '539 patent, does it pass

15:27:26  7     through the two wires that are present in that device, the

15:27:30  8     wire spring?

15:27:33  9     A.    The wires, and they snap back.  Obviously, they snap.

15:27:36  10    Q.    Okay.  So it must make contact with the lateral

15:27:39  11    surface of the male snap that's inserted; is that correct?

15:27:44  12    A.    The male snap touches the wires, yes.  Also after

15:27:47  13    being inserted.

15:27:48  14    Q.    And the contact is on the lateral surface of it; is

15:27:51  15    that correct?

15:27:51  16    A.    Lateral surface?  You mean --

15:27:53  17    Q.    This side of the male snap?

15:27:56  18    A.    Of the male snap?  Yes.

15:28:01  19    Q.    Now, Nox also holds a design registration that relates

15:28:05  20    to the Nox RES belt; is that correct?

15:28:08  21    A.    Yes.  I believe the -- the hole shape or keyhole

15:28:16  22    shape.  Okay.

15:28:17  23          MR. ADELSON:  Could you put up 18 and 21,

15:28:20  24    please.  And if you could go to page 2 on both.

15:28:29  25    BY MR. ADELSON:

Hoskuldsson - direct

15:28:29　1　Q.　　And these are those design registrations; is that

15:28:31　2　correct?

15:28:33　3　A.　　Yes.

15:28:34　4　Q.　　All right.  And it's classified, if we look underneath

15:28:38　5　the picture, as a respiratory belt connector; is that

15:28:42　6　correct?

15:28:42　7　　　　　　THE COURT:  All right.  So I think we're going

15:28:43　8　to take another pause.  The jury has a verdict.  So I think

15:28:47　9　is everybody here that we need to take the verdict?

15:28:51　10　　　　　　MR. NYDEGGER:  Yes, your Honor, on plaintiff's

15:28:53　11　side.

15:28:55　12　　　　　　THE COURT:  All right.  So, Mr. Hoskuldsson, why

15:28:59　13　don't you step down and go back and sit in the audience, and

15:29:02　14　we'll bring the jury in.

15:29:03　15　　　　　　(Witness excused.)

15:29:03　16　　　　　　(The jury entered the courtroom.)

15:30:05　17　　　　　　THE COURT:  All right.  Members of the jury,

15:30:06　18　welcome back.

15:30:07　19　　　　　　Everyone, you may be seated.

15:30:10　20　　　　　　Madam foreperson, has the jury unanimously

15:30:13　21　agreed upon a verdict?

15:30:15　22　　　　　　THE FOREPERSON:  Yes, your Honor.

15:30:16　23　　　　　　THE COURT:  All right.  I'm going to ask the

15:30:19　24　deputy clerk to go over and get the verdict from you.

15:30:43　25　　　　　　All right.  I'm going to ask the deputy clerk to

Hoskuldsson - direct

15:30:46    1    announce the verdict.  Actually, the official word is you

15:30:50    2    publish the verdict.  So I say that because after the

15:30:53    3    verdict is read, it's possible you will be asked whether you

15:30:56    4    individually agree with the verdict, so listen carefully to

15:31:00    5    make sure it is the verdict that you have agreed with.  All

15:31:03    6    right?

15:31:03    7                DEPUTY CLERK:   In the United States District

15:31:05    8    Court for the District of Delaware, Nox Medical Ehf versus

15:31:09    9    Natus Neurology, Inc., Civil Action 15-709-RGA.

15:31:15   10                Number 1, has Natus proven by clear and

15:31:18   11    convincing evidence that any of the following claims of the

15:31:20   12    U.S. Patent Number 9,059,532, the '532 patent, is invalid

15:31:27   13    because it would have been obvious to a person of ordinary

15:31:29   14    skill in the art at the time of the invention in light of

15:31:33   15    the following prior art references and combinations of

15:31:36   16    references?

15:31:38   17                Check yes or no on the appropriate box below.

15:31:40   18                Claim 1, Nox semi-disposable/RES belt, no.

15:31:47   19                Nox semi-disposable/RES belt and McIntire, no.

15:31:52   20                Claim 5.  Nox semi-disposable/RES belt, no.

15:31:57   21                Nox semi-disposable/RES belt and McIntire, no.

15:32:01   22                Claim 9.  Nox semi-disposable/RES belt, no.

15:32:06   23                Nox semi-disposable RES and McIntire, no.

15:32:12   24                What amount of damages should be awarded to Nox

15:32:17   25    Medical to compensate for the infringement by Natus?

Hoskuldsson - direct

15:32:20   1               **$623,175.   ($2.10 per belt x 296,750 units.)**

15:32:34   2               **Number 3, has Nox Medical proven by a**

15:32:37   3   **preponderance of the evidence that Natus infringement was**

15:32:40   4   **willful?**

15:32:41   5               **Yes.**

15:32:42   6               **THE COURT:  All right.  Are there any requests?**

15:32:47   7               **MR. NYDEGGER:  No, your Honor.**

15:32:49   8               **MR. REYNOLDS:  No, your Honor.  Thank you.**

15:32:51   9               **THE COURT:  All right.  So, members of the jury,**

15:32:53   10   **that concludes your service on this case.**

15:32:55   11               **I do on behalf of the Court and the parties want**

15:32:59   12   **to thank you for your time last week and this week and your**

15:33:03   13   **attention during trial, and to emphasize that we really do**

15:33:09   14   **count on juries composed of people such as yourselves to**

15:33:16   15   **reach verdicts and dispense justice, because that's what you**

15:33:20   16   **are doing when the parties can't resolve matters between**

15:33:24   17   **themselves.**

15:33:25   18               **So I thank you, and I'm going to take you out or**

15:33:32   19   **have you taken out.  I'm just going to come back and thank**

15:33:35   20   **you personally in just a minute also.**

15:33:37   21               **All right.  Can we take the jury out, please?**

15:33:40   22               **(The jury was excused.)**

15:33:56   23               **THE COURT:  All right.  So we'll be in recess**

15:33:59   24   **while I go back and thank the jury.  I don't know how long**

15:34:09   25   **it will be.  It might not be very long.**

15:34:12    1              (Short recess taken.)

15:34:16    2                    -   -   -

15:34:16    3              (Proceedings resumed after the short recess.)

15:36:00    4              THE COURT:  All right.  Let's get Mr.

15:36:02    5    Hoskuldsson back on the stand.

15:36:20    6    BY MR. ADELSON:

15:36:28    7    Q.      Now, Mr. Hoskuldsson, we were discussing that both of

15:36:31    8    these references relate to respiratory belt connectors; is

15:36:35    9    that correct?

15:36:38   10    A.      Yes.  Yes, it does.

15:36:41   11    Q.      Okay.  And do you see at the bottom that there's a

15:36:45   12    section entitled exhibition priority?

15:36:49   13    A.      Yes, I do.

15:36:50   14    Q.      And you attended the Sleep 2008 Conference in

15:36:56   15    Baltimore, Maryland in June of 2008?

