IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NOX MEDICAL EHF,

Plaintiff,

v.

NATUS NEUROLOGY INC.,

Defendant.

Civil Action No. 15-709-RGA

## **MEMORANDUM OPINION**

David E. Moore, Bindu A. Palapuru, Stephanie E. O'Byrne, POTTER ANDERSON &
CORROON LLP, Wilmington, DE; Chad E. Nydegger, Brent P. Lorimer, Brittany
Frandsen, WORKMAN NYDEGGER, Salt Lake City, UT.

Attorneys for Plaintiff.

Arthur G. Connolly, III, Ryan P. Newell, Mary I. Akhimien, CONNOLLY
GALLAGHER LLP, Wilmington, DE; Thomas S. Reynolds II, Alan W. Nicgorski, John
W. McCauley, Jeremy Adelson, HANSEN REYNOLDS LLC, Milwaukee, WI.

Attorneys for Defendant.

August 27, 2018

**ANDREWS, U.S. DISTRICT JUDGE:**

On August 7, 2015, Plaintiff sued Defendant for infringement of U.S. Patent No. 9,059,532 ("the '532 patent"). (D.I. 1). I held a jury trial from April 30-May 8, 2018. (D.I. 273-278 ("Tr."))[1] The jury found each of the asserted claims infringed and not invalid, and decided that Plaintiff had proven, by a preponderance of the evidence, that Defendant's infringement was willful[2] (D.I. 261). The jury awarded Plaintiff $623,175 in damages for Defendant's infringement. (*Id.*).

Presently before the Court are Plaintiff's Post-Trial Motions for (1) Enhanced Damages, (2) Exceptionality and Attorneys' Fees, (3) Pre-Judgment Interest and (4) Post-Judgment Interest (D.I. 288) and related briefing (D.I. 292, 311, 317); Plaintiff's Motion to Strike Evidence Outside of the Trial Record (and to Strike Accompanying Arguments) Proffered in Support of Defendant's Inequitable Conduct Defense (D.I. 301) and related briefing (D.I. 302, 313, 216); Defendant's Motion for Judgment that U.S. Patent No. 9,059,532 is Unenforceable Under the Doctrine of Inequitable Conduct (D.I. 289) and related briefing (D.I. 290, 300, 315); Defendant's Renewed Motion for Judgment as a Matter of Law of Invalidity and No Willfulness and Alternative Motion for a New Trial (D.I. 286) and related briefing (D.I. 287, 310, 314); and Defendant's Motion for Leave to File Sur-Reply in Opposition to Nox's Post-Trial Motions (D.I. 324).

## I.     LEGAL STANDARDS

### A.  Judgment as a Matter of Law

Judgment as a matter of law is appropriate if "the court finds that a reasonable jury would

---

[1] The trial transcript is consecutively paginated. References to the trial transcript will refer to "Tr." in lieu of the docket item reference number.

[2] The asserted claims are claims 1, 5, and 9. (D.I. 261).

not have a legally sufficient evidentiary basis to find for [a] party" on an issue. Fed. R. Civ. P. 50(a)(1). "Entry of judgment as a matter of law is a 'sparingly' invoked remedy, granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007) (citation omitted).

In assessing the sufficiency of the evidence, the Court must give the nonmovant, "as [the] verdict winner, the benefit of all logical inferences that could be drawn from the evidence presented, resolve all conflicts in the evidence in his favor and, in general, view the record in the light most favorable to him." *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1348 (3d Cir. 1991). The Court may "not determine the credibility of the witnesses [nor] substitute its choice for that of the jury between conflicting elements in the evidence." *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed. Cir. 1984). Rather, the Court must determine whether the evidence reasonably supports the jury's verdict. *See Gomez v. Allegheny Health Servs. Inc.*, 71 F.3d 1079, 1083 (3d Cir. 1995); 9B *Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure* § 2524 (3d ed. 2008) ("The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury might reasonably find a verdict for that party.").

Where the movant bears the burden of proof, the Third Circuit applies a stricter standard. *Fireman's Fund Ins. Co. v. Videfreeze Corp.*, 540 F.2d 1171, 1177 (3d Cir. 1976). To grant judgment as a matter of law in favor of a party that bears the burden of proof on an issue, the Court "must be able to say not only that there is sufficient evidence to support the [movant's proposed] finding, even though other evidence could support as well a contrary finding, but additionally that

3

there is insufficient evidence for permitting any different finding." *Id.*

**B. New Trial**

Federal Rule of Civil Procedure 59(a)(1)(A) provides, in pertinent part: "The court may, on motion, grant a new trial on all or some of the issues—and to any party— . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . ." Among the most common reasons for granting a new trial are: (1) the jury's verdict is against the clear weight of the evidence, and a new trial must be granted to prevent a miscarriage of justice; (2) newly discovered evidence exists that would likely alter the outcome of the trial; (3) improper conduct by an attorney or the court unfairly influenced the verdict; or (4) the jury's verdict was facially inconsistent. *See Zarow-Smith v. N.J. Transit Rail Operations, Inc.*, 953 F. Supp. 581, 584-85 (D.N.J. 1997).

The decision to grant or deny a new trial is committed to the sound discretion of the district court. *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980); *Olefins Trading, Inc. v. Han Yang Chem Corp.*, 9 F.3d 282, 289 (3d Cir. 1993). Although the standard for granting a new trial is less rigorous than the standard for granting judgment as a matter of law—in that the Court need not view the evidence in the light most favorable to the verdict winner—a new trial should only be granted where "a miscarriage of justice would result if the verdict were to stand" or where the verdict "cries out to be overturned" or "shocks [the] conscience." *Williamson*, 926 F.2d at 1352-53.