15:37:01   16    A.      We did with the intention of having a booth there, but

15:37:04   17    we never set up.

15:37:05   18    Q.      And Mr. Herrmansson accompanied you on that trip; is

15:37:07   19    that correct?

15:37:11   20    A.      Yes, I believe he did.

15:37:13   21    Q.      And while you were there at the Sleep 2008 conference,

15:37:18   22    you showed the Nox RES belt to representatives of

15:37:22   23    CareFusion, I believe it may have been called Cardinal

15:37:27   24    Health at that time; is that correct?

15:37:29   25    A.      We showed them belts that we had at the time, but I

Hoskuldsson - direct

15:37:32   1   believe -- well, in the other case, I expect we only got the

15:37:37   2   RES belt from Sinbon in, I would like to say late June 2009,

15:37:44   3   when we -- sorry.  2009.

15:37:50   4   Q.   This was in 2008?

15:37:52   5   A.   Yes.  Late 2008 where we got the first belts or, yes,

15:37:57   6   from Sinbon, so I'm not sure what -- but I'm not sure what

15:38:05   7   we showed them.

15:38:06   8   Q.   Okay.  But you did show Cardinal Health a belt at that

15:38:08   9   time; is that correct?

15:38:09   10   A.   We showed them what we had.

15:38:10   11   Q.   And we'll come back to that in a moment.

15:38:16   12        Prior to the Nox RES belt, there was a belt that

15:38:20   13   has been referred to in this litigation as the PRIT belt or

15:38:24   14   the metal snap belt.

15:38:26   15        Do you know what I'm speaking of?

15:38:27   16   A.   You are speaking of the concept prototype, yes.

15:38:32   17   Q.   Okay.  And you brought that belt to a conference in

15:38:40   18   Florida, the Pediatric Sleep Conference that was held in

15:38:45   19   Florida in March of 2008; is that correct?

15:38:48   20   A.   In March 2008, yes.

15:38:50   21   Q.   Okay.  And you displayed that prototype belt at that

15:38:55   22   conference; is that correct?

15:38:56   23   A.   Yes.

15:38:57   24   Q.   Okay.

15:39:01   25        MR. ADELSON:  Could you please bring up

Hoskuldsson - direct

15:39:03    1    Exhibit 56, please.

15:39:17    2    BY MR. ADELSON:

15:39:18    3    Q.    And that's a picture of you attending that conference;

15:39:20    4    is that correct?

15:39:21    5    A.    That is correct.

15:39:25    6            MR. ADELSON:  Okay.  Could you please bring up

15:39:27    7    Exhibit 205 and -- sorry, 201 and 202, please.

15:39:27    8    BY MR. ADELSON:

15:39:40    9    Q.    And that is a picture of that device that was shown in

15:39:43    10   Florida; is that correct?

15:39:46    11   A.    At least the early prototype.  Yes.  Most likely.

15:39:51    12           MR. ADELSON:  I would like to move Exhibits 56,

15:39:56    13   201 and 202 into evidence.

15:39:59    14           MR. LORIMER:  No objection.

15:39:59    15           THE COURT:  Admitted without objection.

15:39:59    16           (Exhibit Number 56, 201 and 202 were admitted

15:40:03    17   into evidence.)

15:40:03    18   BY MR. ADELSON:

15:40:04    19   Q.    Now, you attended the conference in Florida in March

15:40:06    20   of 2008; is that correct?

15:40:08    21   A.    March of 2008?  Yes, I believe so, yes.

15:40:12    22   Q.    And then you were in Baltimore in June of 2008?

15:40:15    23   A.    Yes.

15:40:15    24   Q.    And when I previously asked you if you showed the RES

15:40:18    25   belt to individuals at CareFusion, you said you didn't think

Hoskuldsson - direct

15:40:22   1   you had shown that.  You showed a different belt?

15:40:25   2   A.     Well, I'm -- this was the belt that we had in March.

15:40:29   3   We had the first manufacturing of the semi-disposable in

15:40:36   4   June.  I remember that very well, because I went to China to

15:40:39   5   collect it myself because we were getting certification of

15:40:42   6   the company at that time.

15:40:43   7          So this is in between, and it was this belt or

15:40:50   8   if it was a semi-belt, I can't say exactly which belt we

15:40:53   9   showed them, this belt or the other belt.

15:40:56   10   Q.     Understood.  You showed them one or the other; is that

15:40:59   11   correct?

15:40:59   12   A.     Yes.  We showed them what we had at the time.  If it

15:41:02   13   was this belt or of the -- if we already got the other belt,

15:41:06   14   I can't say.

15:41:06   15   Q.     Okay.  There wasn't a third belt, was there?

15:41:10   16   A.     Between those?  Not that I recall.

15:41:14   17   Q.     You don't know or there wasn't?

15:41:17   18   A.     It was ten years ago, and we were -- I don't know of

15:41:23   19   any other belt than those two.

15:41:33   20   Q.     Now, did you provide information about the PRIT belt

15:41:37   21   or the metal snap belt that we see here to the Patent

15:41:40   22   Office?

15:41:42   23   A.     This belt.

15:41:43   24   Q.     Yes.

15:41:43   25

Hoskuldsson - direct

15:41:43    1    A.    No.

15:41:44    2    Q.    Did you provide it to your U.S. counsel prior to the

15:41:47    3    issuance of the '532 patent?

15:41:51    4    A.    I don't believe we did.

15:41:52    5    Q.    Okay.  It includes a flexible textile belt; is that

15:41:55    6    correct?

15:41:55    7    A.    It is, yes.

15:41:57    8    Q.    But it has a flexible textile belt; is that correct?

15:42:01    9    A.    Yes.

15:42:01   10    Q.    With a wire woven there in?

15:42:05   11    A.    It has a wire woven in the textile belt, yes.

15:42:09   12    Q.    It has a molded or a plastic end connector; is that

15:42:12   13    correct?

15:42:13   14    A.    The end connector -- well, plastic with a metal snap.

15:42:18   15    Q.    And you are now named an inventor on the '532 patent;

15:42:24   16    is that correct?

15:42:25   17    A.    Now what.

15:42:27   18    Q.    You are now named as an inventor --

15:42:30   19

15:42:30   20    A.    Yes.  Yes.

15:42:30   21    Q.    And you first identified yourself as an inventor in

15:42:33   22    January of 2016; is that correct?

15:42:36   23    A.    Yes, that's correct.

15:42:39   24          MR. ADELSON:  If you could please put up

15:42:41   25    DTX-1024.  Yes, at two.

Hoskuldsson - direct

15:42:49    1          I would like to move DTX-1024 into evidence.

15:42:54    2          THE COURT:  All right.

15:42:56    3          MR. LORIMER:  No objection, your Honor.

15:42:58    4          (Defendant's Trial Exhibit Number 1024 was

15:42:59    5   admitted into evidence.)

15:42:59    6   BY MR. ADELSON:

15:43:00    7   Q.    This is your signature here, Mr. Hoskuldsson?

15:43:02    8   A.    It is.