**C. Enhanced Damages**

The Patent Act gives the Court discretion to "increase the damages up to three times the amount found or assessed." 35 U.S.C. § 284. The Court's discretion "should be exercised in light of the considerations underlying the grant of that discretion." *Halo Elecs., Inc. v. Pulse*

*Elecs., Inc.*, 136 S. Ct. 1923, 1926 (2016). Enhanced damages are "designed as a 'punitive' or 'vindictive' sanction for egregious infringement behavior," which is "willful, wanton, malicious, bad-faith, deliberate, consciously wrong, flagrant, or—indeed—characteristic of a pirate." *Id.* at 1932. Enhanced damages are "not to be meted out in a typical infringement case." *Id.* A jury's finding of willful infringement is a prerequisite to enhancement of damages, but is not by itself sufficient. *Id.*

Where an infringer's behavior is willful, the Court may evaluate a set of "non-exclusive" factors set forth in *Read Corp. v. Portec, Inc.*, to determine if damages should be enhanced and the extent to which they should be enhanced. 970 F.2d 816, 826-27 (Fed. Cir. 1992); *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1382-83 (Fed. Cir. 2017), *pet. for cert. pending*, No. 17-1649 (filed June 8, 2018), No. 17-1497 (filed May 1, 2018). The *Read* factors include: "(1) whether the infringer deliberately copied the ideas or design of another"; "(2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed"; "(3) the infringer's behavior as a party to the litigation"; "(4) [d]efendant's size and financial condition"; "(5) [c]loseness of the case"; "(6) [d]uration of defendant's misconduct"; "(7) [r]emedial action by the defendant"; "(8) [d]efendant's motivation for harm"; and "(9) "[w]hether defendant attempted to conceal its misconduct." *Read Corp.*, 970 F.2d at 826-27.

A movant must establish its entitlement to enhanced damages under § 284 by a preponderance of the evidence. *Halo*, 136 S. Ct. at 1934.

### D. Exceptionality and Attorneys' Fees

The Patent Act provides that the court "in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. The Supreme Court has defined an "exceptional"

case as "simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014). When considering whether a case is exceptional, district courts are to exercise their discretion on a case-by-case basis, considering the totality of the circumstances. *Id.* Relevant factors for consideration include "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* at 1756 n.6 (citation omitted). A movant must establish its entitlement to attorney fees under § 285 by a preponderance of the evidence. *Id.* at 1758.

### E. Inequitable Conduct

"Inequitable conduct is an equitable defense to patent infringement that, if proved, bars enforcement of the patent." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1287 (Fed. Cir. 2011) (en banc). "To prevail on the defense of inequitable conduct, the accused infringer must prove that the applicant misrepresented or omitted material information with the specific intent to deceive the PTO." *Id.*

"In a case involving nondisclosure of information, clear and convincing evidence must show that the applicant made a deliberate decision to withhold a known material reference." *Id.* at 1290 (citing *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1181 (Fed. Cir. 1995)) (emphasis omitted).

To be material, withheld information must be "but-for" material, meaning that the "PTO would not have allowed a claim if it had been aware of" the information. *Therasense*, 649 F.3d

at 1291. Courts evaluating materiality must "apply the preponderance of the evidence standard and give the claims their broadest reasonable interpretation." *Id.* at 1291-92.

## II.  DISCUSSION

### A. Plaintiff's Post-Trial Motions for (1) Enhanced Damages, (2) Exceptionality and Attorneys' Fees, (3) Pre-Judgment Interest and (4) Post-Judgment Interest

#### i.  Enhanced Damages

Plaintiff argues that the *Read* factors support an award of enhanced damages. (D.I. 292 at 3-20; D.I. 317 at 1-8). Defendant argues the opposite. (D.I. 311 at 9-20).

The first factor, "whether the infringer deliberately copied the ideas or design of another," supports enhancement of damages. Plaintiff presented evidence that Defendant sent Plaintiff's commercial product to Defendant's Chinese manufacturer, and told the manufacturer to copy Plaintiff's product. (Tr. 302:24-303:10, 289:1-22; PTX0046 at 4). Furthermore, Defendant's director of marketing described the accused product as the "Nox knock off." (PTX0022).

Defendant does not deny that it copied Plaintiff's product. Rather, Defendant argues that Plaintiff "cannot satisfy its burden under *Read* Factor[] 1 . . . simply by pointing to pre-issuance conduct." (D.I. 311 at 9-10). However, as I instructed the jury, "[d]eliberate copying of the commercial product of the patent owner before issuance of the patent . . . can be evidence of willfulness to the extent it demonstrates [Defendant's] state of mind after the '532 patent issued and after [Defendant] became aware of it." (D.I. 259 at 33). Defendant "deliberately copied the ideas [and] design" of Plaintiff, and continued to produce copied belts after receiving notice of the '532 patent's existence. (D.I. 287 at 24). This action supports enhancement of damages. That Defendant's deliberate copying pre-dates the patent does not negate this finding, but does reduce its weight.

The second factor, "whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed," does not support enhancement of damages. In the face of evidence that it copied the commercial embodiment of the '532 patent and continued to produce copies after receiving notice of the patent's existence, Defendant presented no evidence during the jury trial that it possessed a good-faith belief that the patent was invalid.[3] Defendant tried to elicit such evidence from its damages expert, Richard Bero. (Tr. 561:4-24). However, Plaintiff objected to Defendant's effort. (Id.). I sustained Plaintiff's objection, stating that "trying to get what [Defendant] thought about whether or not the patent was invalid or not by having Mr. Bero testify about it is improper." (Tr. 617:23-618:15). I also stated, "There's actually no evidence in the record that the jury could use [to show that Defendant] thought the patent was invalid." (Id.). During the subsequent inequitable conduct trial, however, Defendant presented evidence that it challenged the validity of the European counterpart to the '532 patent before the '532 patent issued. (Tr. 996:16-1000:4; DTX1025). Accordingly, even though Defendant knew that it was copying the commercial embodiment of the '532 patent almost immediately upon the patent's issuance, it can be inferred that Defendant did so with a good-faith belief that the patent was invalid.