15:43:03    9   Q.    And if we could take a look at the -- well, first of

15:43:07   10   all, during testimony during trial last week, you testified

15:43:12   11   that you did not invent anything in claim 1 of the '532

15:43:16   12   patent; is that correct?

15:43:20   13   A.    That is correct.

15:43:21   14          MR. ADELSON:  Okay.  If you could please pull up

15:43:23   15   the '532 patent, DTX-1001.  And if you could go to the back

15:43:31   16   page of that, or the second-to-last page of that patent.

15:43:38   17   Okay.

15:43:38   18   BY MR. ADELSON:

15:43:39   19   Q.    Now, at the time that the '532 patent, the earliest

15:43:46   20   application was filed, textile belts with wires woven there

15:43:52   21   in were well-known; is that correct?

15:43:55   22   A.    That is correct.

15:43:56   23   Q.    All right.  So what I'd like to understand, Mr.

15:43:59   24   Hoskuldsson, is, what is the specific thing that you

15:44:01   25   believe you contributed to the claimed invention of the '532

Hoskuldsson - direct

15:44:06   1   patent?

15:44:08   2   A.   So which claim I contributed it to.

15:44:13   3   Q.   Yes, please.

15:44:14   4

15:44:15   5   A.   Well --

15:44:16   6   Q.   Well, if it's easier, could you just tell me without

15:44:19   7   me reading the claim language what it is you think you

15:44:22   8   contributed?

15:44:23   9   A.   I think I contributed the using teeth to adjust the

15:44:27  10   size of the belt.

15:44:28  11   Q.   Okay.  So the '532 patent includes a claim for a slot

15:44:37  12   having teeth for adjusting the length of a belt; is that

15:44:42  13   correct?

15:44:42  14   A.   It does.

15:44:43  15   Q.   And that is what you believe you invented?

15:44:46  16   A.   At least the teeth, yes.

15:44:47  17   Q.   Okay.  The RES belt includes a lot for adjusting the

15:44:53  18   length of a belt; is that correct?

15:44:56  19   A.   You mean the Velcro section.

15:44:58  20   Q.   There is a slot present in the connector of the RES

15:45:02  21   belt device; is that correct?

15:45:03  22   A.   Yes.

15:45:04  23   Q.   And the flexible textile belt goes through that slot;

15:45:08  24   is that correct?

15:45:08  25   A.   It does.

Hoskuldsson - direct

15:45:09  1    Q.    Okay.  Have you -- can you briefly describe the

15:45:14  2    circumstances under which you came up with the idea for

15:45:16  3    teeth in a slot?

15:45:19  4    A.    Yes.  So basically, there are the four of us, like

15:45:30  5    seven of us sitting together.  So my partner at the desk was

15:45:35  6    Mr. Herrmansson, of course working on this design.  And he

15:45:40  7    was -- came up with an idea about how to adjust the size of

15:45:45  8    the belts.  I didn't think it would work because it would

15:45:50  9    ruin the belt.

15:45:51  10           He asked me about it.  I gave another opinion,

15:45:52  11   and I sketched in my notebook a picture of teeth instead of

15:45:59  12   using friction, as he was thinking about doing.

15:46:03  13   Q.    So Mr. Herrmansson had a different idea how to adjust

15:46:07  14   the length of the belt?

15:46:08  15   A.    Yes.

15:46:08  16   Q.    And what exactly was that idea?

15:46:12  17   A.    So his original idea was just to have a slot, but

15:46:16  18   only have a very narrow slot so that the friction of the

15:46:19  19   belt would be sufficient to stop it from, you know, sliding

15:46:25  20   back.

15:46:25  21           So -- but what I thought, at least I think I

15:46:31  22   thought at the time was that the -- because the disposable

15:46:38  23   belt is very, you know, loose fabric, it would ruin the

15:46:44  24   belt.  So if you would pull it through friction, a very

15:46:48  25   small hole, it would actually, you know, ruin the belt when

Hoskuldsson - direct

15:46:52  1   you would take it through.

15:46:53  2          So it had to be like a wide slot so you wouldn't

15:46:57  3   like damage, and then you would need teeth to hold it so it

15:47:02  4   would slide back.

15:47:03  5          So that was the concept, I guess.

15:47:05  6   Q.     Had you ever previously seen a slot with teeth to

15:47:08  7   adjust the belt length?

15:47:16  8   A.     Slot with teeth to adjust the belt length.

15:47:18  9   Q.     Yes.

15:47:19  10

15:47:19  11  A.     Well, I've seen teeth.  Some belts, they have like,

15:47:22  12  you know, a clasp with teeth, and teeth are used widely in

15:47:28  13  industry, I guess.

15:47:31  14  Q.     Earlier I was asking you about suspenders.

15:47:34  15

15:47:34  16  A.     Yes, you did.

15:47:35  17  Q.     And do those have slots with teeth in there for

15:47:38  18  adjusting the length of a woven fabric material?

15:47:43  19  A.     Do they have lots with teeth?  I thought they had like

15:47:45  20  a -- like a lid that stops them from sliding back.

15:47:50  21  Q.     Some do.  Do others have a slot with teeth?

15:47:53  22  A.     A slot with teeth?  I mean, I don't know.

15:47:55  23  Q.     Okay.

15:47:56  24

15:47:56  25  A.     Maybe.

Hoskuldsson - direct

15:47:57  1   Q.    Now, before you said you met with Mr. Fridriksson

15:48:01  2   during the preparation of the application for the '532

15:48:04  3   patent.

15:48:04  4             Do you remember testifying to that?

15:48:06  5   A.    I met with him at least once, yes.

15:48:08  6   Q.    And you said you reviewed the application before it

15:48:10  7   was filed; is that correct?

15:48:12  8   A.    Yes, I did.

15:48:13  9   Q.    And what I don't understand is how come you didn't

15:48:17  10  identify that you were an inventor at that time?

15:48:21  11  A.    Well, just like you said, those teeth are tiny, tiny

15:48:25  12  little detail.  That wasn't the invention.  The invention

15:48:29  13  was really, you know, claim 1.  It was about creating a new

15:48:34  14  type of electrical connector separating the function of the

15:48:41  15  snap and the connection of the electrical connectivity,

15:48:46  16  solving problems with quality and stability and

15:48:48  17  manufacturing cost and that was the invention.

15:48:51  18             Those suspenders, things that I added, it is

15:48:57  19  really just a tiny detail, so I didn't really consider

15:49:00  20  myself as an inventor of the patent.

15:49:03  21             MR. ADELSON:  Could you please pull up DTX-1019

15:49:06  22  at 15.

15:49:12  23             And can you zoom in on claim 10.

15:49:19  24  BY MR. ADELSON:

15:49:20  25  Q.    So this is what you've just described as what you

Hoskuldsson - direct

15:49:23  1    believe your inventive contribution was?

15:49:28  2    A.    Yes.

15:49:29  3    Q.    Okay.  And if we can go back to page 2 of this

15:49:33  4    document.

15:49:40  5          All right.  And this is the provisional

15:49:43  6    application that was filed.  Okay.  Correct.