The third factor, "the infringer's behavior as a party to the litigation," is neutral. Plaintiff argues that Defendant engaged in litigation misconduct. (D.I. 292 at 6-10). In support of its argument, Plaintiff points to several actions taken by Defendant. Plaintiff notes that Defendant "conceded infringement" after Plaintiff "had spent the time and resources to brief summary judgment and prepare for argument on the motion." (D.I. 292 at 6 (citing D.I. 71, 59:25-63:8;

---

[3] Defendant stipulated to infringement. (D.I. 72, 73). Defendant does not argue that it had a pre-litigation good-faith belief that it did not infringe.

8

D.I. 72-73)). Plaintiff also argues that Defendant "maintain[ed] a large number of invalidity theories until the eve of trial," and represented to the Court that it did not intend to file a petition for *inter partes* review, but later did so. (D.I. 292 at 7 (citing D.I. 235-1, p. 185; D.I. 121)). Plaintiff further notes that Defendant demanded that Plaintiff's CEO Petur Halldorsson return from Iceland for the bench trial on inequitable conduct, and argues that this demand was "a waste of time and resources." (D.I. 292 at 9-10). Taken together, Plaintiff characterizes Defendant's tactics as a "campaign to spend [Plaintiff] under the table." (D.I. 292 at 6).

However, Defendant offers reasonable explanations for its conduct. (D.I. 311 at 10-15). For example, where Plaintiff accuses Defendant of conceding infringement at the last minute, Defendant argues that Plaintiff did not immediately specify any asserted claims, and notes that it stipulated to infringement when it did because it suspected that Plaintiff "was hoping to resolve the infringement question by stipulation so that it could pursue . . . narrow constructions of claim terms." (D.I. 311 at 12 (citing D.I. 1)). Where Plaintiff accuses Defendant of maintaining numerous invalidity theories until the eve of trial, Defendant notes that there were ongoing claim construction issues, but that after their resolution, Defendant reduced its number of references. (D.I. 311 at 13). Where Plaintiff accuses Defendant of being deceptive by representing to the Court that it did not intend to file a petition for *inter partes* review but later doing so, Defendant asserts that its response was "accurate and truthful at that time," and that Plaintiff "presents no evidence to the contrary." (*Id.*) (emphasis omitted). Defendant states that after its representation to the Court, it discovered that Plaintiff had petitioned the PTO to add Hoskuldsson as an inventor to the '532 patent, which made U.S. Patent No. 8,025,539 potentially invalidating prior art. (*Id.* at 13-14). Where Plaintiff accuses Defendant of wastefully asking that Halldorsson return from Iceland for examination during the bench trial on inequitable conduct, Defendant

notes that it previously "identified Halldorsson as a live witness it intended to call in its case-in-chief." (D.I. 311 at 14 (citing D.I. 235 at 21)). Plaintiff's argument is ultimately devoid of any persuasive evidence that Defendant engaged in bad faith behaviors over the course of the litigation. Accordingly, Plaintiff's argument falls short.[4]

The fourth factor, "[d]efendant's size and financial condition," is neutral. Plaintiff argues that Defendant is the wholly owned "subsidiary of Natus Medical, Inc., a public company that posted $501 million in annual revenue for 2017 that has 1,726 employees." (D.I. 292 at 10; D.I. 317 at 5). But Plaintiff did not sue Natus Medical, Inc. Rather, Plaintiff sued Defendant, a comparatively small corporation. As Defendant notes, Plaintiff offers no information about Defendant's size or financial condition. (D.I. 311 at 15-16). Plaintiff has not met its burden of showing that this fourth factor supports enhancement of damages.[5]

The fifth factor, "[c]loseness of the case," weighs against enhancement of damages. Defendant's invalidity defense made the case close.[6] Generally, Defendant notes that its obviousness defenses survived Plaintiff's Cross-Motion for Summary Judgment of No Invalidity

---

[4] Defendant moves for leave to file a sur-reply in opposition to Plaintiff's motion. (D.I. 324). Defendant's motion concerns declarations cited and arguments made by both parties that pertain to settlement. (*See, e.g.,* D.I. 311 at 10-11, D.I. 317 at 9). Statements made by parties during settlement negotiations are not usually persuasive evidence about a defendant's "behavior as a party to the litigation," as it pertains to enhancement of damages, or the "manner in which" a defendant litigated a case, as it pertains to exceptionality. And there are confidentiality issues. The back and forth on settlement is not important to my evaluation of Defendant's behavior. I will deny Defendant's Motion for Leave to File Sur-Reply in Opposition to Nox's Post-Trial Motions (D.I. 324).

[5] In its reply brief, Plaintiff notes, "In settlement negotiations[,] Jim Hawkins, CEO of Natus Medical, appeared for [Defendant]." (D.I. 317 at 5, 9). Defendant takes issue with the timing of Plaintiff's argument, and with Plaintiff's effort to "introduce its own version of the events of the parties' initial settlement efforts"—including Hawkins's presence—after "complain[ing] that [Defendant] must be precluded by Chief Magistrate Judge Thygne's mediation order from presenting the facts that forced the parties down the path of litigation . . . ." (D.I. 328). However, Hawkins's presence at settlement negotiations does not impact Defendant's size or financial condition. Accordingly, it does not impact my decision, as to the fourth factor.

[6] That Defendant stipulated to infringement and offered an arguably weak inequitable conduct defense does not mean that the case was not close. *Infra* Section II.B. Indeed, Defendant could have stipulated to infringement and offered no inequitable conduct defense, but won the case based on its invalidity defense.