15:49:48  7

15:49:49  8    A.    I believe so.

15:49:50  9    Q.    Okay.  So at the time of filing, there was a claim

15:49:53  10   directed to what you believe is your contribution; is that

15:49:57  11   correct?

15:49:58  12   A.    Yes.

15:49:59  13   Q.    Okay.  But at that time, you still didn't identify

15:50:01  14   yourself as an inventor; is that correct?

15:50:04  15   A.    No, I did not.

15:50:12  16   Q.    Mr. Herrmansson was the original named inventor on the

15:50:15  17   '532 patent; is that correct?

15:50:16  18   A.    Yes.

15:50:16  19   Q.    All right.  And he was a Nox employee; is that

15:50:19  20   correct?

15:50:20  21   A.    Yes.

15:50:20  22   Q.    And he left in early 2014; is that correct?

15:50:26  23   A.    I believe that's true, yes.

15:50:30  24   Q.    But even to this day, Nox sometimes engages

15:50:33  25   Mr. Herrmansson for consulting; is that correct?

Hoskuldsson - direct

| | | |
|---|---|---|
| 15:50:36 | 1 | A.    Yes.  He's a very good friend of mine and he comes in |
| 15:50:39 | 2 | if I need him. |
| 15:50:40 | 3 | Q.    All right.  And did you ask Mr. Herrmansson for |
| 15:50:44 | 4 | assistance in connection with responding to an office action |
| 15:50:48 | 5 | issued by the Patent Office during prosecution of the '532 |
| 15:50:51 | 6 | patent? |
| 15:50:54 | 7 | A.    Could you repeat that question. |
| 15:50:56 | 8 | Q.    Did you ask Mr. Herrmansson for assistance in |
| 15:50:59 | 9 | preparing a response to an office action that was issued in |
| 15:51:03 | 10 | connection with the application of the '532 patent? |
| 15:51:08 | 11 | A.    Yes. |
| 15:51:09 | 12 | Q.    And Mr. Herrmansson sent you an e-mail in October of |
| 15:51:12 | 13 | 2014 with a listing of patents related to RIP belts; is that |
| 15:51:16 | 14 | correct? |
| 15:51:18 | 15 | A.    To me or Mr. Halldorsson that was the CEO at the time, |
| 15:51:24 | 16 | so it is -- probably, he did, yes. |
| 15:51:28 | 17 | Q.    Okay.  And did you provide the list of references that |
| 15:51:31 | 18 | were attached to that e-mail to your U.S. counsel at that |
| 15:51:34 | 19 | time? |
| 15:51:37 | 20 | A.    So did we send the list to the -- to -- to Workman |
| 15:51:42 | 21 | Nydegger. |
| 15:51:43 | 22 | Q.    Yes. |
| 15:51:43 | 23 | |
| 15:51:43 | 24 | A.    Yes, we did. |
| 15:51:44 | 25 | Q.    Okay. |

15:51:45    1

15:51:45    2    A.      I believe so, or I didn't personally, but I believe we

15:51:49    3    sent the list.

15:51:50    4    Q.      Who do you believe sent it if you did not?

15:51:53    5    A.      It could have been our CEO that was handling the

15:51:57    6    communications with Workman Nydegger at the time.

15:51:59    7    Q.      Okay.  You were not engaged in communications with

15:52:02    8    Workman Nydegger at that time?

15:52:04    9    A.      At that time, they -- well, we were transferring lots

15:52:09   10    of information to them, so I delivered everything that I

15:52:14   11    was asked for.  So, yes, I was in that communication

15:52:17   12    certainly.

15:52:18   13    Q.      Okay.  But you don't believe that you sent that list

15:52:21   14    to Workman Nydegger; is that correct?

15:52:25   15    A.      I don't think I did, but I would assume that it was

15:52:29   16    Mr. Halldorsson.

15:52:31   17    Q.      Now, do you know that none of the references listed by

15:52:36   18    Mr. Herrmansson except for the application, which was in his

15:52:42   19    earlier name, appeared on the face of the '532 patent?

15:52:46   20    A.      Do I know the --

15:52:47   21    Q.      None of the references ended up being in the file

15:52:51   22    history or considered in the '532 patent?

15:52:54   23    A.      Well, I -- I didn't know that, but it's -- it's not a

15:53:07   24    surprise.

15:53:08   25              MR. ADELSON:  If we could pull up DTX-26,

Hoskuldsson - direct

15:53:11    1    please.

15:53:17    2                    And if you could scroll to, I believe it's the

15:53:19    3    fifth page.   Actually, go to the seventh page, please.

15:53:30    4    BY MR. ADELSON:

15:53:31    5    Q.      And if you could look at the last line.   And in there,

15:53:37    6    if you can blow that up as big as you can, Mr. Herrmansson

15:53:41    7    identified the subject matter of his application as a

15:53:44    8    commercially successful as a reliable alternative.

15:53:48    9                    Do you see that?

15:53:53    10   A.      So this is the '539?   Okay.

15:53:56    11   Q.      And that's a characterization that Mr. Herrmansson

15:53:58    12   made; is that correct?

15:54:02    13   A.      That's his comment, yes.

15:54:03    14   Q.      Do you disagree with that characterization?

15:54:07    15   A.      That it was commercially successful.

15:54:09    16   Q.      Yes.

15:54:09    17

15:54:10    18   A.      Well, it established lock support, so it was the only

15:54:15    19   patent that we had until we released the other one.   We

15:54:18    20   succeeded in a way.   We started up to a $1 million business

15:54:21    21   at the time.   But nothing compared with the -- of course,

15:54:25    22   the disposable belts.

15:54:34    23                    MR. ADELSON:   Okay.   If you could bring up

15:54:36    24   DTX-25, please.

15:54:43    25   BY MR. ADELSON:

Hoskuldsson - direct

15:54:43   1   Q.    And in October of 2014, you were working on a patent

15:54:49   2   review of the pending application; is that correct?

15:54:51   3   A.    Is it October?  Yes.  Yes.

15:54:53   4   Q.    October 1st?

15:54:53   5   A.    Yes.

15:54:54   6   Q.    And you were working on this in response to the U.S.

15:54:58   7   Patent Office's rejection of those claims; is that correct?

15:55:04   8   A.    I think around the time that we were transferring the

15:55:08   9   engagement to Workman Nydegger, and at that time we created

15:55:14  10   a lot of documents to explain -- well, to our new

15:55:21  11   co-workers, everything about the history and how things

15:55:23  12   worked.  I believe we did this document in connection with

15:55:27  13   that.

15:55:27  14   Q.    Okay.

15:55:29  15         MR. ADELSON:  If you could go to page 4, please.

15:55:36  16   And if you could go down to the last paragraph and blow that

15:55:39  17   up, please.

15:55:44  18         Actually, go up to the one before it.  I'm

15:55:48  19   sorry.  That one, yes.  That's the right one.

15:55:54  20   BY MR. ADELSON:

15:55:54  21   Q.    This is a section of your report; is that correct?

15:56:01  22   And if you could just look at the last sentence.