Separately, to decide whether Plaintiff's willfulness was "close" in an effort to decide whether enhanced damages are warranted strikes me as a circular effort. Therefore, I decline to do so.

10

(D.I. 156). (D.I. 311 at 16 (citing D.I. 227)). Defendant also notes that the PTAB instituted *inter partes* review based on a finding that Defendant had "established a reasonable likelihood that it will prevail in challenging claims 1-9 and 12 of the '532 patent as unpatentable under 35 U.S.C. § 103(a)." (D.I. 311 at 17 (citing D.I. 146-3 at 25)).

Plaintiff argues that the case is not close, because certain claim elements are missing from both obviousness combinations proffered by Defendant: the Nox RES belt, as modified by a PHOSITA; and the Nox RES belt in view of the McIntire reference. Plaintiff specifically identifies the claimed "conductor of the electrode belt," "elongated member," "engaging member," and "receiving hole configured to fasten" limitations as definitively missing from the asserted prior art. (D.I. 292 at 11-12). Defendant correctly notes that Plaintiff's analysis "amounts to nothing more than *ipse dixit*." (D.I. 311 at 16). Indeed, Defendant presented evidence that the Nox RES belt includes a "conductor of the belt" comprising a wire spring (Tr. 646:16-647:11); that McIntire includes an "elongated member having flexibility transverse to its longitudinal axis, thus imparting flexibility to the width of the hole" (Tr. 667:22-670:7); that the Nox RES belt includes two raised "engaging members" adjacent to the receiving hole that engage and keep the conductor of the belt in place so that it is forced into contact with a lateral surface of the inserted male snap (Tr. 650:17-651:17); and that McIntire discloses "a receiving hole flexible such that it . . . fastens to a male snap" (Tr. 661:19-663:12, 855:3-7). No claim element among the asserted claims of the '532 patent stands out as being nakedly absent from the prior art. Because Defendant's invalidity defense made the case at least relatively close, the fifth *Read* factor weighs against enhancement of damages.

The sixth factor, "[d]uration of defendant's misconduct," supports enhancement of damages. As Plaintiff notes, Defendant began willfully infringing the '532 patent on June 16,

2015, the day the patent issued, and continued doing so for nearly three years. (D.I. 292 at 16 (citing PTX0116)). That three year-period stretched into this litigation. (*Id.*). Other courts have found similar periods of willful infringement, coupled with post-litigation infringement, to support enhancement. *See Broadcom Corp. v. Qualcomm Inc.*, 2007 WL 2326838, at *3 (C.D. Cal. Aug. 10, 2007) ("The length of [the infringer's] infringement (approximately two years), coupled with the fact that infringement continued after [the patentee] filed its suit, supports an increase in damages."), *vacated on other grounds,* 2007 WL 8030058 (C.D. Cal. Nov. 21, 2007); *Novozymes A/S v. Genecor Int'l, Inc.*, 474 F. Supp. 2d 592, 611 (D. Del. 2007).

The seventh factor, "[r]emedial action by the defendant," supports enhancement of damages, albeit weakly. Defendant notes that it took remedial action by initiating the launch of a replacement belt in January 2018 and depleting its inventory of the accused belt by April 2018. (D.I. 311 (citing D.I. 235, ¶ 19)). This action by itself might weigh against enhancement of damages. However, Plaintiff notes that Defendant's witnesses testified that Defendant could have avoided infringement for international sales by "simply" or "easily" shipping those sales to its Ireland warehouse rather than its Wisconsin warehouse. (D.I. 292 (citing Tr. 506:15-507:5, 560:6-561:3)). Defendant's failure to take a remedial action that was by its own witnesses' admission "simpl[e]" and "eas[y]" supports enhancement.

The eighth factor, "[d]efendant's motivation for harm," does not support enhancement. The main pieces of evidence Plaintiff offers in support of this factor are two emails from Defendant's employees, stating, "[I]f we are fast, we can stop [Plaintiff] immediately and would hit them hard," and, "We are going to steal the Pre-cut belt business from [Nox]." (D.I. 292 at 18 (citing PTX0017, PTX0058)). These emails do not strike me as displaying behavior "characteristic of a pirate." *Halo*, 136 S. Ct. at 1926. They strike me as colloquial

12

communications between colleagues about competitive business practices, rather than as a strategic decision by Defendant to harm Plaintiff.

The ninth factor, "[w]hether defendant attempted to conceal its misconduct," does not support enhancement. Plaintiff points to Defendant's arguments to the jury as indicating an effort to conceal misconduct. (D.I. 292 at 18-19). Plaintiff's efforts are off-base. The actions of Defendant's attorneys at trial have nothing to do with whether Defendant concealed its copying from Plaintiff. Defendant notes, and Plaintiff does not dispute, that it sold the accused product openly. (D.I. 311 at 20; D.I. 317 at 8).

Weighing the *Read* factors and considering the totality of the circumstances, I find that enhancement of damages is not warranted. Even though the evidence shows that Defendant deliberately copied Plaintiff's product, it also shows that Defendant possessed a good-faith belief that the '532 patent was invalid, a belief it had formed before the patent issued. This good-faith belief, coupled with the closeness of the invalidity issues at trial, outweighs Defendant's deliberate copying, duration of misconduct, and failure to take easy remedial action. Defendant's behavior falls short of the "willful, wanton, malicious, bad faith, deliberate, consciously wrong, flagrant," or pirate-like behavior required to award enhanced damages. Accordingly, I decline to increase the damages awarded by the jury.

I will deny Plaintiff's Post-Trial Motion, as to Enhanced Damages (D.I. 288).

### ii. Exceptionality and Attorneys' Fees

An "exceptional" case is "simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness*, 134 S. Ct. at 1756.