15:56:03  23         In this sentence you agree with

15:56:06  24   Mr. Herrmansson's assessment that the belts however became

15:56:08  25   very popular with the Nox products?

Hoskuldsson - direct

15:56:12  1    A.    Yes.   They resolved some of the problems.

15:56:18  2    Q.    Okay.

15:56:18  3

15:56:18  4    A.    Yes.

15:56:20  5          MR. ADELSON:   And if you could now close that

15:56:23  6    and go up to the 2.1.1 paragraph.

15:56:29  7    BY MR. ADELSON:

15:56:30  8    Q.    Now, in this paragraph, you identify a patent to a

15:56:33  9    company called RespiTrace?

15:56:35  10   A.    Yes.

15:56:39  11   Q.    And you also identified there was a product made by

15:56:42  12   RespiTrace; is that correct?

15:56:43  13   A.    I think they were both --

15:56:48  14   Q.    Okay.   And this is a section of your report --

15:56:49  15

15:56:50  16   A.    Yes.

15:56:50  17   Q.    -- on the patent review --

15:56:55  18

15:56:55  19   A.    Yes.

15:56:56  20   Q.    -- entitled "Background."   Is that correct?

15:56:57  21   A.    Yes.

15:56:57  22   Q.    Did you provide U.S. Patent 5,543,012 to U.S. counsel?

15:57:07  23   A.    This is something we provided to our patent

15:57:12  24   specialist, so I was not in connection with the U.S. Patent

15:57:17  25   Office, no.

Hoskuldsson - direct

15:57:18    1    Q.    All right.  And you have samples of this product at

15:57:20    2    all?

15:57:21    3    A.    Did we -- did Nox have samples of that product.

15:57:24    4    Q.    Yes.

15:57:25    5

15:57:25    6    A.    I believe we did, yes.

15:57:27    7    Q.    Okay.  Did you provide samples of those to either your

15:57:30    8    U.S. counsel or the U.S. Patent Office?

15:57:34    9    A.    I'm not -- definitely not to the U.S. Patent Office.

15:57:38   10    I've never been in touch with the U.S. Patent Office.

15:57:41   11    Q.    Neither appear on the '532 patent; is that correct?

15:57:47   12    A.    Probably, yes.

15:57:48   13    Q.    Probably yes or probably no?

15:57:50   14    A.    No.  I'm saying I'm not exactly sure what appears

15:57:53   15    there, but that's probably true, that these were not listed

15:57:57   16    as -- it might have.

15:58:00   17    Q.    Okay.

15:58:01   18            MR. ADELSON:  I would like to move Exhibit

15:58:08   19    DTX-25 into evidence.

15:58:08   20            THE COURT:  All right.

15:58:09   21            (DTX-25 was admitted into evidence.)

15:58:12   22            MR. ADELSON:  And if you could go to page 7 of

15:58:14   23    this document, please.

15:58:19   24    BY MR. ADELSON:

15:58:20   25    Q.    And if you could look at the very bottom paragraph and

Hoskuldsson - direct

15:58:24  1   please blow that up.

15:58:25  2           In this paragraph you identified the hook design

15:58:28  3   as important; is that correct.

15:58:30  4

15:58:30  5   A.    Mm-hmm.

15:58:31  6   Q.    And this is what you were talking about before?

15:58:33  7   A.    Yes.

15:58:33  8   Q.    Okay.  And if you could go to page 10 of this

15:58:38  9   document, please.

15:58:46  10          And if you again could go to, at the top, the

15:58:51  11  first paragraph and blow that up, please.

15:58:55  12          And in this paragraph you comment the figures do

15:58:59  13  not explain well the design concept, to not demonstrate the

15:59:08  14  stretching mechanism based on hooks.

15:59:10  15                Is that correct?

15:59:11  16  A.    Yes, that's what I say there.  The initial figures,

15:59:17  17  they are referring to the pictures as they were at that

15:59:19  18  point in time based on the provisional application, I guess.

15:59:23  19  Q.    Okay.  And this is on a page titled "Review of the

15:59:26  20  USPTO action."  Is that correct?

15:59:29  21  A.    Okay.

15:59:30  22  Q.    But at this time, you didn't identify yourself as an

15:59:32  23  inventor; is that correct?

15:59:33  24  A.    No.

15:59:34  25  Q.    Okay.  But what you are discussing, the portion of the

15:59:39    1    device that you believe is your inventive contribution; is

15:59:42    2    that correct?

15:59:42    3    A.    Yes.

15:59:44    4    Q.    And if you could go to page 11, please.  And under

15:59:51    5    Section 4.2, if you could blow that up, please.

15:59:57    6          Do you know what the name Uehara means.

16:00:01    7

16:00:01    8    A.    What the name is?  Well, it's one of the -- the

16:00:07    9    patents that the Examiner saw, I guess.

16:00:12    10    Q.    Okay.  In this section you do an analysis where you

16:00:16    11    seek to differentiate the Nox teeth design from the Uehara

16:00:21    12    reference; is that correct?

16:00:28    13    A.    Okay.

16:00:33    14    Q.    Is that correct?

16:00:33    15    A.    Okay.  Yes, yes.  I'm saying that they didn't

16:00:37    16    understand correctly the project.

16:00:40    17    Q.    You suggest that the claims should be written to

16:00:43    18    emphasize the one way stretch characteristics of the Nox

16:00:46    19    design; is that correct?

16:00:48    20    A.    I'm sorry.  That the --

16:00:49    21    Q.    That the claims be written to emphasize the one way

16:00:53    22    stretch characteristic of the Nox design; is that correct?

16:00:56    23    A.    Okay.  Yes.

16:00:58    24    Q.    Now, even though in 2014 you conducted this analysis,

16:01:02    25    you didn't realize that you were the person who came up with

Hoskuldsson - direct

16:01:05  1    this idea; is that correct?

16:01:08  2    A.    Well, we did the design in 2009.  I never thought of

16:01:14  3    me as the inventor on the product, so it just didn't occur

16:01:19  4    to me that that could be the case.

16:01:20  5    Q.    Even though you did an extensive analysis here?

16:01:24  6    A.    Extensive analysis, maybe, but then again, no, I did

16:01:29  7    not.

16:01:34  8             MR. ADELSON:  If we could bring up DTX-22,

16:01:36  9    please.

16:01:48  10   BY MR. ADELSON:

16:01:49  11   Q.    This is an e-mail from Mr. Herrmansson and it's to

16:01:51  12   you, and you are -- there's a chain here, but you are on

16:01:55  13   that chain as well as Mr. Halldorsson; is that correct?

16:02:03  14   A.    Yes.

16:02:04  15   Q.    And it says belt comparison, and it looks to be a

16:02:07  16   PowerPoint that's attached to that; is that correct?

16:02:09  17   A.    Okay.  So it's something that Mr. Halldorsson sent to

16:02:12  18   me coming from -- coming to Mr. Halldorsson.

16:02:17  19   Q.    Okay.

16:02:19  20            MR. ADELSON:  Could you put slide 3 and 4 up

16:02:22  21   side by side, please.