13

Plaintiff was the prevailing party. But this case is not "exceptional." As discussed above, Defendant presented an invalidity defense that was at least somewhat "close." *Supra* Section II.A.i. Defendant's "litigating position" was therefore not "unreasonable." Furthermore, I found that "the infringer's behavior as a party to the litigation" was not "unreasonable," because Defendant offers reasonable explanations for its conduct for its litigation behavior. *Id.*

Plaintiff's argument that this case is "exceptional" is weaker than its case that damages should be enhanced. (D.I. 292 at 20-24). The *Read* factors that support enhancement— deliberate copying, duration of misconduct, and failure to take easy remedial action—pertain exclusively to Defendant's business conduct. The *Octane Fitness* standard, on the other hand, emphasizes post-litigation attorney conduct. Plaintiff has not shown that any such conduct by Defendant or its attorneys warrants a finding that this case is "exceptional" or that Plaintiff should be awarded attorneys' fees.

I will deny Plaintiff's Post-Trial Motion, as to Exceptionality and Attorneys' Fees. (D.I. 288).

### iii. Pre-Judgment and Post-Judgment Interest

Plaintiff argues that it is entitled to pre- and post-judgment interest. (D.I. 292 at 24). Courts award pre-judgment interest to "compensate[] the patent owner for the use of its money between the date of injury and the date of judgment." *Oiness v. Walgreen Co.*, 88 F.3d 1025, 1033 (Fed. Cir. 1996). The Court has broad discretion to select the pre-judgment interest rate to be applied, and the Federal Circuit has held that application of the U.S. prime rate is appropriate even if there is no evidence that the patent holder borrowed at the prime rate. *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1991). Likewise, post-judgment "interest

shall be allowed on any money judgment in a civil case recovered in the district court." 28
U.S.C. § 1961.

Plaintiff further argues that the interest rate should be adjusted using the Icelandic prime
lending rate. (D.I. 292 at 24-25). In support, Plaintiff notes that it "incurs most of its operational
expenses in Icelandic kronas," and if Plaintiff had borrowed money, "it would have borrowed it
from an Icelandic bank, at the Icelandic prime rate, which was higher than the prime rate in the
U.S." (*Id.*). Plaintiff represents that the "difference in value due to the changes in the exchange
rates amounts to $61,997." (D.I. 292 (citing D.I. 292-2, Exh. 10 at ¶¶ 3-8; D.I. 292-2, Exh. 11 at
¶¶ 8-11)).

Defendant does not dispute that an award of interest is appropriate. (D.I. 311 at 25).
However, Defendant argues that Plaintiff "cites no authority . . . for either of the propositions
posited by [Plaintiff] that this interest rate should be adjusted according to the Icelandic prime
lending rate, or by fluctuations in the exchange rate between U.S. dollars and Icelandic krona."
(*Id.*).

In response, Nox only reiterates that pre-judgment interest is to "compensate[ ] the patent
owner for the use of its money between the date or injury and the date of judgment," cites 35
U.S.C. § 284, and argues that "the adjustments [Plaintiff] requests based on the Icelandic prime
lending rate and the fluctuations in the exchange rate serve" the purpose of those rules. (D.I. 317
at 10).

I agree with Defendant that Plaintiff has not shown that the interest rate should be
adjusted according to the Icelandic prime lending rate, or by fluctuations in the exchange rate
between U.S. dollars and Icelandic krona. Accordingly, I will deny Plaintiff's Post-Trial Motion
(D.I. 288), insofar as it requests that pre-judgment and post-judgment interest should be so

adjusted. However, I will grant Plaintiff pre-judgment interest at the U.S. prime rate, compounded quarterly. I will also award post-judgment interest at the rate provided by the statute. *See* 28 U.S.C. § 1961(a).

### B. Defendant's Motion for Judgment that U.S. Patent No. 9,059,532 is Unenforceable Under the Doctrine of Inequitable Conduct and Plaintiff's Motion to Strike Evidence Outside of the Trial Record and to Strike Accompanying Arguments Proffered in Support of Defendant's Inequitable Conduct Defense

#### i. Plaintiff's Motion

As a preliminary matter, Plaintiff argues that Defendant should not be permitted to rely on certain evidence it cites in support of its Motion for Judgment that U.S. Patent No. 9,059,532 is Unenforceable Under the Doctrine of Inequitable Conduct. (*See generally* D.I. 301, 302).

Plaintiff argues that in support of Defendant's post-trial motion for judgment of inequitable conduct (D.I. 289), "[Defendant] has submitted and relies on 13 items of evidence that were fully available to [Defendant] before and during the [inequitable conduct] trial, but which were not offered or admitted." (D.I. 302 at 1). Plaintiff moves "for an order striking the proffered evidence . . . because it is not properly before the Court, not having been admitted during trial." (D.I. 302 at 1).

Plaintiff relies on Federal Rule of Civil Procedure 52(b), which holds that a party may seek to have the Court amend its findings or to make additional findings, but "the trial record must support whatever additional findings of fact or conclusions of law a party seeks under Rule 52(b) or it is certainly not entitled to them." (D.I. 302 at 5 (citing *United States Gypsum Co. v. Schiavo Bros., Inc.*, 668 F.2d 172, 180 (3d Cir. 1981)). However, as Defendant notes, Rule 52(b) applies to motions "filed . . . after entry of judgment." Fed. R. Civ. P. 52(b). I have not entered judgment. Furthermore, during trial, I suggested that Defendant could enter inequitable conduct-related documents into the record without a testifying witness. (Tr. 831:17-18).

Accordingly, I will deny Plaintiff's Motion to Strike Evidence Outside of the Trial Record and to Strike Accompanying Arguments Proffered in Support of Defendant's Inequitable Conduct Defense (D.I. 301). I will consider all evidence cited by Defendant in its brief.