16:02:23  22   BY MR. ADELSON:

16:02:24  23   Q.    Do you recognize this document?

16:02:26  24   A.    Yes.  I've seen it before.

16:02:28  25   Q.    And was Mr. Herrmansson asked to prepare this?

Hoskuldsson - direct

| | |
|---|---|
| 16:02:34 | 1 |
| 16:02:40 | 2 |
| 16:02:45 | 3 |
| 16:02:50 | 4 |
| 16:02:57 | 5 |
| 16:03:01 | 6 |
| 16:03:03 | 7 |
| 16:03:04 | 8 |
| 16:03:07 | 9 |
| 16:03:07 | 10 |
| 16:03:11 | 11 |
| 16:03:13 | 12 |
| 16:03:15 | 13 |
| 16:03:18 | 14 |
| 16:03:21 | 15 |
| 16:03:25 | 16 |
| 16:03:26 | 17 |
| 16:03:28 | 18 |
| 16:03:35 | 19 |
| 16:03:39 | 20 |
| 16:03:40 | 21 |
| 16:03:42 | 22 |
| 16:03:45 | 23 |
| 16:03:50 | 24 |
| 16:03:57 | 25 |

A.     I guess -- guess -- maybe.  It's something that was in
the -- between Mr. Halldorsson and Herrmansson at the time.
So Petur was trying to get -- Mr. Halldorsson was trying to
get -- collect data, and they told me that he asked
Mr. Herrmansson to prepare it.

Q.     All right.  So are you saying you weren't involved in
that effort?

A.     To prepare this -- this one.

Q.     Yes.



A.     Participated in preparing it?  I don't think so.

Q.     Okay.  Mr. Halldorsson didn't ask you to prepare a
document like this?

A.     Well, I prepared all the documents like the one you
showed before, but I don't recall him asking me to prepare
this type of document.

Q.     Okay.  And just to be clear, this is a comparison
between the '532 and the '539 products, the products that
are embodied, that embody those patents?

A.     Okay.

Q.     Do you agree or disagree?

A.     Do I -- do I agree that this is a comparison between
those two?  It looks like that, yes.

Q.     And both are molded plastic parts, correct, with
webbing -- with a wire woven there in?

Hoskuldsson - direct

| 16:04:01 | 1 | A.     Both are, with plastic ends.  A totally different |
| 16:04:07 | 2 | concept in functionality, so, yes. |
| 16:04:20 | 3 | MR. ADELSON:  If you can pull up DTX-63 and 64, |
| 16:04:23 | 4 | please. |
| 16:04:23 | 5 | THE COURT:  Mr. Adelson, you'd better wrap up in |
| 16:04:25 | 6 | about two minutes here. |
| 16:04:26 | 7 | MR. ADELSON:  Okay. |
| 16:04:33 | 8 | If you can pull up 64 as well. |
| 16:04:35 | 9 | BY MR. ADELSON: |
| 16:04:36 | 10 | Q.     Do you recognize these documents, Mr. Hoskuldsson? |
| 16:04:38 | 11 | A.     Yes. |
| 16:04:39 | 12 | Q.     All right.  And did you author both of these |
| 16:04:42 | 13 | documents? |
| 16:04:42 | 14 | A.     Did I author. |
| 16:04:44 | 15 | Q.     Did you write them? |
| 16:04:46 | 16 | A.     At least the -- it would say on the back side if I -- |
| 16:04:53 | 17 | I probably did, yes.  It would have been -- |
| 16:04:57 | 18 | MR. ADELSON:  Okay.  I would like to move these |
| 16:04:59 | 19 | into evidence. |
| 16:05:00 | 20 | (Defendant's Trial Exhibit Number 63 and No. 65 |
| 16:05:00 | 21 | were admitted into evidence.) |
| 16:05:03 | 22 | MR. ADELSON:  And if you could go to 63 at page |
| 16:05:09 | 23 | 2, and if you would blow up the top paragraph, please. |
| 16:05:15 | 24 | BY MR. ADELSON: |
| 16:05:15 | 25 | Q.     And this is your -- this is an assessment of the new |

Hoskuldsson - direct

16:05:18    1    Nox disposable device; is that correct?

16:05:27    2    A.    So what I'm saying there is that the Embla, the

16:05:32    3    adaptable products --

16:05:36    4    Q.    If you wouldn't mind, this is an assessment of where

16:05:39    5    it says the belts are based on the current Nox

16:05:41    6    semi-disposable belts; is that correct?  That's regarding

16:05:44    7    the Nox disposable?

16:05:47    8    A.    It says that -- yes.  These belts are based on the

16:05:51    9    current semi-disposable belts, yes.

16:05:54    10    Q.    Okay.  And if we could go down to 64, down to the

16:05:57    11    Section C.

16:06:00    12                  There's a paragraph that says, the disposable

16:06:01    13    belts will be a simplified form of the current

16:06:05    14    semi-disposable belts.

16:06:06    15                  Do you see that?

16:06:08    16    A.    Talking about the form, yes.

16:06:10    17    Q.    Okay.  And so again, this is a comparison you made

16:06:12    18    between the new design and the existing RES belt; is that

16:06:16    19    correct?

16:06:17    20    A.    Yes, but I believe there's a pro forma criteria, like

16:06:23    21    a little bit about, specifies the difference.

16:06:28    22    Q.    Okay.  But in at least two places you said that they

16:06:31    23    were based on the earlier design; is that correct?

16:06:35    24    A.    But you have to understand that the new belt had to

16:06:39    25    fit the regular, regular belts, the same patient.

Hoskuldsson - cross

16:06:44  1    So obviously, they were meant for -- to do the

16:06:48  2  same things.  So in that way, it is based on the same

16:06:54  3  specification as we had for the semi belt.

16:06:57  4    THE COURT:  All right.  Thank you, Mr. Adelson.

16:06:59  5    All right.  Any cross-examination?

16:07:01  6    MR. LORIMER:  Very briefly, your Honor.

16:07:02  7    CROSS-EXAMINATION

16:07:05  8  BY MR. LORIMER:

16:07:10  9  Q.    Mr. Hoskuldsson, prior to the issuance of the '532

16:07:18  10  patent, did you ever think you should have been named as an

16:07:21  11  inventor on that patent?

16:07:23  12  A.    No.

16:07:23  13  Q.    Did you have any understanding under U.S. law how

16:07:27  14  inventors are identified for U.S. applications?

16:07:35  15  A.    At least not to the degree as a lawyer.

16:07:37  16  Q.    What was your -- you said you were the CEO I think

16:07:42  17  when this application was filed; is that correct?

16:07:43  18  A.    I was the much CEO, yes.

16:07:46  19  Q.    And who was in charge of this project at Nox?

16:07:50  20  A.    The development of the RIP belts?  That would be a

16:07:53  21  product manager within Nox.

16:07:56  22  Q.    All right.  And who was more involved in the

16:07:59  23  day-to-day of the disposable belt, you or Mr. Herrmansson?