### ii. Defendant's Motion

"In an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a). I made findings of fact on the record after the close of evidence. (Tr. 1068:10-1072:2). This opinion provides my conclusions of law.

To prevail on the defense of inequitable conduct, an accused infringer must prove by clear and convincing evidence that the applicant (a) had a specific intent to deceive the PTO, and (b) withheld or misrepresented material information. *Therasense*, 649 F.3d at 1287, 1290.

To be material, withheld information must be "but-for" material, meaning that the "PTO would not have allowed a claim if it had been aware of" the information. *Therasense*, 649 F.3d at 1291. Courts evaluating materiality must "apply the preponderance of the evidence standard and give the claims their broadest reasonable interpretation." *Id.* at 1291-92.

Defendant offers two theories in support of its inequitable conduct defense. First, Defendant argues, "The evidence shows that Hoskuldsson, Halldorsson and Hermannsson filed unmistakably false statements with the PTO to add Hoskuldsson as an inventor when he is not an inventor." (D.I. 290 at 3-4 (citing DTX1024; D.I. 175-8, Exh. B at p. 75-77 (Hoskuldsson's sworn statement to the PTAB))). Second, Defendant argues, "During prosecution of the '532 Patent, each of Hermannsson, Hoskuldsson and Fridriksson had a duty to disclose material information to the PTO, but all of them intentionally withheld material information on

[Plaintiff's] prior art RIP belts to deceive the PTO into allowing the claims of that patent." (D.I. 290 at 6).

Several facts underlie Defendant's theories.

During prosecution of the '532 patent, Plaintiff's employee Kormakur Hermannsson, Plaintiff's employee Sveinbjorn Hoskuldsson, and Plaintiff's Icelandic attorney Einar Fridriksson disclosed prior art reference U.S. Patent No. 8,025,539 ("the '539 patent") and its corresponding published application to the patent examiner. (D.I. 290 at 6; D.I. 1-1, Exh. C at p. 16-17).

At the time, Hermannsson was listed as the sole inventor of both the '539 patent and the application that would later become the '532 patent. (D.I. 1-1, Exh. C; D.I. 139-11, Exh. P). Therefore, under the "unity of inventorship" doctrine of 35 U.S.C. § 102(e), the examiner could not actually consider the '539 patent as prior art. Nonetheless, the examiner acknowledged having considered the '539 patent on June 22, 2014. (PTX0129 at NOX00017). The '539 patent also appears on the face of the '532 patent. (PTX0002).

Even though Plaintiff disclosed the '539 patent to the PTO, Plaintiff did not disclose several other pieces of prior art, including the Nox RES belt, the 2009 CareFusion Catalog, certain International Design Registrations, and the Nox PRIP Belt. (D.I. 290 at 7-9 (citing D.I. 1-1, Exh. C)). Hoskuldsson and Plaintiff's CEO Halldorsson testified that the Nox RES belt is the commercial embodiment of the '539 patent, and is the device shown in the CareFusion catalog. (Tr. 1013:1-18, 1024:7-11, 1056:23-1057:3, 1058:7-21). The International Design Registrations (WO/D071077-001 and WO/D071077-002; D.I. 235 at 11, ¶ 45) do not add anything beyond what is disclosed in the '539 patent. (Tr. 1071:16-18). The Nox PRIP belt is a "Nox RIP belt that was publicly displayed in the U.S. in March of 2008," and "includes a plastic

connector frame having a fastener that fastens the frame to a flexible textile electrode belt." (D.I. 290 at 9 (citing D.I. 157 at 7, ¶ 14, DTX0201)).

Nonetheless, the PTO allowed the '532 patent on June 16, 2015. (D.I. 1-1, Exh. C).

Seven months after the '532 patent issued and five months after this litigation commenced, Hoskuldsson, Hermannsson, and Halldorsson filed statements with the PTO to add Hoskuldsson as an inventor on the '532 patent. (DTX1024). Defendant alleges that Plaintiff did not notify Defendant of this change and did not submit inventorship change documents in the prosecution history Plaintiff filed with the Court. (D.I. 290 at 2 (citing PTX0129)).

At trial, Hoskuldsson testified that Hermannsson was the "sole designer of the disposable belt" of claim 1. (Tr. 1055:22-24). However, he also testified that he contributed the "teeth" of claim 8. (Tr. 1038:6-16, 1039:1-1040:5). Hoskuldsson testified that he was desk partners with Hermannsson. (Tr. 1039:1-6). Hermannsson testified that the pair often exchanged ideas on an informal basis. (D.I. 291-16, Exh. P at 124:12-126:1). During one of these exchanges, testified Hoskuldsson, he found Hermannsson's idea for adjusting the belt size to be unworkable, so he proposed the claimed "teeth." (Tr. 1039:1-20). Hoskuldsson further testified that he was unfamiliar with U.S. law defining inventorship, and that he thought his contribution of the claimed "teeth" was minor enough that it would not bestow "inventor" status. (Tr. 1041:9-20, 1050:24-1051:4, 1055:9-12). Plaintiff asserts that during document production in this litigation, it discovered sketches drawn by Hoskuldsson showing the claimed teeth. (D.I. 300 at 3 (citing Tr. 994:17-995:5, 995:18-996:4, 996:9-15, 1039:1-12)). Plaintiff says that it added Hoskuldsson "as an inventor because it believed that the sketches showed him to be a co-inventor of at least some claims of the '532 patent." (D.I. 300 at 3 (citing Tr. 994:17-996:4)).

Given these facts, both of Defendant's theories in support of its inequitable conduct defense fall short.