16:08:02  24  A.    Well, he was the sole designer of the disposable belt.

16:08:09  25  Q.    All right.  Mr. Hoskuldsson, up until June the 16th of

Hoskuldsson - cross

16:08:14    1   2015, did you have any understanding as to whether your

16:08:20    2   being named or not named as an inventor on the '532 would

16:08:23    3   have any effect on whether the Herrmansson '539 patent would

16:08:27    4   be considered by the Examiner?

16:08:29    5   A.    No.  No way.

16:08:30    6   Q.    Did you ever attempt to withhold or make it so the

16:08:34    7   Examiner couldn't see the Herrmansson '539 patent?

16:08:36    8   A.    No.

16:08:42    9   Q.    Mr. Adelson showed you a spreadsheet that had a bunch

16:08:45   10   of patents on it.

16:08:47   11          Did you ever compare all of those patents to the

16:08:49   12   claims of the '532 patent.

16:08:51   13

16:08:52   14   A.    Did I -- did I do.

16:08:54   15   Q.    Did you?

16:08:54   16   A.    No.

16:08:55   17   Q.    All right.  Mr. Adelson asked you a couple questions

16:08:59   18   about the European opposition that Natus filed.  Were the

16:09:03   19   claims in that opposition the same as the claims in the U.S.

16:09:07   20   case?

16:09:07   21   A.    No.

16:09:08   22   Q.    And were they ultimately allowed over Herrmansson?

16:09:10   23   A.    Yes.

16:09:17   24   Q.    We talked very briefly about the semi-disposable belt,

16:09:22   25   the Herrmansson '539, and the CareFusion.

Hoskuldsson - cross

16:09:25    1           Are the devices in those three references

16:09:27    2    basically the same?

16:09:29    3    A.    It's all the same device, yes.

16:09:32    4    Q.    And the design application that you saw, does that

16:09:37    5    show more or less than the Herrmansson '539?

16:09:40    6    A.    The design application.

16:09:42    7    Q.    The design applications that showed the pictures?

16:09:45    8    A.    Yes.  That was less.  In the shape of the hole.

16:09:50    9    Q.    He talked to you about the PRIT belt?

16:09:54   10    A.    Yes.

16:09:54   11    Q.    Did that have a plastic receiving hole that received a

16:09:59   12    stud?

16:10:01   13    A.    No.  It was a metal snap.

16:10:02   14    Q.    Did it have a wire inside like the semi-disposable

16:10:06   15    belt that grabbed the stud?

16:10:08   16    A.    Yes.

16:10:14   17           MR. LORIMER:  Bring up PTX-2 briefly.  Go to the

16:10:20   18    second page, if you would.

16:10:23   19    BY MR. LORIMER:

16:10:23   20    Q.    There it lists Herrmansson as the second-to-last

16:10:26   21    reference.

16:10:27   22           Did you have any idea that the Examiner had not

16:10:30   23    considered the Herrmansson '539 prior to the issuance of the

16:10:34   24    '532 patent?

16:10:35   25    A.    No.

Hoskuldsson - cross

16:10:43   1   Q.      Prior to the issuance of the '532 patent, did you have

16:11:08   2   any belief as to whether the, if the Examiner considered the

16:11:12   3   Herrmansson '539 patent, whether that would have resulted in

16:11:15   4   the rejection of any of the claims?

16:11:17   5   A.      No.

16:11:19   6              MR. LORIMER:  Okay.  I have nothing further.

16:11:21   7              THE COURT:  Mr. Hoskuldsson, the CareFusion

16:11:25   8   catalog, do you understand what's pictured in that?

16:11:32   9              THE WITNESS:  I believe so, yes.

16:11:33   10             THE COURT:  All right.  And again, can you tell

16:11:35   11  me what that is?

16:11:39   12             THE WITNESS:  It is a picture of the belt that

16:11:40   13  we -- that is the semi-disposable belt.  It's a picture of

16:11:44   14  the semi-disposable belt.

16:11:45   15             THE COURT:  Is there any difference between the

16:11:47   16  semi-disposable belt and the picture in the CareFusion

16:11:51   17  catalog?

16:11:52   18             THE WITNESS:  No.

16:11:52   19             THE COURT:  It's just the belt is a physical

16:11:55   20  thing and the picture is a picture of that physical thing?

16:11:59   21             THE WITNESS:  Yes.

16:11:59   22             THE COURT:  Okay.  Thank you.

16:12:01   23             Any more questions?

16:12:03   24             MR. LORIMER:  No, your Honor.  I know that there

16:12:07   25  has been deposition testimony submitted.  Typically, at this

16:12:09    1    point we would make a JMOL motion.

16:12:12    2              THE COURT:  Since I have not seen the deposition

16:12:14    3    testimony --

16:12:14    4              MR. LORIMER:  Yes.  That's why.

16:12:16    5              THE COURT:  So, Mr. Hoskuldsson, I believe you

16:12:18    6    can step down.  Your done.

16:12:20    7              THE WITNESS:  Thank you.

16:12:21    8              THE COURT:  Thank you.

16:12:21    9              (Witness excused.)

16:12:22   10              THE COURT:  All right.  So how much of this

16:12:23   11    deposition testimony are we talking about?  Do I have it?

16:12:29   12              MR. ADELSON:  Not yet, your Honor.  We have

16:12:31   13    binders prepared.

16:12:32   14              We weren't sure if the Court wanted to receive

16:12:33   15    it in paper or electronic form.

16:12:35   16              THE COURT:  Well, how many pages is it?

16:12:38   17              MR. ADELSON:  There's designation testimony that

16:12:43   18    is probably a total of -- portions of 25 pages or so, but

16:12:50   19    then for context, we've included proceedings and a

16:12:54   20    subsequent page.

16:12:57   21              THE COURT:  Well, so the things that you've

16:12:58   22    designated, are they highlighted in blue or yellow or some

16:13:01   23    other portion?

16:13:02   24              MR. ADELSON:  The designated portions for both

16:13:05   25    parties are highlighted in contrasting colors, and they also

| | |
|---|---|
| 16:13:12 | 1 | include a text box to indicate alongside which party |
| 16:13:13 | 2 | designated it. |
| 16:13:14 | 3 | THE COURT:  Who designated doesn't make so much |
| 16:13:17 | 4 | difference.  I just wanted to make sure what you are telling |
| 16:13:19 | 5 | me is it's in some kind of color other than white and black? |
| 16:13:25 | 6 | MR. ADELSON:  Yes, sir. |
| 16:13:26 | 7 | THE COURT:  All right.  So, Mr. Lorimer, you |
| 16:13:28 | 8 | were saying? |
| 16:13:29 | 9 | MR. LORIMER:  I was done saying, your Honor, |
| 16:13:32 | 10 | actually. |
| 16:13:33 | 11 | THE COURT:  Okay.  So do you have this 25 pages |
| 16:13:35 | 12 | plus the binder? |
| 16:13:37 | 13 | MR. ADELSON:  We have those here, your Honor. |
| 16:13:39 | 14 | THE COURT:  Can we get one marked and made an |
| 16:13:41 | 15 | exhibit or something? |
| 16:14:11 | 16 | MR. ADELSON:  May I approach? |
| 16:14:12 | 17 | THE COURT:  Yes. |
| 16:14:13 | 18 | MR. ADELSON:  There's one for Mr. Herrmansson |
| 16:14:14 | 19 | and one for Mr. Fridriksson. |
| 16:14:16 | 20 | THE COURT:  Okay. |
| 16:14:17 | 21 | (Mr. Adelson handed binders to the Court.) |
| 16:14:22 | 22 | MR. LORIMER:  Your Honor, is there some -- when |
| 16:14:26 | 23 | the Court has completed its review of the depositions, we'd |
| 16:14:28 | 24 | like to make a JMOL, but we won't know, of course, unless |
| 16:14:31 | 25 | the Court informs us of when that is. |