As to the first theory, Defendant does not come close to proving by clear and convincing evidence that intent to deceive the PTO is the single most reasonable inference drawn from Plaintiff's addition of Hoskuldsson as an inventor of the '532 patent. *Therasense*, 649 F.3d at 1290. Rather, at trial, I found Hoskuldsson credible, and believed his testimony that he did not lie when he signed the certificate of correction. (Tr. 1068:10-12, 18-20). I found his explanation for the delay in his being added as an inventor to be "the simplest explanation and the one that is most likely to be true."[7] (Tr. 1069:18-1070:3). Defendant does not offer any coherent explanation as to why Hoskuldsson would have been added as an inventor if those concerned had not thought it was true.

As to the second theory, Defendant likewise does not come close to proving by clear and convincing evidence that intent to deceive the PTO is the single most reasonable inference drawn from Plaintiff's failure to disclose the Nox RES belt, the 2009 CareFusion Catalog, certain International Design Registrations, and the Nox PRIP Belt. *Therasense*, 649 F.3d at 1290. I found Hoskuldsson, Halldorsson, Hermannsson, and Fridriksson credible, and found no proof that they knew about the obscure "unity of inventorship" doctrine. (Tr. 1068:18-1069:1, 1069:7-17). Nox disclosed the '539 patent to the PTO. (D.I. 290 at 6; D.I. 1-1, Exh. C at p. 16-17). The Nox RES belt was the embodiment of the '539 patent, and therefore, believing that it was cumulative seems perfectly reasonable. The 2009 CareFusion Catalog and the International

---

[7] Defendant argues that Hoskuldsson, Halldorsson, and Hermannsson "filed unmistakably false statements with the PTO to add Hoskuldsson as an inventor to the '532 Patent when he is not an inventor." (D.I. 290 at 3-4). Defendant urges that such false statements are "inherently material." (*Id.* at 4). Given my finding that Hoskuldsson, Halldorsson, and Hermannsson did not act with intent to deceive the PTO, I need not evaluate Defendant's materiality argument.

Design Registrations were not material. (Tr. 1071:10-23). Therefore, I find it overwhelmingly likely that the inventors, Halldorsson, and Fridriksson, believed they were under no obligation to disclose the Nox RES belt, 2009 CareFusion Catalog, and International Design Registrations. When an applicant believes a reference to be cumulative of another reference before the PTO, he cannot form the required intent to deceive. *Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.*, 628 F.3d 1359, 1379 (Fed. Cir. 2010). Therefore, I find that Defendant has not shown that Plaintiff intended to deceive the PTO. Defendant's theory that Hoskuldsson, Halldorsson, Hermannsson, and Fridriksson exploited the "unity of inventorship" doctrine to deceive the PTO into allowing the '532 patent does not hold up as a reasonable inference, let alone the single most reasonable inference. (Tr. 1071:10-1072:3).

Whether the Nox RES belt was material is a difficult issue. Plaintiff argues, "An undisclosed reference that is cumulative of prior art submitted to the PTO cannot support a finding of inequitable conduct because the fact that a reference is cumulative negates a finding of materiality." (D.I. 300 at 9 (summarizing *Technology Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1337 (Fed. Cir. 2008)). As previously stated, I find that Hoskuldsson, Halldorsson, Hermannsson, and Fridriksson could have reasonably believed the Nox RES belt to be cumulative of the '539 patent. However, the '539 patent was not legally prior art when the examiner considered it. PTO examiners are presumed to do their jobs correctly. *Microsoft Corp v. i4i Ltd. P'ship*, 131 S. Ct. 2238. 2243 (2011). Accordingly, I assume that the examiner did not actually consider the '539 patent. As Defendant argues, "The withheld . . . references were not cumulative of [the '539 patent] for at least the reason that by law the PTO could not have substantively considered [the '539 patent's] disclosures." (D.I. 290 at 7). It is unnecessary to

decide the materiality of the Nox RES belt, and therefore, I make no explicit finding as to its materiality.[8]

Defendant has presented only a conclusory argument that Defendant intended to deceive the PTO by failing to disclose the PRIP Belt. (D.I. 290 at 10). In a single sentence, Defendant explains that the PRIP belt is "but-for" material, because had it been known to the examiner, Plaintiff could not have argued that "Gobron . . . fails to disclose or suggest" the limitations of Claim 1, including "a fastener configured to fasten the frame to a first end of [an] electrode belt." (D.I. 290 at 9 (citing PTX0129 at NOX00064)). Defendant's brief explanation cannot satisfy its burden of showing that the examiner would not have allowed the '532 patent had he seen the PRIP Belt. (Tr. 1071:16-18).

Defendant has not proved intent to deceive by clear and convincing evidence. I will deny Defendant's Motion for Judgment that U.S. Patent No. 9,059,532 is Unenforceable Under the Doctrine of Inequitable Conduct (D.I. 289).

## C. Defendant's Renewed Motion for Judgment as a Matter of Law of Invalidity and No Willfulness and Alternative Motion for a New Trial

### i. Invalidity

Defendant makes two arguments in support of its Motion, as to invalidity.

First, Defendant argues, "The Court should reconsider its claim construction rulings, and grant [Defendant] . . . a new trial."[9] (D.I. 287 at 3). Defendant asks the Court to reconsider its

---

[8] Plaintiff notes, "The PTAB considered [the '539 patent] under the preponderance of the evidence standard and the [broadest reasonable interpretation] claim construction standard and ruled that [the'539 patent] does not disclose the limitation requiring that the conductor pass through the receiving hole." (D.I. 300 at 10 (citing PTX0108 at 14)). Given that Defendant "has not identified any other reference before the examiner that supplies the missing limitation and has not identified any reason a PHOSITA would have modified [the '539 patent] to include it," argues Plaintiff, the '539 patent "was not 'but-for' material." (D.I. 300 at 10). If the '539 patent was not "but-for" material, then the cumulative Nox RES belt would not be "but-for" material, either.