| | | |
|---|---|---|
| 16:14:34 | 1 | THE COURT:  Hold on a minute. |
| 16:14:37 | 2 | (Pause.) |
| 16:14:50 | 3 | THE COURT:  So I got handed up two things.  One |
| 16:14:53 | 4 | appears to be a binder that's marked Mr. Fridriksson and |
| 16:14:57 | 5 | appears to have no -- |
| 16:14:58 | 6 | MR. ADELSON:  I'm sorry.  I may have given you |
| 16:15:00 | 7 | the witness binder.  I apologize. |
| 16:15:18 | 8 | (Pause.) |
| 16:15:26 | 9 | MR. ADELSON:  Sorry, your Honor.  There are |
| 16:15:28 | 10 | witness binders as well as deposition transcripts to both |
| 16:15:32 | 11 | (handing binders to the Court). |
| 16:15:33 | 12 | THE COURT:  When you say 25 pages, Mr. Adelson, |
| 16:15:51 | 13 | your saying 25 pages in each? |
| 16:15:53 | 14 | MR. ADELSON:  Yes, your Honor.  There was over |
| 16:15:59 | 15 | 450 pages of deposition testimony and we cut as much as we |
| 16:16:04 | 16 | could.  We just included in the pages for context. |
| 16:16:07 | 17 | THE COURT:  All right. |
| 16:16:09 | 18 | So, Mr. Adelson, before I go back and read these |
| 16:16:37 | 19 | 50 pages of what I'm sure is highly exciting stuff, what |
| 16:16:43 | 20 | is the best point that you make in either of these |
| 16:16:46 | 21 | depositions? |
| 16:16:47 | 22 | MR. ADELSON:  Well, your Honor, Mr. Fridriksson |
| 16:16:52 | 23 | was the patent agent. |
| 16:16:53 | 24 | THE COURT:  No.  I understand who he is. |
| 16:16:56 | 25 | MR. ADELSON:  Yes.  Okay.  He wholeheartedly |

16:16:58  1   admitted that when Klein gave him prior art references, he

16:17:02  2   took over the role of U.S. counsel.  He is the man who wrote

16:17:06  3   the applications and wrote the claims and he has made a

16:17:09  4   determination regarding the materiality of prior art

16:17:13  5   references.  So he effectively asserts the role of U.S.

16:17:17  6   counsel.  He's not a member of the patent bar.

16:17:20  7          THE COURT:  Is this inequitable conduct?

16:17:22  8          MR. ADELSON:  Yes.  If you are taking the

16:17:26  9   decisions of materiality out of the hands of U.S. counsel

16:17:30  10  who are registered to practice before the Patent Office and

16:17:33  11  withhold prior art, I would say that that is inequitable

16:17:37  12  conduct.

16:17:38  13         THE COURT:  Okay.  What's the best thing in

16:17:42  14  Mr. Herrmansson's deposition?

16:17:43  15         MR. ADELSON:  Mr. Herrmansson, he explains that

16:17:47  16  he submitted documents.

16:17:50  17         By all accounts, it appears that Mr. Herrmansson

16:17:52  18  tried to do everything he could do, including sending

16:17:55  19  e-mails with listings of prior art to Mr. Halldorsson and

16:17:59  20  Mr. Hoskuldsson.  Those documents have never made it.

16:18:03  21         THE COURT:  Well, so what I don't understand is

16:18:05  22  this.  Like you put up a spreadsheet of 15 things that

16:18:12  23  Mr. Herrmansson sent along as prior art that somehow or

16:18:17  24  other is related to, I don't know, devices for sleep

16:18:21  25  studies.

16:18:22   1          Presumably, I have no particular way of knowing

16:18:27   2   whether any of that is material.  Right?

16:18:30   3          MR. ADELSON:  Your Honor, there's a level of

16:18:33   4   materiality just based on the fact the inventor himself

16:18:38   5   thought that this is relevant information.

16:18:40   6          We believe that the Patent Office is the best

16:18:43   7   entity to make determinations of materiality.  If the

16:18:47   8   inventor thinks it is something that is relevant, it should

16:18:53   9   then be passed onto the Patent Office.

16:18:55  10          So that's --

16:18:55  11          THE COURT:  Do you have any authority for the

16:18:57  12   proposition that if an inventor says it's relevant, that

16:19:00  13   if it's not produced, that's automatically inequitable

16:19:03  14   conduct?

16:19:04  15          MR. ADELSON:  Well, Mr. Herrmansson, with

16:19:06  16   respect to the '532 patent, is the only person who signed an

16:19:09  17   inventor's oath, and the inventor's oath says your supposed

16:19:13  18   to produce all material information.

16:19:15  19          As far as I can tell, I believe that

16:19:17  20   Mr. Herrmansson actually tried to comply with that, but

16:19:21  21   others upstream from him interfered with that process.

16:19:25  22          MR. LORIMER:  Your Honor, we have to have clear

16:19:27  23   and convincing evidence on intent to deceive.  It has to be

16:19:30  24   the single most reasonable inference.  This clearly is not

16:19:33  25   that.  It's not even close.

16:19:34    1          THE COURT:  All right.  Well, so I'm handicapped
16:19:39    2   because I've got now 50 pages of stuff to look at.
16:20:07    3          So why you all come back here tomorrow morning
16:20:12    4   at 9:00 a.m., and I will see whether or not I can tell you
16:20:16    5   what I'm thinking about all of this.  Okay?
16:20:20    6          MR. ADELSON:  Thank you, your Honor.
16:20:21    7          MR. LORIMER:  Yes, sir.
16:20:22    8          THE COURT:  All right.  Also, why don't you see
16:20:26    9   if you can't agree between yourselves overnight as to how
16:20:34   10   much briefing you think you need on various motions that are
16:20:37   11   sure to be coming and also what time frame you have in mind,
16:20:46   12   though I will tell you that the time frame I have in mind
16:20:50   13   certainly requires that your briefing will be finished by
16:20:58   14   like a month from now.  All right?
16:21:02   15          So we'll be in recess.
16:21:08   16          (Court recessed at 4:23 p.m.)
16:21:08   17                  -   -   -
           18
           19
           20
           21
           22
           23
           24
           25