[9] In its opening brief, Defendant argued that the Court should reconsider its construction and grant judgment as a matter of law. (D.I. 287 at 3). However, in its reply brief, Defendant withdrew that request. (D.I. 314 at 1 n.1).

constructions for three terms: "receiving hole being configured to function as a female snap button fastener . . . for receiving and fastening a . . . snap connector electrode," "passing through the receiving hole," and "conductor of the electrode belt." (*Id.* at 3-9).

Defendant's arguments amount to a re-hash of its original claim construction arguments. (*See* D.I. 63, 78, 175, 226). Defendant's Motion also amounts to an improper motion for reconsideration of the Court's claim construction. As Plaintiff notes, Local Rule 7.1.5(a) requires motions for reargument to "be filed within 14 days after the Court issues its opinion or decision." (D.I. 310 at 2). The Court ruled on claim construction issues in January 2017 (D.I. 78, 82) and February 2018 (D.I. 227, 230). Accordingly, I will deny Defendant's request that the I reconsider my claim construction and grant a new trial.

Second, Defendant argues, "The Court should find as a matter of law that the asserted claims of the '532 patent are invalid as obvious in view of the Nox RES belt and McIntire." (D.I. 287 at 9). Defendant argues that all "limitations of claim 1 are taught by the Nox RES belt and McIntire"; "the [additional] limitations of [dependent] claims 5 and 9 are taught by McIntire"; McIntire "provides express reasons to combine its teachings with" the Nox RES belt; and Plaintiff "did not demonstrate a nexus between the limitations of claims 1, 5, and 9 and any purported secondary consideration." (D.I. 287 at 9-19).

Plaintiff responds that several limitations of claim 1 are not present in the prior art. First, Plaintiff argues, "The issue of whether the [Nox] RES belt discloses 'passing through the receiving hole' turns on what structure in the RES belt constitutes 'the receiving hole,' which was a fact for the jury to determine." (D.I. 310 at 5). Plaintiff continues, "Three alternatives of what constitutes the 'receiving hole' in the RES belt were presented to the jury," including Mr. Oslan's testimony that the "receiving hole" is defined "by the plastic material of the connector."

(*Id.* at 6 (citing Tr. 756:8-12)).  Under Mr. Oslan's "alternative," where the receiving hole is "defined by the plastic material," argues Plaintiff, there "is no evidence in the record that . . . the conductor of the belt 'passes through the receiving hole.'"[10]  (D.I. 310 at 7 (citing Tr. 758:23-759:8, 757:1-758:16)).  Second, Plaintiff argues, "[S]ubstantial evidence was presented [at trial] to support the jury's implicit finding that it was the spring force of the wire spring, not the plastic ridges [Defendant] argues are 'engaging members,' that forces the wire spring into contact with the male electrode in the manner claim 1 requires."[11]  (D.I. 310 at 15 (citing Tr. 650:6-651:7, 717:23-720:3)).

I agree with Plaintiff that a reasonable jury could have found that the "passing through the receiving hole" and "engaging member" limitations were not present in the asserted prior art. Such findings would result in the invention being nonobvious.  And Defendant has not shown that the jury's verdict is against the clear weight of the evidence.  Accordingly, I will deny Defendant's Renewed Motion for Judgment as a Matter of Law of Invalidity and No Willfulness and Alternative Motion for a New Trial, as to invalidity.[12]

### ii.  Willfulness

Defendant argues that Court should enter judgment as a matter of law of no willfulness. (D.I. 287 at 19).  Defendant argues, "[Plaintiff's] willfulness case at trial was based entirety on [Defendant's] pre-issuance conduct and thus erroneously focused on a period of time during

---

[10] Defendant relied solely on the Nox RES belt as disclosing the "through the receiving hole" limitation. (D.I. 310 at 5).

[11] Likewise, Defendant relied solely on the Nox RES belt as disclosing the "engaging members" limitation. (D.I. 314 at 5).

[12] Plaintiff makes other arguments, including that "[s]ubstantial evidence supports the jury's finding that the wire spring of the RES belt is not part of the 'conductor of the electrode belt,'" and "[s]ubstantial evidence supports the jury's finding that there was no reason to combine McIntire with the RES Belt" to arrive as the "receiving hole being configured to . . . fasten" limitation.  (D.I. 310 at 7-14).  The parties also argue about secondary considerations of nonobviousness.  (D.I. 310 at 16-20; D.I. 314 at 6-7).  In light of my conclusions about the "passing through the receiving hole" and "engaging member" limitations, I need not assess these other arguments.

24

which [Defendant] simply could not have had the requisite subjective intent to willfully infringe the then-non-existent '532 Patent, or for that matter, could not have infringed at all." (D.I. 287 at 22). Among other evidence of pre-issuance copying, Plaintiff pointed to an email sent more than two years before the '532 patent issued (PTX0022). Defendant also notes, "[T]he only evidence of post-issuance conduct [Plaintiff] introduced was that it notified [Defendant] of the '532 Patent on the date of its issuance and that [Defendant] continued to manufacture and sell the accused belts." (D.I. 287 at 24).

I instructed the jury, "Deliberate copying of the commercial product of the patent owner before issuance of the patent . . . can be evidence of willfulness to the extent to it demonstrates [Defendant's] state of mind after the '532 patent issued and after [Defendant] became aware of it." (D.I. 259 at 33). Accordingly, a reasonable jury could have concluded that Defendant's infringement was willful on the basis of Defendant's post-issuance conduct, which includes what it knew it had done before issuance. I will deny Defendant's Renewed Motion for Judgment as a Matter of Law of Invalidity and No Willfulness and Alternative Motion for a New Trial, as to willfulness.

## III.  CONCLUSION

A separate order will be entered.